ORIGINAL

Approved: [signature]
THANE REHN/CECILIA VOGEL
Assistant United States Attorneys

DOC #

Before: THE HONORABLE ONA T. WANG
United States Magistrate Judge
Southern District of New York

20 MAG 8521

UNITED STATES OF AMERICA

- v. -

SUKHROB SOBIROV
and ABDURAFIK SAMIYEV,

Defendants.

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 371, 1344, and 1960

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

ZACHARY CARROLL, being duly sworn, deposes and says that he is a Special Agent with Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNT ONE**

(Conspiracy to Operate an Unlicensed Money Transmitting Business)

1. From at least in or about May 2019, up to and including the present, in the Southern District of New York and elsewhere, SUKHROB SOBIROV and ABDURAFIK SAMIYEV, the defendants, and others known and unknown, knowingly and willfully did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960.

2. It was a part and object of the conspiracy that SUKHROB SOBIROV and ABDURAFIK SAMIYEV, the defendants, and others known and unknown, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and

foreign commerce, which (a) was operated without an appropriate money transmitting license in a State where such operation was punishable as a misdemeanor and a felony under State law, and (b) failed to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, to wit, SOBIROV and SAMIYEV and their co-conspirators used companies they owned and controlled in Brooklyn, New York, to transmit money from, through, and out of the United States, including money transmitted through the Southern District of New York, without an appropriate state license, which conduct was punishable as a misdemeanor under New York law, and without meeting the Federal registration requirements set forth for money transmitting businesses.

Overt Acts

3. In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York:

a. On or about July 28, 2020, SUKHROB SOBIROV, the defendant, picked up $80,000 in cash at a location in Manhattan, New York.

b. On or about July 29, 2020, ABDURAFIK SAMIYEV, the defendant, wrote a check for $28,302 payable to a bank account located in Manhattan, New York.

(Title 18, United States Code, Section 371.)

**COUNT TWO**

(Conspiracy to Corruptly Influence a Bank Officer)

4. From at least in or about July 2020 up to and including the present, in the Southern District of New York and elsewhere, SUKHROB SOBIROV, the defendant, and others known and unknown, did willfully and knowingly combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Section 215(a)(1).

5. It was a part and object of the conspiracy that SUKHROB SOBIROV, the defendant, and others known and unknown, would and did corruptly give, offer, and promise a thing of value to a person, to wit, a sum of money greater than $1,000,

with the intent to influence and reward an officer, director, employee, agent, and attorney of a financial institution, in connection with a business and transaction of such institution, in violation of Title 18, United States Code, Section 215(a)(1).

Overt Act

6. In furtherance of said conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York:

c. On or about August 11, 2020, SUKHROB SOBIROV, the defendant, delivered $10,000 to a person believed by SOBIROV to be an employee of a financial institution at a location in Manhattan, New York.

(Title 18, United States Code, Section 371.)

**COUNT THREE**

(Bank Fraud)

7. From at least in or about May 2019 up to and including the present, in the Southern District of New York and elsewhere, ABDURAFIK SAMIYEV, the defendant, did knowingly execute and attempt to execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations, and promises, to wit, SAMIYEV knowingly made, and aided and abetted the making of, material misrepresentations to a federally insured financial institution and others in order to deceive that financial institution into allowing a company operated by SAMIYEV to operate and process financial transactions through the institution, and in doing so, obtained and attempted to obtain moneys, funds, and property owned by and under the custody and control of such financial institutions.

(Title 18, United States Code, Sections 1344 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8. I am a Special Agent with FBI and I have been personally involved in the investigation of this matter. This

affidavit is based upon my investigation, my conversations with witnesses and other law enforcement agents, and my review of bank records and websites. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview

9. From my participation in this investigation, I have learned about a network of companies (the "Network") operating in and around the New York City area as unlicensed money transmitting businesses for the purpose of moving funds primarily from within the United States to companies located outside of the United States. In the course of the investigation, I and other law enforcement agents have reviewed bank and other financial records, debriefed witnesses, conducted surveillance, and reviewed electronic evidence, and have learned that some of the Network companies have legitimate business operations in addition to being used as unlicensed money transmitting businesses, while other Network companies have no apparent legitimate business activity and exist solely as unlicensed money transmitting businesses. I have learned that, to perpetrate the scheme, the individuals who operate Network companies have made false statements to banks for the purpose of inducing the banks to open bank accounts in the name of the companies and execute transactions for the companies.

The Undercover Transactions

10. In the course of the investigation, I and other law enforcement officers have worked with an individual who has historically conducted business with companies in the Network ("CS-1"). CS-1 owns and operates an electronics wholesale company in Manhattan, New York (the "CS-1 Company"), has been arrested and criminally charged in the Southern District of New York with receipt of stolen property, and is cooperating with law enforcement in the hope of obtaining leniency. To date, information received from CS-1 has proven reliable and has been corroborated by independent sources of evidence.

11. Following CS-1's arrest, at the direction of law enforcement, CS-1 continued to maintain contact with individuals involved in the Network, including an individual not charged in this Complaint ("CC-1"), and SUKHROB SOBIROV, the defendant, and

recorded certain conversations and messages that CS-1 had with CC-1 and SOBIROV. In the course of my involvement with CS-1's cooperation, I have learned, among other things, the following:

a. From in or around February 2020 through in or about July 2020, CS-1 exchanged messages with CC-1 in which CS-1 represented, in substance and in part, that CS-1 was in possession of cash and needed to move it into a bank account (the "Sting Bank Account"), which was held at a bank located in Manhattan, New York ("Bank-1"). CC-1 offered to facilitate this request by placing CS-1 in contact with an associate of CC-1, later identified as SOBIROV, and, among other things, provided CS-1 with a phone number ("Number-1"), which law enforcement subsequently identified on the basis of subscriber records to be subscribed in the name "Sukhrob Sobirov."

b. CS-1 and SOBIROV, using a telephone assigned Number-1, had telephone and text communications, and agreed that SOBIROV would meet with CS-1 at a location in Manhattan, New York, to pick up cash from CS-1.

c. On or about June 16, 2020, CS-1 met with SOBIROV at a location in Manhattan, New York, and delivered $26,000 in cash to SOBIROV. I and other law enforcement agents conducted surveillance of this meeting and identified that the person CS-1 met with appeared to match a known photograph of SOBIROV obtained from the New York Department of Motor Vehicles, and CS-1 also identified SOBIROV to law enforcement agents following this meeting. At this meeting, SOBIROV took possession of the $26,000 in cash and counted it in the presence of CS-1.

d. On or around June 16, 2020, the Sting Bank Account received a deposited check of $25,640 from a bank account owned by a company named Manipal Drugs. The difference between the $26,000 in cash provided by CS-1 to SOBIROV and the $25,640 deposited into the Sting Bank Account represented the agreed-upon fee owed to the money transmitting operation for conducting the transaction.

e. On or about July 28, 2020, CS-1 again met with SOBIROV at a location in Manhattan, New York, and delivered $80,000 in cash to SOBIROV. I and other law enforcement agents conducted surveillance of this meeting and identified that the person CS-1 met with appeared to match a known photograph of SOBIROV, and CS-1 also identified SOBIROV to law enforcement agents following this meeting. At this meeting, SOBIROV took possession of the $80,000 in cash and counted it in the presence of CS-1.

f. On or around July 29, 2020, the Sting Bank Account received four deposited checks for a total of $50,000 from a bank account in the name of a company named Boulevard 9229 LLC, and one deposited check for $28,302 from a bank account in the name of a particular company ("Company-1" and the "Company-1 Bank Account"). The difference between the $80,000 in cash provided by CS-1 to SOBIROV and the $78,302 transferred to the Sting Bank Account represented the agreed-upon fee owed to the money transmitting business for conducting the transaction.

g. In or around June 2020, CC-1 began sending Whatsapp text messages to CS-1 in which CC-1 inquired, in sum and substance, whether CS-1 could use a bank account in the name of the CS-1 Company held at a bank ("Bank-2") in Manhattan, New York (the "CS-1 Company Bank Account") to receive money from other companies and transmit that money to companies located outside the United States. Acting at the direction of law enforcement, CS-1 agreed to conduct such money transmitting transactions at CC-1's direction. CS-1 and CC-1 further discussed, in sum and substance, that the payments into the CS-1 Company Bank Account should indicate that they are connected to electronics sales, because the CS-1 Company was an electronics wholesale company.

h. From on or about July 9, 2020, to on or about July 29, 2020, the CS-1 Company Bank Account received deposits of 13 checks for a total of $639,420 from the Company-1 Bank Account. The CS-1 Company did not provide any goods or services to Company-1 in connection with these payments, but eight of the checks from Company-1 falsely stated that the purpose of the payment was for "Electronics" in the memo line.

i. From on or about July 9, 2020, to on or about July 21, 2020, acting at the direction of law enforcement, CS-1 transferred some of the funds received from Company-1 from the CS-1 Bank Account to a bank account in the name of a Chinese company (the "Chinese Company"), which was provided to CS-1 by CC-1 via Whatsapp. The Chinese Company did not provide any goods or services to the CS-1 Company in connection with these transfers, but the sole purpose of the transfers was to transmit money received from the Company-1 Bank Account to the Chinese Company.

j. CS-1 did not transfer funds received from Company-1 to the Chinese Company after July 21, 2020. CC-1 and CS-1 discussed this issue over Whatsapp text and audio communications. Acting at the direction of law enforcement, CS-1

informed CC-1, in sum and substance, that the CS-1 Company Bank Account was being held up by Bank-2 due to concerns about the suspicious transactions that had been conducted in the account.

k. CC-1 and CS-1 conducted further Whatsapp text and audio communications, in which CS-1 suggested, in sum and substance, giving a "gift" to the Bank-2 employee who handled the CS-1 Company Bank Account to induce Bank-2 to release the funds from the account.

l. Acting at the direction of law enforcement, CS-1 introduced CC-1 via Whatsapp to an undercover agent ("UC-1") who CS-1 identified as a Bank-2 employee. CC-1 exchanged Whatsapp communications with UC-1 and agreed, in sum and substance, to arrange a meeting at which a confederate of CC-1's would deliver $10,000 in cash to UC-1 in exchange for the release of the funds from the CS-1 Company Bank Account. CC-1 and UC-1 further agreed, in sum and substance, that the confederate would provide UC-1 with the CS-1 Company Bank Account Number at the meeting, to confirm the purpose of the meeting.

m. On or about August 11, 2020, UC-1 met with SOBIROV at a pre-arranged location in Manhattan, New York. I and other law enforcement agents conducted surveillance of this meeting and positively identified SOBIROV, and UC-1 carried covert audio recording equipment and recorded this meeting. I have discussed this meeting with UC-1 and have reviewed the audio recording of the meeting.

n. During the August 11, 2020 meeting, SOBIROV wrote down the CS-1 Company Bank Account number on a piece of paper and gave it to UC-1, and gave UC-1 an envelope containing $10,000 in cash. SOBIROV also stated, in sum and substance and among other things, that he understood UC-1 to be a Bank-2 employee, that he was the person who performed most of the cash deliveries for CC-1, and that UC-1 could reach out to SOBIROV with any further inquiries.

o. Following the August 11, 2020 meeting with SOBIROV, UC-1 spoke with CC-1, who stated, in sum and substance, that SOBIROV could perform services for UC-1 including opening a bank account.

<u>The SAMIYEV Bank Account</u>

12. From my review of records provided by Bank-2, which is the bank where the Company-1 Bank Account is held, I have learned the following, among other things:

a. The Company-1 Bank Account was opened on or about May 31, 2019, by ABDURAFIK SAMIYEV, the defendant, who provided government-issued documentation that he was the owner of Company-1 and identified himself to Bank-2 as the president and owner of Company-1. SAMIYEV is the only signatory on the Company-1 Bank Account.

b. At the time SAMIYEV opened the Company-1 Bank Account, SAMIYEV informed Bank-2 that Company-1 was a marketing and consulting company, and provided an address in Brooklyn, New York, as the business address for Company-1 (the "Company-1 Address"). SAMIYEV also informed Bank-2 that Company-1 has ten employees.

c. On or about July 29, 2020, a check in the amount of $28,302 was drafted payable from the Company-1 Bank Account to the Sting Bank Account.

d. From on or about July 9, 2020, a total of 13 checks for a total of $639,420 were drafted payable from the Company-1 Bank Account to the CS-1 Company Bank Account. I have compared the signature on 12 of these checks to SAMIYEV's signature as it appears on the signature card for the Company-1 Bank Account and they appear to be the same. Eight of these checks falsely stated in the memo line that the purpose of the payment was for "electronics."

e. Based on my review of account records for the Company-1 Bank Account, and on my training and experience, the transaction activity in the Company-1 Bank Account is inconsistent with the use of the Company-1 Bank Account for a marketing and consulting business employing ten people. For instance, there are no apparent payroll expenses.

f. Based on my review of account records for the Company-1 Bank Account, and my training and experience, the transaction activity in the Company-1 Bank Account indicates that the account is used for money transmitting activities. For instance:

i. On July 1, 2019 and July 2, 2019, four checks from a purported real estate company (the "Real Estate Company") were deposited into the Company-1 Bank Account for a total of $100,000. Between July 2, 2019 and July 10, 2019, SAMIYEV wrote 16 checks from the Company-1 Bank Account for a total of $99,310.

ii. On July 23, 2019, and July 29, 2019, four checks from the Real Estate Company were deposited into the Company-1 Bank Account for a total of $120,000. Between July 24, 2019 and July 30, 2019, SAMIYEV wrote 18 checks from the Company-1 Bank Account for a total of $117,400.

13. I and other law enforcement agents have conducted surveillance at the Company-1 Address, which is a single family home located in Brooklyn, New York. There were no signs of any business activity taking place at the location.

WHEREFORE, deponent respectfully requests that warrants be issued for the arrest of SUKHROB SOBIROV and ABDURAFIK SAMIYEV, the defendants, and that they be imprisoned or bailed, as the case may be.

s/ Zachary Carroll/OTW
Special Agent Zachary Carroll
Federal Bureau of Investigation
Cred. No. 27542

Sworn to before me this
12th day of August, 2020

THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK