M8N6RAH1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                            20 CR 653(RA)

5   DJONIBEK RAHMANKULOV,

6              Defendant.
                                            Trial
7   ------------------------------x

8                                           New York, N.Y.
                                            August 23, 2022
9                                           10:15 a.m.

10  Before:

11
                         HON. RONNIE ABRAMS,
12
                                            District Judge
13                                          -and a Jury-

14                            APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  THANE REHN
17       CECILIA VOGEL
         SAMUEL RAYMOND
18       Assistant United States Attorneys

19  JOSEPH MURRAY
         Attorney for Defendant
20

21
    NERLANDE PIERRE, USAO Paralegal
22  ANTHONY IMPERATO, USAO Paralegal
    MUHITDIN AHUNHODJAEV, Uzbek Interpreter
23  SANJAR BABADJANOV, Uzbek Interpreter

24

25

M8N6RAH1

1           (Trial resumed; jury not present)

2           THE COURT:  Be seated.  Thanks.

3           Did you have an issue, Mr. Murray?  For the future, if

4    you can let me know in advance so we can get started early.  I

5    said that a couple times.  Go ahead.

6           MR. MURRAY:  That's why I came in -- that's why I

7    brought it up.  Should I e-mail it or how --

8           THE COURT:  You should notify my chambers by e-mail as

9    soon as possible so we don't keep the jury waiting.  That said,

10   go ahead.  What is the issue?

11          MR. MURRAY:  Very simple issue, Judge.  In state

12   court -- I'm more familiar there -- the defendant has the right

13   to reserve opening arguments until they present their case.

14   I'd like to do that in this case, especially since with the

15   outstanding subpoena, I really can't talk about the evidence

16   too much because I don't really know what we're going to do

17   with that yet.

18          THE COURT:  What's the government's position?

19          MR. REHN:  Your Honor, we would object to this.  I

20   don't think it would be appropriate for the defense to reserve

21   an opening statement until the middle of the trial.

22          MR. MURRAY:  Well, no, it's at the beginning of the

23   defense case, just like it's at the beginning of their case.

24   It's nothing different, and it's routinely done in state court.

25   I'm not sure about the federal.

M8N6RAH1

1          THE COURT:  Why don't we just take a break for

2     five minutes, and I'll let you know?  But, again, this is why

3     you need to raise this.  You could have raised this yesterday.

4     You could have raised it last week.  But why don't we take a

5     short break, and I'll let you know shortly?

6          MR. MURRAY:  Thank you, Judge.  I'm sorry.

7          (Recess)

8          THE COURT:  Everyone can be seated.  Thank you.

9          So I am going to grant Mr. Murray's request.  I think

10    issues with respect to the making and timing of an opening

11    statement are within the discretion of the trial judge, and I

12    found at least one case from the District of Connecticut.  It's

13    *United States v. Farrah*, 128 F.Supp. 2d, 103 at Page 109 and

14    110, and I'll just read you a quote from that which says:

15          "Deferring the decision as to whether to give an

16    opening statement was consistent with this approach of not

17    committing to a specific strategy before the close of the

18    government's case.  Defense counsel made a reasonable judgment

19    to defer decision as to whether to make an opening statement

20    until the close of the government's case, suggesting that is

21    indeed proper under certain circumstances to make an opening

22    statement at the close of the government's case."

23          So I am going to allow that.  What would you like me

24    to tell the jury today?

25          MR. MURRAY:  Judge, I would just ask -- just to

M8N6RAH1

reaffirm to the jury that statements -- opening statements are

not evidence, and that the defense -- so, let me ask you,

procedurally, so when they're done, you'll say, "Mr. Murray, do

you want to present your opening?"  And I'll say, "I'll reserve

until the defense puts on their case," if that's okay with the

Court.

            THE COURT:  Yes.  We'll leave it at that.

            MR. MURRAY:  And then if we just explain to the jury

opening statements are not evidence, and you should take no

issue with the fact that Mr. Murray's reserving his right to

present an opening -- something similar to that, Judge.  That's

fine.

            THE COURT:  All right.  So, yes, Mr. Rehn?

            MR. REHN:  Yes, your Honor.  Just our sort of research

in the short break agrees with what the Court has said.  It's

in the trial Court's discretion.  Based on our initial

research, we just want to make clear that it appears that this

cannot be used as an opportunity for the defense to attempt to

make some sort of a summation of the government's case.  It

should be an opening statement without argument or the sort of

things that you hear in a summation that's sort of smuggled

into the middle of the trial.

            So with that understanding, we don't object to this

proceeding.

            THE COURT:  Thank you.

M8N6RAH1

1          MR. MURRAY:  My intention is to tell the jury what our

2    defense is, introduce my client who I believe will be

3    testifying and the witnesses who will be also testifying.

4    That's my intention.  Of course, I'm going to address the

5    allegations, but my intention in opening statements is to say

6    what's coming.

7          THE COURT:  Understood.  But I think the government

8    makes a valid point what we don't want is a mini-summation

9    after the government's case and then another summation.  And,

10   again, we can talk about this further at a later date, but I

11   think we're all in agreement at this point and on the same

12   page.

13         So my deputy is checking on the jury, but I expect

14   we'll get started shortly.  And, Mr. Raymond, you'll be doing

15   the opening; is that correct?

16         MR. RAYMOND:  Yes, your Honor.  Yes, your Honor.

17         THE COURT:  Thank you.  Are they ready?  Okay.  The

18   jury is heading down now.

19         (Pause)

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Good morning, everyone.  You can be

3    seated.  I hope you are well.

4            We are going to begin this morning with the government

5    making an opening statement.  As I indicated yesterday, opening

6    statements are not evidence but just a preview of what the

7    government, in this case, expects you will hear during the

8    course of this trial.

9            You may proceed, Mr. Raymond.

10            MR. RAYMOND:  Thank you, your Honor.

11            In February 2018, a man in Florida was on his way to

12    work when he checked his bank account.  He noticed something

13    shocking.  More than $90,000 had been stolen from his account.

14    The very next day, employees at a small business in Virginia

15    also realized something shocking.  More than $80,000 had been

16    stolen from the company.  On both occasions, the money had been

17    stolen by computer hackers.

18            After stealing money from these innocent people, the

19    hackers sent it to this man, the defendant,

20    Djonibek Rahmankulov.  Why did the hackers send the money that

21    they stole to the defendant?  Simple.  He spent the years, from

22    2017 to 2020, working with hackers and other criminals to hide

23    the money that they stole through a series of financial

24    transactions.

25            Hiding stolen money in this way is called money

M8N6RAH1                          Opening - Mr. Raymond

1    laundering.  And this defendant was very good at it.  He

2    laundered more than a million dollars over those years.  The

3    way the defendant laundered money was by transferring stolen

4    money through bank accounts to phone companies that he had set

5    up to try to disguise the transactions as legitimate business

6    transactions.

7              He used some of the stolen money to operate an illegal

8    and unlicensed money transfer business.  And he lied to banks

9    again and again to cover his tracks.  That is why we are here

10   today.  Because the defendant conspired to commit money

11   laundering, conspired to operate an unlicensed money

12   transmitting business, and he committed bank fraud.

13             This opening statement is the government's opportunity

14   to give you a preview, or a roadmap of the evidence that proves

15   the defendant committed these crimes.  So this morning, I'll

16   give you an overview of the case.

17             I'd like to first tell you what the evidence will show

18   and then explain how we're going to show it to you.  So what

19   will the evidence show?  The evidence will show that the

20   defendant received the proceeds of different fraud schemes and

21   then hid the funds using bank accounts that he controlled in

22   the names of phoney companies.  During trial, you will hear

23   that the defendant concealed the proceeds of different kinds of

24   crimes, including stealing money through computer hacking and

25   money that had been generated from healthcare fraud.  That is,

1   he had hid money that had been stolen from Medicare and

2   Medicaid.

3          Beginning with the hacking, you will hear how the

4   defendant helped computer hackers hide their stolen money.  In

5   about 2018, the defendant's coconspirator arranged for a hacker

6   located overseas to send stolen money to a bank account the

7   defendant controlled in the name of one of the defendant's

8   phoney companies.

9          The defendant went to the bank and withdrew tens of

10  thousands of dollars in cash, and he gave the stolen money to

11  his coconspirator.  When a bank investigator asked the

12  defendant about this money, he lied.  He said he received it as

13  payment for a truck he had sold.

14         Soon, the defendant began working with the hackers

15  directly.  The bank froze his account after those first

16  transfers, but the defendant didn't stop.  He just became more

17  careful.  He used his wife's name to open bank accounts for

18  another fake company.  He recruited two friends to open bank

19  accounts in the names of even more phoney businesses.

20         Over the next few months, as hackers stole hundreds of

21  thousands of dollars from victims across the country, they sent

22  the stolen money to the fake companies belonging to the

23  defendant's friends.

24         The defendant told his friends to withdraw the stolen

25  money as cash or cashier's checks made out to the phoney

1    company that he had set up in his wife's name.  That's the

2    defendant's laundering of the hacked money.  The hackers stole

3    the money and sent it to the defendant so that he could conceal

4    it through his fake companies.

5          Second, the healthcare fraud.  You will hear that

6    starting in 2020, the defendant helped another group of

7    criminals hide the proceeds of Medicare and Medicaid fraud.

8    You'll hear about pharmacies that were stealing money from

9    Medicare and Medicaid by fraudulently billing the government

10   for expensive HIV medicines.

11         The defendant helped those pharmacies launder their

12   stolen money, using the same playbook that he had used for the

13   hacking.  He took large checks from these pharmacies and

14   deposited them in the bank accounts of his fake companies.  The

15   checks added up to well over a million dollars.  In exchange

16   for the checks, the defendant gave the pharmacy criminals cash.

17   And he transferred the money in his company's bank accounts

18   onto others.  That's how the defendant laundered money from the

19   healthcare fraud that I mentioned.

20         The defendant also hid some of the money he got from

21   the pharmacy checks by using it to operate an illegal money

22   transfer business.  The defendant transferred money from these

23   dirty pharmacies to people and businesses in the U.S. and

24   overseas, keeping a fee for himself.

25         As you'll hear, in order to prevent criminals from

M8N6RAH1                        Opening - Mr. Raymond

1    using the U.S. financial system to move illegal money, federal

2    law requires companies that transmit money to register and to

3    get a license.  But the defendant didn't do that.  Instead, he

4    used his fake companies to transmit money outside the legal

5    banking system, to hide all the stolen money he was getting.

6           And to operate this money transfer business, the

7    defendant lied to bank after bank.  He needed business bank

8    accounts to make all of his transactions look legitimate.  The

9    problem, as you will hear, is that banks won't allow bank

10   accounts if they know the accounts are being used to transfer

11   crime proceeds or to operate an unlicensed money transfer

12   business.  So the defendant lied to the banks to keep his

13   criminal schemes going.

14          He told the banks that the fake businesses were real

15   operating companies, engaged in businesses like trucking,

16   consulting, and wholesale.  But those were lies.  The

17   defendant's companies were just fronts for receiving money from

18   criminals, like computer hackers and crooked pharmacies.

19          So that is what the government will prove to you at

20   this trial.  The defendant incorporated fake companies and made

21   false statements to banks to open bank accounts for those

22   companies.  He used those bank accounts to transfer money he

23   got from computer hackers, who stole money from unsuspecting

24   victims and from dirty pharmacies, who stole money from

25   Medicare and Medicaid.  And he transmitted some of that money

1    to people without the appropriate licenses.

2            So how will we prove this to you?  In this trial, you

3    will see and hear several kinds of evidence of these crimes.

4    I'll mention three primary types.

5            First, I expect you'll hear from many witnesses,

6    witnesses like the numerous victims whose money was stolen by

7    the computer hackers who were working with the defendant.

8    Witnesses who will explain how Medicare and Medicaid work,

9    about why HIV medicines are particularly susceptible to fraud,

10   and how Medicare and Medicaid billing records show that the

11   pharmacies that sent money to the defendant were engaged in

12   fraud, a witness who will explain the rules that financial

13   institutions that transmit money must follow.  Witnesses from

14   banks who will tell you that the banks would never have let the

15   defendant open or keep bank accounts if they had known the

16   truth, that his companies were fake and that he was actually

17   receiving and sending stolen money.

18           You will also hear from witnesses who participated in

19   the defendant's crimes who will give you an inside look at the

20   criminal conspiracies in this case.

21           One witness will tell you about the computer hacker

22   that he was working with and how he told that hacker to send

23   the defendant stolen money.  You'll also hear from the

24   defendant's two friends, the people he convinced to incorporate

25   even more phoney companies and open bank accounts.  One of them

1    will tell you that the defendant admitted that the money being

2    transferred was money which had been stolen by computer

3    hackers.

4         You'll also hear from witnesses who laundered stolen

5    money for the same crooked pharmacies as the defendant, sending

6    money through an illegal money transfer business just like the

7    defendant did.

8         Now, I mentioned that these witnesses will take you

9    inside the defendant's criminal schemes.  Some of these

10   witnesses have pled guilty to their crimes and have agreed to

11   testify in the hopes of receiving a shorter sentence.  Others

12   are testifying pursuant to an agreement with the government

13   that they won't be prosecuted.  When these witnesses testify,

14   you should scrutinize their testimony carefully.  Ask yourself

15   whether it is consistent with the other evidence in this case.

16        Some of that other evidence that you will see are bank

17   records.  Those records show that the defendant's bank accounts

18   received hundreds of thousands of dollars stolen from innocent

19   victims by hackers.  The records will also show that right

20   after the stolen money hit his account, the defendant acted

21   quickly to transfer or withdraw it, making it harder to trace

22   the stolen money.

23        Surveillance photos from the banks show the defendant

24   withdrawing stolen money from bank branches.  Other records

25   show that the defendant deposited hundreds of thousands of

1  dollars of stolen money from pharmacies committing fraud into

2  his own phoney companies and that he then transferred those

3  funds overseas and within the U.S.  The bank records also show

4  the defendant's false statements to the banks about his sham

5  companies.

6          Finally, you'll even hear from the defendant himself.

7  You'll see a videotaped message with the defendant speaking in

8  Russian to the hacker he was working with all while counting

9  $100,000 in cash into a backpack.  Some of the witnesses will

10 tell you that they saw the defendant deliver similar bags of

11 cash to various people.

12         When you look at all of the evidence, you'll see that

13 each piece individually adds up to a broader picture.  And at

14 the end of this trial, that picture will be clearer, the

15 defendant received stolen money and that he tried to hide it.

16 He transmitted money without a license.  And he did all of that

17 by lying to banks for years so he could first open and then

18 maintain the bank accounts through which he committed his

19 serious crimes.

20         I'm going sit down in a moment, but before I do, I'm

21 going ask that you do three things during the course of this

22 trial:  First, pay close attention to the evidence that you see

23 and hear; second, follow Judge Abrams's instructions on the

24 law; and third, use your common sense, the same common sense

25 you use in your everyday lives.

1          If do you these three things, then at the end of this

2     trial, you will come to the only conclusion that is consistent

3     with the evidence, with the law, and with common sense:  That

4     the defendant, Djonibek Rahmankulov, is guilty.

5          THE COURT:  Thank you, Mr. Raymond.

6          So, folks, as I indicated yesterday, a defendant in a

7     criminal case has no burden whatsoever, and that means that he

8     doesn't have to put on a case or present any evidence.  He

9     doesn't have to make an opening statement, and in addition, if

10    he wants to, he can reserve his opening statement.

11         Mr. Murray, what would you like to do today?

12         MR. MURRAY:  Thank you, your Honor.  The defense would

13    like to reserve our opening statement till such time that the

14    government has completed their case and we will present our

15    case.

16         THE COURT:  Very well, thank you.

17         The government may call its first witness.

18         MR. RAYMOND:  Thank you, your Honor.  The government

19    calls William Schulz.

20     WILLIAM SCHULZ,

21         called as a witness by the Government,

22         having been duly sworn, testified as follows:

23         DEPUTY CLERK:  Please state and spell your name for

24    the record.

25         THE WITNESS:  William Schulz.

M8N6RAH1                        Schulz – Direct

1              THE COURT:  Good morning.  I should say that these

2     plexiglasses boxes have air filters and are COVID safe; so if

3     you'd like to remove your mask, you're free to do so, and it's

4     safe to do.  It's up to you.  That's the very reason we have

5     these plexiglass boxes.  They were created in light of the

6     pandemic.

7     DIRECT EXAMINATION

8     BY MR. RAYMOND:

9     Q.  Good morning, Mr. Schulz

10    A.  Good morning.

11    Q.  Where do you live?

12    A.  I live in Harrisonburg, Virginia.

13    Q.  What do you do for a living?

14    A.  I'm currently retired.

15    Q.  How long have you been retired?

16    A.  Approximately two years.

17    Q.  What did you do for work before you were retired?

18    A.  I was an owner and employed by May Supply company in

19    Harrisonburg, Virginia.

20    Q.  And you said you were an owner.  How much of the company

21    did you own?

22    A.  I owned 50 percent of the voting shares and was also --

23             THE COURT:  It can be very difficult to hear in this

24    courtroom, so I'm just going to ask you to speak very loudly

25    and clearly into the microphone.  Thank you very much.

M8N6RAH1                        Schulz - Direct

1   BY MR. RAYMOND:

2   Q.  Did you also have a role in the company's board?

3   A.  A role in what?

4   Q.  The company's board.

5   A.  Yes.  I was a corporate officer, held the office of

6   treasurer.

7   Q.  What was May Supply's business?

8   A.  May Supply was a plumbing supply company, serving

9   approximately a 100-mile area surrounding Harrisonburg,

10  Virginia.

11  Q.  And how many employees did May Supply have when you were

12  working there -- when you left there?

13  A.  Approximately 50.

14  Q.  How long were you involved at May Supply?

15  A.  I was an owner beginning in 1997 and became active in

16  management in 2007 and then remained active until my

17  retirement.

18  Q.  Besides your role on the board, did you have any

19  responsibilities in the day-to-day operations of the company?

20  A.  Yes, I did.  I was the chief financial officer and chief

21  operating officer.

22  Q.  In your roles at the company, were you generally aware of

23  financial transfers made by May Supply?

24  A.  Yes.

25  Q.  Were you the person with ultimate authority over payments

M8N6RAH1                         Schulz - Direct

1   by the company?

2   A.  Yes.

3   Q.  Directing your attention to the period in about February or

4   March 2018, were you informed about an issue related to a

5   financial transaction at May Supply?

6   A.  Yes, I was.

7   Q.  What was the issue?

8   A.  I was informed that an ACH transfer to WIT and Company, our

9   buying group, was diverted to another payee at another bank.

10  Q.  What is an ACH transfer?

11  A.  Excuse me?

12  Q.  You mentioned the term "ACH transfer."  What does that

13  mean?

14  A.  A bank transfer.

15  Q.  And you mentioned it was for WIT Buying Group.  What was

16  WIT Buying Group?

17  A.  Excuse me?

18  Q.  What is WIT Buying Group?

19  A.  WIT Buying Group, it's a group of companies that are in the

20  same -- were in the same business as May Supply company, and

21  they group together to take advantage of better purchasing

22  terms.  And so they paid -- they paid vendors directly, and we

23  had to pay the WIT company weekly for our purchases.

24  Q.  How long had May Supply been using WIT Buying Group?

25  A.  It was approximately ten years.

M8N6RAH1                          Schulz - Direct

1    Q.  Did you know where WIT Buying Group was located?

2    A.  It was located in Dallas, Texas.

3    Q.  Directing your attention back to the issue in February or

4    March 2018, can you describe what happened?

5    A.  Yes.  Ms. Suzanne Miller was our accounts payable clerk,

6    and part of her duties were to initiate the transfer, weekly,

7    to the WIT Buying Group.  And she sent a -- sent the request

8    over her -- over e-mail to the bank.

9    Q.  And I guess, first of all, what was the name of the

10   individual that you described?

11   A.  Suzanne Miller.

12   Q.  And you mentioned that she -- how did you learn what you

13   just described?

14   A.  I learned by -- I was informed by her that day.

15   Q.  You mentioned the bank.  With whom did May Supply bank?

16   A.  United Bank.

17   Q.  Where was United Bank located?

18   A.  We dealt with a local branch in Harrisonburg, Virginia.

19   Q.  What precisely did you do after you spoke to Ms. Miller?

20   A.  When I learned what happened, I instructed her and -- to

21   contact the bank to see if they could correct the mistake and

22   get the money returned.

23   Q.  What else did you do after that conversation?

24   A.  Well, I instructed them to contact the bank, and I spoke

25   with representatives of United Bank.

M8N6RAH1                          Schulz - Direct

1    Q.  And what did you do after you spoke to the representatives

2    of United Bank?

3    A.  I learned -- I learned from them that they were unable to

4    retrieve the money.

5              MR. RAYMOND:  Ms. Pierre, can you show the witness

6    what has been marked for identification as

7    Government Exhibit 3401?

8    BY MR. RAYMOND:

9    Q.  Mr. Schulz, do you recognize Government Exhibit 3401?

10   A.  Yes, I do.

11   Q.  What is it?

12   A.  That was the payment confirmation for the transfer that was

13   intended to go WIT.

14   Q.  Okay.

15             JUROR:  My apologies, I don't have anything on my

16   screen.

17             THE COURT:  Thank you for raising that.  So what we do

18   before evidence is admitted is it needs to be shown to the

19   jury.  And a foundation needs to be laid, and then there will

20   be a request to admit it into evidence.  And then it will be

21   published to you.  And I should add, if at any time once it's

22   published, any of your screens aren't working, just raise your

23   hand.

24             JUROR:  Thank you.

25             THE COURT:  Thank you.  You may proceed.

M8N6RAH1                        Schulz - Direct

1              MR. RAYMOND:  Thank you, your Honor.

2   BY MR. RAYMOND:

3   Q.  Do you recognize what's been marked as

4   Government Exhibit 3401?

5   A.  Yes, I recognize this.

6   Q.  What is it?

7   A.  It is the payment confirmation intended to go WIT company

8   dated March 2nd, 2018.

9   Q.  When did you receive Government Exhibit 3401?

10  A.  It was the day of the transaction.

11  Q.  Was Government Exhibit 3401 kept in the course of the

12  regularly conducted activities of May Supply?

13  A.  Yes.

14  Q.  Was making and keeping these records a regular practice of

15  May Supply's business?

16  A.  Yes.

17             MR. RAYMOND:  Your Honor, the government moves to

18  admit Government's Exhibit 3401.

19             THE COURT:  Any objection?

20             MR. MURRAY:  No objection.

21             THE COURT:  It will be admitted.

22             (Government's Exhibit 3401 received in evidence)

23             THE COURT:  It can now be published to the jury.

24             MR. RAYMOND:  Thank you, your Honor.

25

M8N6RAH1                          Schulz – Direct

1   BY MR. RAYMOND:

2   Q.  Mr. Schulz, can you read below the template information?

3   A.  Yes, the template says -- the template name is WIT.  And

4   company ID, May Supply, and the last four digits of the account

5   number and the effective date.  And the transmit status is

6   pending approval.

7        MR. RAYMOND:  Ms. Pierre, if you can go to the next

8   part, the credit/destination accounts.

9   BY MR. RAYMOND:

10  Q.  Mr. Schulz, can you read that?

11  A.  Yes, I can.  This indicates that the credit designation

12  account was an account to the name of Jasmina Transport Inc. in

13  the amount of $88,439.76.

14  Q.  Mr. Schulz, before reviewing these records, had you ever

15  heard of Jasmina Transport?

16  A.  No, I had not.

17       MR. RAYMOND:  Ms. Pierre, can you go to the next page

18  of Government Exhibit 3401?  And, Ms. Pierre, can you pull up

19  the approved transmit requests?

20  BY MR. RAYMOND:

21  Q.  Mr. Schulz, what does the transmit status say on this

22  record?

23  A.  It says it was transmitted in the amount of $88,439.76 on

24  the 18th -- 2018.

25  Q.  Is that day actually March 2nd, 2018?

M8N6RAH1                          Schulz – Direct

1    A.  Yes, March 2nd, 2018.

2    Q.  Mr. Schulz, did May Supply ever recover the money that had

3    been misdirected?

4    A.  No, they did not.

5    Q.  Mr. Schulz, have you ever heard of Djonibek Rahmankulov?

6    A.  I have not.

7    Q.  Did May Supply ever do any business with

8    Jasmina Transport Inc.?

9    A.  No.

10   Q.  Did May Supply ever do any business with

11   Djonibek Rahmankulov?

12   A.  No.

13   Q.  Did May Supply ever do business with trucking companies?

14   A.  May Supply received most, almost all of their goods -- the

15   freight was paid by the vendor on occasion.  If we shipped

16   something, it was shipped via common carrier because of the

17   small size of the loads.

18   Q.  To your knowledge, did May Supply ever do any business with

19   unregistered trucking companies?

20   A.  No.

21   Q.  To your knowledge, did May Supply ever do business with

22   companies in New York City?

23   A.  No.

24            MR. RAYMOND:  No further questions, your Honor.

25            THE COURT:  Any cross-examination?

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M8N6RAH1

1        MR. MURRAY:  Just very briefly.

2    CROSS-EXAMINATION

3    BY MR. MURRAY:

4    Q.  Mr. Schulz, can you hear me?

5    A.  Yes.

6    Q.  I just want to ask you real quick, the exhibit that was up

7    and you were shown, was that the first thing that alerted you

8    to this transaction?

9    A.  Yes.

10   Q.  And is that something that you regularly interact with,

11   that database that showed you that record?

12   A.  Yes.

13   Q.  Okay.  And was there anything about that record that was

14   concealed in some way?

15   A.  No.

16   Q.  Okay.  Thank you.

17        MR. MURRAY:  Nothing further.

18        THE COURT:  Any redirect?

19        MR. RAYMOND:  No, your Honor.  Thank you.

20        THE COURT:  You may step down, sir.  Thank you so

21   much.

22        (Witness excused)

23        THE COURT:  The government may call its next witness.

24        MR. RAYMOND:  Your Honor, the government calls

25   Paulo Greco.

M8N6RAH1                          Greco - Direct

1    PAULO GRECO,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              DEPUTY CLERK:  Please state and spell your name for

5    the record.

6              THE WITNESS:  Good morning, my name is Paulo Greco.

7              THE COURT:  You may proceed.

8              MR. RAYMOND:  Thank you, your Honor.

9    DIRECT EXAMINATION

10   BY MR. RAYMOND:

11   Q.  Mr. Greco, go where do you live?

12   A.  I live in Florida.

13   Q.  What do you do for a living?

14   A.  I worked for 20 years for international companies.  Today,

15   I do consulting.

16             THE COURT:  I'm just going to ask you -- I say this to

17   all the witnesses -- but just speak very loudly and slowly,

18   because it can be very difficult to hear in this courtroom.

19   Thank you.

20   BY MR. RAYMOND:

21   Q.  Directing your attention to February 2018, where did you

22   live then?

23   A.  On Florida, same place.

24   Q.  Mr. Greco, are you married?

25   A.  Yes.

M8N6RAH1                          Greco - Direct

1    Q.  What is your wife's name?

2    A.  Clarissa Greco.

3    Q.  As of February 2018, what did she do for a living?

4    A.  She was remodeling houses.  She was doing flip-flops,

5    buying houses, remodeling, and selling.

6    Q.  At the time, did you have any bank accounts?

7    A.  Yes.

8    Q.  Where did you bank?

9    A.  Bank of America.

10   Q.  Was the account that you held at Bank of America individual

11   or joint?

12   A.  Joint.

13   Q.  And joint with who?

14   A.  With her.

15   Q.  As of about February 2018, approximately how much money did

16   you have in the account?

17   A.  Around a couple hundred thousand, probably a hundred and

18   something.

19   Q.  Why did you have that amount of money in the account?

20   A.  Because -- it was because we had the money in the account,

21   but used this money really to do the closing.  We had a closing

22   coming up in the next couple of days, so we're going to use

23   this money to close our new property.

24   Q.  And just to confirm, when you say "closing," what do you

25   mean by that?

M8N6RAH1                          Greco - Direct

1    A.   Buying.

2    Q.   Buying what?

3    A.   Buying a house that she was remodeling and selling.

4    Q.   Now, did there come a time where anything strange began to

5    happen around that time?

6    A.   Well, on the end of February -- I don't really remember

7    exactly the date -- but the end of February, I was driving to

8    the work -- I was working for J K Wireless at the time.  It was

9    a company that sells cell phone parts.  I was on my way to

10   work.  Then I don't recall exactly what -- why I was looking

11   for my bank account, but I think I was waiting for a payment or

12   something.  Then I checked my bank account, and the money that

13   I was going to use for the closing disappeared.  Then I

14   don't -- my first instinct was my wife just used the money for

15   the closing, but it's weird because normally, we do it

16   together.

17          So I called her and asked her exactly that, if she

18   already made the close.  She said, "No, I didn't do nothing."

19   Then I realized it was -- the money disappeared.  So the first

20   thing I did, I went directly to Bank of America.  I was driving

21   to work.  I return.  I was -- there was a Bank of America very

22   close at the time.  So I went to Bank of America.  I went and

23   the branch and screamed, "My money disappeared" because it was

24   a huge line at the bank.  So I went there, I said, "My money

25   disappeared.  I need help."

M8N6RAH1                          Greco - Direct

1           And they -- I think it was the manager of the branch

2    came to help me.  I explain to her what happened, and she --

3    first thing she told me she going to do is freeze the account.

4    She froze the account.  And I don't know if she told me to do

5    or I decide to go to the police after that, because I think

6    it -- she didn't told me much.  She just said we're going to

7    freeze your account.

8           So after that, I went to the police, or I think it was

9    the sheriff office -- also close by.  And I filled the report

10   that the money disappeared, that I went to the bank.  Then what

11   I recall is that there was not much.  The bank is saying -- who

12   was really helpful was the officer, the police officer, that

13   told me that -- ask me -- he called me couple of times, asking

14   me how was the development.  And the bank was saying nothing,

15   so he told me -- that one day he called me and -- he knew -- he

16   called me later on and says, I called the bank, and they're

17   going to return the money.  They were able to freeze part of

18   the transaction, and you're going to receive the money in the

19   next couple of weeks.

20           (Continued on next page)

21

22

23

24

25

M8NCrah2                          Greco - direct

1   BY MR. RAYMOND:

2   Q.  Mr. Greco, just to take a step back from when you were

3   driving to work, did anything happen before that day when you

4   were driving to work?

5   A.  What I recall the night before of that day, my phone was

6   ringing like crazy.  I remember it was night and it was not

7   very late at night because my daughter was around, so probably,

8   I don't know, around 9:00, 8:00, 9:00.  And my phone was

9   ringing a lot, ringing and text message with nothing, but it

10  was super, super continuous ringing.

11  Q.  Did you pick up the phone at any time?

12  A.  I tried, but was just hanging on.  So it was continuing

13  every 30 seconds.  Then I put on the silence, but when I put in

14  the silence, it was like continued buzzing, and then I turn off

15  the phone.

16  Q.  So the phone ring day, could you walk us through, a little

17  slower, what happened the next day?

18  A.  The next day, exactly, the next day what I did is what I

19  told you, I went to the work, then I checked the bank account,

20  then --

21  Q.  Pause on that.  How did you check your bank account?

22  A.  With the phone.

23  Q.  Do you have an application on your phone?

24  A.  Yes, I have the Bank of America application app.

25  Q.  What did you see when you pulled up the Bank of America

M8NCrah2                          Greco - direct

1    app?

2    A.  What I recall, what's my -- I see the statement and the

3    money was not there.  The first thing I saw was the balance.

4    Q.  Do you remember about how much money had been withdrawn?

5    A.  $93,451.

6    Q.  And what did you do after you saw the money had been

7    withdrawn from your bank account?

8    A.  Ran to the bank.

9    Q.  Did you do anything before you ran to the bank?

10   A.  No.  I just called my wife to ask if she did something in

11   the closing or not.

12   Q.  What was her answer?

13   A.  No.

14   Q.  So after that, what did you do?

15   A.  So I went to the bank, screaming and running like a crazy.

16   Q.  You mentioned that you went to the police about that.  What

17   happened to the money, eventually?

18   A.  The money was returned to me, like, in 15 days.  The money

19   was, like, 15 days, maybe less, maybe nothing much, but they

20   returned the money.

21   Q.  Did the bank tell you anything about what had happened?

22   A.  No, I asked the money, I asked what happened.  They said

23   listen, we detect a fraud.  I remember --

24            MR. MURRAY:  Objection, your Honor.  I just want to

25   object to this as to hearsay about what he was told.

M8NCrah2                          Greco - direct

|      |                                                                       |
|------|-----------------------------------------------------------------------|
| 1    |       THE COURT:  Just give me one second.  Do you want to             |
| 2    | respond to the objection?                                             |
| 3    |       MR. RAYMOND:  Your Honor, we'll withdraw the question.           |
| 4    |       THE COURT:  Okay.                                                |
| 5    | BY MR. RAYMOND:                                                        |
| 6    | Q.  Did you do anything afterwards with respect to your phone          |
| 7    | or computer or anything else?                                         |
| 8    | A.  Yeah, my phone, I reset my phone and I change my phone and         |
| 9    | my computer.  I don't know what happened.  So my computer,            |
| 10   | also, I reset my computer, I bought a new computer and a new          |
| 11   | phone.                                                                 |
| 12   | Q.  And did you change anything else at the bank?                      |
| 13   | A.  Yes, they open an -- the executive, they freeze my account,       |
| 14   | they open a new bank account and they transfer the rest of the        |
| 15   | money there and we operate from that new account.                     |
| 16   | Q.  Mr. Greco, in February 2018, what kind of car did you             |
| 17   | drive?                                                                 |
| 18   | A.  At that time, a Jaguar, a white Jaguar XE, 2017.                   |
| 19   | Q.  And what kind of car did your wife drive?                          |
| 20   | A.  It was a Nissan Frontier.                                          |
| 21   | Q.  Where did you buy your car?                                        |
| 22   | A.  On the dealer.                                                     |
| 23   | Q.  Where did your wife buy her car?                                   |
| 24   | A.  On the dealer.                                                     |
| 25   | Q.  Where were the dealers located?                                   |

M8NCrah2                          Greco - cross

1   A.   The Nissan Frontier, it was Pembroke Pines, Florida, and

2   the Jaguar is also another dealer in Florida.

3   Q.   Have you ever owned a truck?

4   A.   No.

5   Q.   Have you ever bought a car or a truck from someone in

6   New York?

7   A.   No.

8   Q.   Have you ever owned a Volvo?

9   A.   Pardon?

10  Q.   Have you ever owned a Volvo?

11  A.   No.

12  Q.   Do you know anyone by the name of Djonibek Rahmankulov?

13  A.   No.

14  Q.   Have you ever heard of a company called Jasmina Transport?

15  A.   No.

16  Q.   Have you ever done business with Djonibek Rahmankulov or

17  Jasmina Transport?

18  A.   No.

19            MR. RAYMOND:  No further questions, your Honor.

20            THE COURT:  Thank you.  Any cross examination?

21            MR. MURRAY:  Just very briefly.

22  CROSS-EXAMINATION

23  BY MR. MURRAY:

24  Q.   Hello, Mr. Greco.  I just want to ask you, was there any

25  indication with regards to this transaction as to where the

M8NCrah2                          Greco - cross

1    money went?

2    A.  I don't recall the time.  I remember there was something on

3    the transaction where the money went, but I don't remember

4    exactly what it was because I don't have -- I cannot have the

5    statement.  Once they closed the account, they didn't give me a

6    statement anymore.

7    Q.  Do you recall if it had the name of a company that the

8    money was sent to?

9    A.  I don't recall.

10   Q.  Even if you don't remember the name, can you recall there

11   being a name?

12   A.  I believe there was a name, but I don't recall if there was

13   a name there.

14             MR. MURRAY:  Thank you, sir.  Nothing further.

15             THE COURT:  Any redirect?

16             MR. RAYMOND:  No, your Honor.

17             THE COURT:  You can step down.  Thank you.

18             (Witness excused)

19             Government can call its next witness.

20             MR. REHN:  Your Honor, the government calls

21   Conor O'Sullivan.

22    CONOR O'SULLIVAN,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

M8NCrah2                    O'Sullivan- direct

1    BY MR. REHN:

2    Q.   Good morning.

3    A.   Good morning.

4    Q.   What is your name?

5    A.   Conor O'Sullivan.

6    Q.   Where do you work?

7    A.   I work at the U.S. Attorney's Office as a federal

8    contractor.

9    Q.   What is your position working at the U.S. Attorney's

10   Office?

11   A.   A litigation financial analyst.

12   Q.   What are your duties as a litigation financial analyst?

13   A.   I assist prosecutors in reviewing financial evidence and

14   analyzing it for them.  I also trace criminal proceeds,

15   identify forfeitable assets, and I prepare charts, summaries,

16   exhibits to help prosecutors explain financial transactions.

17   Q.   How long have you worked as a financial litigation analyst

18   at the U.S. Attorney's Office?

19   A.   Over two years.

20   Q.   Where did you work prior to that?

21   A.   I worked as a special agent for the FBI for over 23 years.

22   Q.   What sort of work did you do as a special agent at the FBI?

23   A.   Conducted complex financial investigations from --

24   primarily involving fraud.  I started working in government

25   fraud and then I started working on mail fraud, investigations

M8NCrah2                          O'Sullivan– direct

1   involving mail fraud, wire fraud, insurance fraud, mass

2   marketing fraud, credit card fraud, securities fraud,

3   healthcare fraud.

4   Q.  Do you have any professional certifications?

5   A.  Yes, I'm also a CPA.

6   Q.  A CPA.  What's a CPA?

7   A.  Certified public accountant.

8           MR. REHN:  Your Honor, at this time, the government

9   moves the admission of two stipulations, Government

10  Exhibit 3501 and Government Exhibit 3504.

11          THE COURT:  They'll be admitted.  Thank you.

12          (Government's Exhibits 3501, 3504 received in

13  evidence)

14          MR. REHN:  Ms. Pierre, if you can bring up Government

15  Exhibit 3501 and publish that.  If you could pull up the

16  introductory paragraph.

17          I'll read the introductory paragraph.

18          It is hereby stipulated and agreed by and among the

19  United States of America, by Damian Williams, United States

20  Attorney for the Southern District of New York, Cecilia Vogel,

21  Samuel Raymond, and Thane Rehn, Assistant United States

22  Attorneys, of counsel, and Djonibek Rahmankulov, the defendant,

23  by his counsel Joseph W. Murray, Esq. that --

24          Before you go to that paragraph, can you go to the

25  seventh page of this exhibit, and I'll read the sentence on the

M8NCrah2                          O'Sullivan- direct

1    seventh page.

2            It is further stipulated and agreed that this

3    stipulation and the exhibits referenced in this stipulation may

4    be received in evidence at trial.

5            Ms. Pierre, could you please bring up paragraph 1.

6            Paragraph 1 lists a number of Government Exhibits and

7    at the end of the paragraph it says, these are true and

8    accurate copies of records maintained by TD Bank, N.A.; the

9    original records were made at or near the time by, or from

10   information transmitted by, a person with knowledge of the

11   matters set forth in the records; the records were kept in the

12   course of a regularly conducted business activity; and it was

13   the regular practice of that business activity to maintain the

14   records.

15           At this time, your Honor, we would move the admission

16   of all the exhibits listed in paragraph 1, with the exception

17   of Government Exhibit 604-06, as to which we're preparing a

18   redacted version to be admitted later.

19           THE COURT:  They'll be admitted.

20           MR. REHN:  Ms. Pierre, can you please bring up

21   paragraph 2 of the stipulation.

22           This says, Government Exhibits 1203-01 and 1203-2 are

23   true and correct copies of videos captured by TD Bank

24   surveillance cameras depicting a transaction that occurred at

25   the South Flushing branch of TD Bank, in Queens, New York, on

1    July 27th, 2020, at approximately 1:42 p.m., in which six

2    checks with a combined value of $149,287 were deposited into

3    the TD Bank account, and it provides an account number.

4          Government Exhibit 1203-07 contains still images taken

5    from Government Exhibits 1203-01 and 1203-02.

6          And your Honor, we would move the admission of the

7    exhibits in this paragraph, as well.

8          THE COURT:  Admitted.  Thank you.

9          MR. REHN:  I'll go to number 3.  This also lists

10    certain exhibits, and it says, they are true and correct copies

11    of videos captured by TD Bank surveillance cameras depicting a

12    transaction that occurred at the South Flushing branch of

13    TD Bank in Queens, New York, on July 22nd, 2020, at

14    approximately 2:55 p.m., in which four checks with a combined

15    value of $150,915 were deposited into the TD Bank account, it

16    provides an account number.

17          And then it says Government Exhibit 1202-01 is a still

18    image taken from Government Exhibit 1202-12, and the government

19    moves the admission of these exhibits.

20          THE COURT:  Admitted.

21          MR. REHN:  Paragraph 4.  Government Exhibits 1203-03

22    and 1203-04 are true and correct copies of videos captured by

23    TD Bank surveillance cameras depicting a transaction that

24    occurred at the South Flushing branch of TD Bank in Queens, New

25    York, on July 22nd, 2020, at approximately 2:55 p.m., in which

M8NCrah2                        O'Sullivan- direct

1    nine checks, with a combined value of $198,765, were deposited

2    into the TD Bank account, and it provides the account number.

3          Government Exhibit 1203-08 contains still images taken

4    from Government Exhibits 1203-03 and 1203-04.  We move for the

5    admission of these exhibits.

6          THE COURT:  Admitted.

7          MR. REHN:  If we can bring up paragraph five.

8          This lists certain exhibits and provides that they are

9    true and accurate copies of records maintained by Santander

10   Bank with a description of how the record were maintained.  We

11   move the admission of these exhibits.

12         THE COURT:  Admitted.

13         MR. REHN:  Paragraph 6, this lists certain exhibits

14   that are true and accurate copies of records maintained by

15   Tompkins Mahopac Bank, and it provides a similar description of

16   how they were maintained.  We move for the admission of these.

17         THE COURT:  Admitted.

18         MR. REHN:  Moving to paragraph 7, again, lists a

19   number of exhibits and provides that they're records maintained

20   by JP Morgan Chase.  We would move the admission of these

21   records.

22         THE COURT:  Admitted.

23         MR. REHN:  Moving to paragraph 8, it lists certain

24   records as true and accurate records of records maintained by

25   Bank of America.  We would move the admission of these records.

M8NCrah2                            O'Sullivan- direct

1          THE COURT:  Admitted.

2          MR. REHN:  Moving to paragraph 9, and again, the same

3    language for certain exhibits that are records maintained by

4    Capital One Bank.  Move the admission of these.

5          THE COURT:  Admitted.

6          MR. REHN:  Paragraph 10, same language with respect to

7    Citibank.  We would move the admission of the exhibits listed

8    in paragraph 10.

9          THE COURT:  Admitted.

10         MR. REHN:  Moving onto paragraph 11, this is the same

11   language with respect to records maintained by

12   AmerisourceBergen.  We would move the admission of these

13   exhibits.

14         THE COURT:  Admitted.

15         MR. REHN:  Paragraph 12, the same language with

16   respect to an exhibit maintained by Kinray Inc.  Move for the

17   admission of this exhibit.

18         THE COURT:  Admitted.

19         MR. REHN:  And paragraph 13, same language with

20   respect to a record from the New York State Department of Motor

21   Vehicles.  We would move the admission of this exhibit.

22         THE COURT:  Admitted.

23         MR. REHN:  Paragraph 14, we have the same language

24   with respect to certain tabs from three Government Exhibits

25   that are spreadsheets.  So we move the admission of those tabs

M8NCrah2                           O'Sullivan- direct

1  of these three exhibits as records maintained by the Centers

2  for Medicare and Medicaid Services.

3           THE COURT:  Admitted.

4           MR. REHN:  In paragraph 15, the same language with

5  respect to certain records maintained by the New York State

6  Board of Pharmacy.  We would move the admission of those

7  records.

8           THE COURT:  Admitted.

9           MR. REHN:  Paragraph 16, the same language with

10  respect to certain records of the New York State Department of

11  Health.  We would move that exhibit to be admitted.

12           THE COURT:  Admitted.

13           MR. REHN:  And paragraph 17, records maintained by the

14  Small Business Administration.  We move the admission of those

15  exhibits.

16           THE COURT:  Admitted.

17           MR. REHN:  Paragraph 18 is records maintained by the

18  United States Department of State.  We move the admission of

19  those records.

20           THE COURT:  Admitted.

21           MR. REHN:  Ms. Pierre, could you please bring up

22  Government Exhibit 3504.

23           This is another stipulation, your Honor, with the same

24  language and the same agreement to admit certain exhibits.

25  Paragraphs 1, 2, and 3 refer to exhibits from JP Morgan Chase,

M8NCrah2                        O'Sullivan- direct

1    Webster Bank, formerly Sterling National Bank, and TD Bank, and

2    we would move the admission of all the exhibits referenced in

3    those three paragraphs.

4            THE COURT:  Admitted.

5            MR. REHN:  Paragraph 4 also refers to TD Bank records.

6    We move the admission of those records.

7            THE COURT:  Admitted.

8            MR. REHN:  Ms. Pierre, if you could bring up

9    paragraph 5.  This describes certain exhibits as true and

10   correct copies of videos captured by Citibank surveillance

11   cameras depicting a transaction that occurred at a Citibank

12   branch located at 866 United Nations Plaza in Manhattan, on

13   November 27th, 2018, at approximately 14:22, that's 2:22 p.m.,

14   in which $20,000 was withdrawn from a Citibank account in the

15   name of Sadullo Transportation.  I move the admission of this

16   exhibit.

17           THE COURT:  Admitted.

18           MR. REHN:  And the still images in this paragraph, as

19   well.

20           THE COURT:  They'll be admitted, as well.

21           MR. REHN:  Paragraph 6 refers to an exhibit that

22   contains records maintained by JM Smith Corporation.  I move

23   the admission of that exhibit.

24           THE COURT:  Admitted.

25           MR. REHN:  And paragraph 7 refers to records

M8NCrah2                          O'Sullivan- direct

1   maintained by Google, and I move the admission of those

2   exhibits.

3              THE COURT:  Admitted.

4              MR. REHN:  Ms. Pierre, before we leave this, can we go

5   back to paragraph 3.  And the last sentence of paragraph 3,

6   referring to certain Government Exhibits, Government

7   Exhibit 604-08.  I just want to note that the stipulation

8   provides that these are true and correct copies of images

9   captured by TD Bank surveillance cameras depicting transactions

10  that occurred using a TD Bank account in the name of Jasmina

11  Transport.  I've already moved for those to be admitted, but I

12  wanted to highlight that language.

13             Thank you, Ms. Pierre.

14  BY MR. REHN:

15  Q.  Mr. O'Sullivan, in preparation for your testimony today,

16  have you reviewed the following exhibits which are now in

17  evidence, the 604-02 series of documents, the 604-03 series,

18  the 605-01 series, the 606 series, the 603 series, the 601

19  series, exhibits 401 through 404, and exhibits 1202-12,

20  1202-01, 1203-07, 1203-08, as well as the stipulations that

21  I've just read?

22  A.  Yes.

23             MR. REHN:  Ms. Pierre, can you please show the witness

24  Government Exhibit 3001.

25  Q.  Mr. O'Sullivan, before you took the stand today, I handed

1    you a copy of that.  Do you have that copy with you?

2    A.  Yes.

3    Q.  What is Government Exhibit 3001?

4    A.  It's a summary of information from the bank records.

5    Q.  This is a summary of information in the bank records that

6    I've just referenced that you reviewed?

7    A.  Yes.

8    Q.  And have you reviewed all of the information contained in

9    Government Exhibit 3001 to verify that it's an accurate summary

10   of information contained in these bank records?

11   A.  Yes.

12   Q.  Is the information contained in this exhibit taken from

13   those documents in evidence that I've listed?

14   A.  Yes.

15   Q.  And does each page of Government Exhibit 3001 identify the

16   Government Exhibits from which the information on that page is

17   taken?

18   A.  Yes.

19           MR. REHN:  Your Honor, the government offers

20   Government Exhibit 3001.

21           THE COURT:  Any objection?

22           MR. MURRAY:  Can I just meet with counsel, Judge?

23           THE COURT:  Yes, go ahead.

24           MR. MURRAY:  I have no objection, your Honor.

25           THE COURT:  It will be admitted.

M8NCrah2                          O'Sullivan- direct

1          (Government's Exhibit 3001 received in evidence)

2          MR. REHN:  Ms. Pierre, if you could publish that for

3    the jury, and if we could go to page 2.

4    BY MR. REHN:

5    Q.  Mr. O'Sullivan, in preparation for your testimony today,

6    were you asked to review records pertaining to the bank

7    accounts listed on this page?

8    A.  Yes.

9          MR. REHN:  If we could go to page 3.

10   Q.  Mr. O'Sullivan, did you review information pertaining to an

11   account in the name of Jasmina Transport Inc. at TD Bank?

12   A.  Yes, I did.

13   Q.  And who was the signatory on this bank account?

14   A.  Djonibek Rahmankulov.

15   Q.  What was the date this was opened?

16   A.  October 23rd, 2017.

17   Q.  And what was the address given for this company?

18   A.  6584 Austin Street, 4M, Rego Park, New York 11374.

19   Q.  What was the email address provided as the contact email

20   address for this bank account?

21   A.  Djonik1988@gmail.com.

22   Q.  And what was the telephone number associated with the bank

23   account?

24   A.  (917)717-9492.

25   Q.  And did the bank account records list what the line of

M8NCrah2                          O'Sullivan- direct

1    business for this company was?

2    A.  Yes.  It was General Freight Trucking, local.

3              MR. REHN:  If we can go to the next page, Ms. Pierre.

4    Q.  Did you also review records for a personal TD Bank account

5    in the name of Djonibek Rahmankulov?

6    A.  Yes.

7    Q.  Was he the signatory for that bank account?

8    A.  Yes.

9    Q.  When was this bank account opened?

10   A.  October 23rd, 2017.

11   Q.  This was on the same date as the business banking account

12   we looked at on the previous page?

13   A.  Yes.

14   Q.  What was the address for the personal bank account?

15   A.  6584 Austin Street, 4M, Rego Park, New York 11374.

16   Q.  Is that the same address that was listed for the business

17   account we looked at on the previous page?

18   A.  Yes.

19   Q.  What's the telephone none number?

20   A.  (917)717-9492.

21   Q.  Is that the same telephone number that was provided for the

22   business account?

23   A.  Yes.

24             MR. REHN:  Ms. Pierre, could you please bring up the

25   next page.  Looks like you're already there.

M8NCrah2                          O'Sullivan- direct

1  Q.  Did you also review records for a bank account in the name

2  of Jasur Transport Inc.?

3  A.  Yes.

4  Q.  Was this account also opened at TD Bank?

5  A.  Yes.

6  Q.  When was this account opened?

7  A.  On December 17th, 2019.

8  Q.  Who's the signatory for this bank account?

9  A.  Rohatoy Khudoynazarov.

10         MR. REHN:  Your Honor, I have another stipulation

11  labeled Government Exhibit 3503, which I would move into

12  evidence.

13         THE COURT:  Yes, it's admitted.

14         (Government's Exhibit 3503 received in evidence)

15         MR. REHN:  Ms. Pierre, can you please bring that up.

16  I'll just read the single paragraph in the stipulation.  It is

17  stipulated that Rohatoy Khudoynazarov is the spouse of the

18  defendant, Djonibek Rahmankulov.

19         Ms. Pierre, can we go back to Government Exhibit 3001

20  and the page we were on previously.

21  BY MR. REHN:

22  Q.  And for this bank account in the name of Jasur Transport

23  Inc., was this the same company address of the same accounts we

24  looked at?

25  A.  Yes, the Rego Park address.

M8NCrah2                          O'Sullivan- direct

1  Q.  What was the line of business listed for this company?

2  A.  Specialized Freight Trucking, local.

3         MR. REHN:  Ms. Pierre, if you could go to the next

4  page, please.

5  Q.  Mr. O'Sullivan, did you also review records for a company

6  called NY Consulting Management Corp.?

7  A.  Yes.

8  Q.  When was that bank account created?

9  A.  On February 5th, 2020.

10  Q.  Was that with the same signatory as the Jasur Transport

11  Inc. account we looked at in the previous page?

12  A.  Yes.

13  Q.  And that's the spouse of Djonibek Rahmankulov?

14  A.  Correct.

15  Q.  Does this have the same address as the other accounts we've

16  looked at?

17  A.  Yes.

18  Q.  What's the email address listed for this account?

19  A.  Djonik1988@gmail.com.

20         MR. REHN:  Ms. Pierre, if you can go back to page 3 of

21  this exhibit.

22  Q.  Mr. O'Sullivan, is the email address you just read the same

23  as the email address that was listed for the account in the

24  name of Jasmina Transport, which is in the name of Djonibek

25  Rahmankulov?

M8NCrah2                        O'Sullivan- direct

 1  A.  Yes.

 2          MR. REHN:  Ms. Pierre, we can go back to the page --

 3  Q.  What was the line of business listed for this bank account?

 4  A.  Business Management Consulting Services.

 5          MR. REHN:  Ms. Pierre, can we go to the next page.

 6  Q.  Did you also review records for a bank account at Chase

 7  Bank in the name of a company called EZ Seven Wholesale Inc.?

 8  A.  Yes.

 9  Q.  When was that account opened?

10  A.  On June 22nd, 2020.

11  Q.  Who's the signatory for that account?

12  A.  Djonibek Rahmankulov.

13  Q.  Is that the same company address that we've seen on the

14  previous accounts?

15  A.  It is.

16  Q.  Is the telephone number the same as the telephone number

17  for the first account we looked at?

18  A.  Yes.

19  Q.  What was the line of business listed for this company?

20  A.  Wholesale watches, office supplies, and office-related

21  merchandise.

22          MR. REHN:  Ms. Pierre, if you could please go to the

23  next page.

24  Q.  Mr. O'Sullivan, did you review records for another bank

25  account, this one at Bank of America, in the name of EZ Seven

1    Wholesale Inc.?

2    A.   Yes.

3    Q.   When was that bank account opened?

4    A.   March 12th, 2020.

5    Q.   Who's the signatory on that bank account?

6    A.   Djonibek Rahmankulov.

7    Q.   Now, Mr. O'Sullivan, did you review certain transactions in

8    the bank account in the name of Jasmina Transport that we've

9    just looked at?

10   A.   Yes.

11           MR. REHN:  Ms. Pierre, if we can just go back to

12   page 3.

13   Q.   So for this particular bank account, you reviewed some

14   transactions?

15   A.   Correct.

16           MR. REHN:  Ms. Pierre, if we can go to page 9.

17   Q.   Does page 9 contain a summary of certain transactions that

18   took place between February 28th, 2018, and March 2nd of 2018?

19   A.   Yes.

20   Q.   What was the balance in the Jasmina Transport Inc. TD Bank

21   account on February 27th action 2018?

22   A.   Negative $499.25.

23   Q.   Was there a deposit into that bank account on

24   February 28th, 2018?

25   A.   Yes.

M8NCrah2                          O'Sullivan- direct

1            MR. REHN:  Ms. Pierre, if you can just highlight that

2    line.

3    Q.   Mr. O'Sullivan, if you can tell us the source of that

4    deposit and the amount that was deposited into this bank

5    account.

6    A.   The source was Paulo Greco, and the amount was $93,451.

7    Q.   How was that deposit made into this account,

8    Mr. O'Sullivan?

9    A.   It's an ACH wire.

10           MR. REHN:  Ms. Pierre, if you can highlight the next

11   line.

12   Q.   Mr. O'Sullivan, if you can describe a transaction that took

13   place on March 2nd, another deposit into this account?

14   A.   Sure, the source of the deposit was May Supply Company.  It

15   was for $88,439.76.

16   Q.   Between February 28th, 2018 and March 2nd, 2018, how many

17   deposits -- what was the total amount of the deposits made into

18   the Jasmina Transport Inc. TD Bank account?

19   A.   $181,890.76.

20   Q.   Did you also look at certain withdrawals that took place on

21   March 1st and March 2nd?

22   A.   Yes.

23           MR. REHN:  Ms. Pierre, if you could highlight the

24   first line under withdrawals.

25   Q.   Mr. O'Sullivan, did you look at some withdrawals that were

M8NCrah2                              O'Sullivan- direct

1     made -- could you just describe what this line reflects?

2     A.  Sure.  That is the net amount of transfers from this

3     account to Djonibek Rahmankulov's personal TD Bank account.  I

4     believe it was four withdrawals and one deposit to that

5     account.  And the $136,119.29 represents the net of those

6     transactions.

7     Q.  So on March 1st and March 2nd, there were several

8     transactions and the net result was a transfer of $136,119.29

9     to the Djonibek Rahmankulov personal TD Bank account?

10    A.  Correct.

11            MR. REHN:  Ms. Pierre, if you could highlight the next

12    line under withdrawals.

13    Q.  Did you also review records showing a withdrawal from the

14    Jasmina Transport Inc. TD Bank account?

15    A.  Yes.

16    Q.  And what does this line reflect?

17    A.  It represents a cash withdrawal of $15,000 at the

18    21st Street and Park TD Bank branch.

19            MR. REHN:  If we can look at the next line.

20    Q.  Was there another withdrawal in the same day?

21    A.  It's the same day at a different branch, at the 23rd Street

22    and Broadway branch for $30,000.

23    Q.  Do these two lines reflect cash withdrawals?

24    A.  Yes.

25    Q.  So to summarize the withdrawals that took place in the

M8NCrah2                           O'Sullivan- direct

1   Jasmina Transport Inc. TD Bank account on March 1st and

2   March 2nd, what was the total amount of withdrawals from this

3   bank account?

4   A.  $181,119.29.

5   Q.  What was the balance in this account at the end of the

6   month in March 2018?

7   A.  $358.

8          MR. REHN:  Ms. Pierre, if we could move to the next

9   page.

10  Q.  Mr. O'Sullivan, could you describe what we see on page 10

11  of Government Exhibit 3001.

12  A.  Sure.  It's the checking withdrawal slip from the

13  withdrawal on March 1st, 2018, for $30,000 at the 23rd Street

14  and Broadway branch.

15  Q.  Was this one of the withdrawals that we looked at on the

16  previous page?

17  A.  Correct.

18  Q.  A cash withdrawal from the Jasmina Transport Inc. bank

19  account?

20  A.  Yes.

21  Q.  And you said this took place at the 23rd and Broadway TD

22  Bank?

23  A.  Correct.

24  Q.  Which borough is that located in?

25  A.  It's Manhattan.

M8NCrah2                        O'Sullivan- direct

1              MR. REHN:  If we could go to the next page.

2    Q.  What does this reflect?

3    A.  That reflects like a snapshot of the video surveillance

4    that was taken at the bank on that date, March 1st, 2018.  This

5    particular snapshot was at approximately 10:25 a.m., 23rd and

6    Broadway branch.

7              MR. REHN:  If we can go to the next page.

8    Q.  And what is this?

9    A.  That is another snapshot of the surveillance taken at the

10   bank at 23rd and Broadway at approximately 10:44 a.m.

11   Q.  So do these photographs line up with the time of this

12   withdrawal took place?

13   A.  Yes.  If you go back to the withdrawal slip, it indicates

14   the time that was processed by the bank.  I think it was about

15   10:35 a.m.

16   Q.  And if we look at --

17             MR. REHN:  Actually, Ms. Pierre, if you can bring this

18   down momentarily.

19             I'd like to offer another stipulation, Government

20   Exhibit 3502.

21             THE COURT:  Go ahead.

22             MR. REHN:  Ms. Pierre, if you can bring that up.

23             I'll read paragraph 1 of this stipulation.

24             Government Exhibit 2503-A is a photograph of the

25   defendant, Djonibek Rahmankulov, taken during processing

M8NCrah2                        O'Sullivan- direct

1   following his arrest on September 17th, 2020.

2              Your Honor, the government moves to admit Government

3   Exhibit 2503-A.

4              THE COURT:  Admitted.

5              (Government's Exhibit 2503-A received in evidence)

6              MR. REHN:  Ms. Pierre, if you can bring up Government

7   Exhibit 2503-A.

8              Ms. Pierre, if we can go back to the page we were

9   looking at from Government Exhibit 3001.

10             Ms. Pierre, can we please go to page 13.

11  BY MR. REHN:

12  Q.  Mr. O'Sullivan, is this a withdrawal slip from the second

13  withdrawal from Jasmina Transport that took place on March 1st,

14  2018?

15  A.  Yes, it's a copy of the front and back of the withdrawal

16  slip.

17  Q.  Where did this withdrawal take place?

18  A.  21st and Park.

19  Q.  Which borough is that in?

20  A.  Manhattan.

21  Q.  And you mentioned the time, I just want, for the jury's

22  benefit, if you could highlight where or if you could point to

23  where on this withdrawal slip you can see what time this

24  transaction took place.

25  A.  Look at the second page, which would be the back of the

M8NCrah2                        O'Sullivan- direct

1    withdrawal slip.  On the first line, the second set of numbers

2    is 110053.  That's the times, military time.  So it would be a

3    24-hour clock.  So it would be 11:00 a.m. and 53 seconds.  To

4    the right of that is the date, which is 20180301, which is

5    March 1st, 2018.

6    Q.  So what we're seeing on the screen, to be clear, is two

7    images, one shows the front and one shows the back of the

8    withdrawal slip?

9    A.  Correct.

10   Q.  You indicated on the back of the withdrawal slip, we can

11   see the time and date of this withdrawal?

12   A.  Sure, and the branch.

13   Q.  And the branch where it took place.

14       MR. REHN:  Ms. Pierre, can you please go to the next

15   page.

16   Q.  Mr. O'Sullivan, can you describe what's on page 14 of

17   Government Exhibit 3001?

18   A.  It's a video snapshot of the surveillance taken at 21st and

19   Park TD branch -- of TD branch at approximately 11:02 on

20   March 1st, 2018.

21   Q.  And so, what's the difference in time between this

22   withdrawal and the previous withdrawal we were looking at?

23   A.  It's about around a half an hour.

24       MR. REHN:  Ms. Pierre, if we can go to the next page.

25   Q.  Mr. O'Sullivan, what do we see on the next page?

M8NCrah2                        O'Sullivan- direct

A.   It's another snapshot of the video surveillance at the TD

branch -- TD Bank branch located at 21st and Park on March 1st,

2018, at approximately 11:08 a.m.

Q.   These are both the withdrawals that took place from that

Jasmina Transport Inc. bank account on March 1st; is that

right?

A.   Correct.

          MR. REHN:  If we can briefly go back to page 9.

Q.   So the withdrawal slips and photos we've just looked at,

which lines on this sheet do they line up with?

A.   Those would be the ones in the withdrawal section below the

personal account.  The 3/1/2018 withdrawal at 21st and Park for

$15,000 and the following withdrawal at 23rd and Broadway for

$30,000.

          MR. REHN:  If we can go to page 16 of this exhibit,

Ms. Pierre.

Q.   Mr. O'Sullivan, were you also asked to look at some records

relating to an account in the name of a company called Gift and

Works USA Inc.?

A.   Yes.

Q.   Who was the signatory on that account?

A.   Sara Sakhrani.

Q.   When was that account opened?

A.   May 24th, 2018.

Q.   Where is the company address for that account?

1    A.   110 West 40th Street, unit 1408, New York, New York 10018.

2              MR. REHN:  Ms. Pierre, if you could please go to

3    page 17.

4    Q.   Mr. O'Sullivan, could you describe what we see on page 17.

5    A.   Sure.  It's a deposit slip for the Gift and Works account

6    at TD Bank.

7    Q.   When did the deposit that this deposit slip correlates to

8    take place?

9    A.   On July 22nd, 2020.

10   Q.   What was the amount of the deposit?

11   A.   It was $150,915.

12   Q.   And how was this deposit made into this account?

13   A.   Physical deposit into the account.

14   Q.   Do you know what kind of financial instrument was used?

15   A.   It was a series of four checks that made up the total.

16   Q.   So it was four checks that collectively made up $150,915?

17   A.   Correct.

18             MR. REHN:  If we can go to the next page.

19   Q.   Can you describe what the page reflects?

20   A.   These four checks that are seen, two from New York

21   Consulting Management Corp., one from Jasmina Transport Inc.,

22   and one from EZ Seven Wholesale, total $150,915, and that's the

23   total deposit.

24   Q.   So these four checks were deposited into the Gift and Works

25   account on July 22nd, 2020?

M8NCrah2                    O'Sullivan- direct

1    A.  Correct.

2    Q.  If we look at those top two checks, you mentioned they come

3    from NY Consulting Management Corp.  Is that a TD Bank account?

4    A.  It is.

5    Q.  Is that the TD Bank account where we looked at the account

6    opening information earlier?

7    A.  Yes.

8    Q.  And if we look at the check on the lower left-hand side,

9    what company is that check from?

10   A.  TD Bank -- oh, it's from Jasmina Transport Inc.

11   Q.  And which bank?

12   A.  TD Bank.

13   Q.  And is that also a company whose account opening

14   information we looked at earlier?

15   A.  Yes.

16   Q.  On the lower right-hand side, what company is that check

17   from?

18   A.  Seven Wholesale Inc.

19   Q.  Is that also a company whose account opening information we

20   looked at earlier?

21   A.  Yes, it was a Chase account we looked at earlier.

22   Q.  Did you also review some surveillance images for this

23   deposit?

24   A.  Yes.

25          MR. REHN:  If we can go to page 19.

M8NCrah2                        O'Sullivan- direct

1   Q.  If you can describe what we see on page 19 of Government

2   Exhibit 3001

3   A.  This is a snapshot of the surveillance of the TD Bank's

4   Flushing branch on July 22nd, 2020, at approximately 2:55 p.m.

5         MR. REHN:  And if we can go to page 20.

6   A.  Again, another snapshot of the same day, same time.

7   Q.  Are these two snapshots taken from the same deposit,

8   different parts of the same video?

9   A.  Yes.  And I believe it's the drive-through window.

10  Q.  It's a drive-through window?

11  A.  Correct.

12  Q.  So I take it that bank's not in Manhattan?

13  A.  No.  It's in Flushing, Queens.

14        MR. REHN:  If we can go to page 21.

15  Q.  Could you describe what we see on page 21.

16  A.  Sure.  It's a deposit slip from July 27th, 2020 at the TD

17  Bank South Flushing branch in the amount of $149,287.

18  Q.  How was this deposit made into the Gift and Works account?

19  A.  It was a physical deposit of six checks which comprised the

20  $149,287 total.

21        MR. REHN:  If we can look at page 22 of this exhibit.

22  Q.  Are these three of those six checks?

23  A.  Yes.

24  Q.  And where were these checks drawn from?

25  A.  They were from the EZ Seven Wholesale Inc. account at Chase

M8NCrah2                        O'Sullivan– direct

1   Bank.

2   Q.  What's written on the memo line of these checks?

3   A.  It says invoice.

4         MR. REHN:  If we can go to the next page, please,

5   Ms. Pierre.

6   Q.  What is on this page, page 23?

7   A.  The other three checks that comprised the total of

8   $149,287.

9   Q.  And are the top two checks from that EZ Seven Wholesale

10  Chase Bank account?

11  A.  Yes.

12  Q.  And where is the bottom check from?

13  A.  A2B Transportation.

14        MR. REHN:  If we can go to the next page.

15  Q.  Could you describe what we see on page 24 of Government

16  Exhibit 3001?

17  A.  This is another digital snapshot of surveillance from the

18  TD Bank South Flushing branch on July 27, 2020, at

19  approximately 1:42 p.m.

20  Q.  So this is a surveillance still taken from a video showing

21  the transaction we've been discussing?

22  A.  Correct.

23        MR. REHN:  If we could go to page 25.

24  Q.  What is page 25 of Government Exhibit 3001?

25  A.  It's a deposit slip for Gift Works USA Inc. made on

M8NCrah2                        O'Sullivan- direct

1    July 29th, 2020, in the amount of $198,765.

2    Q.  You said this was nine checks?

3    A.  I didn't say --

4    Q.  I'm sorry.

5    A.  It's -- the total is composed of nine individual checks.

6              MR. REHN:  Could we go to page 26.

7    Q.  Are these some of the checks that made up this deposit?

8    A.  Those are three of the checks that make up the total.

9    Q.  If we look at the check on the upper left-hand corner,

10   where is that check drawn from?

11   A.  From NY Consulting Management Corp.

12   Q.  That's the TD Bank account we looked at previously?

13   A.  Correct.

14   Q.  What was written in the memo line of this check?

15   A.  It says electronic.

16   Q.  And if we look at the check on the upper right-hand side,

17   what does that check say?

18   A.  It's EZ Seven Wholesale Inc. and the memo line says

19   electronic.

20   Q.  And what's the bottom check?

21   A.  Bottom check is a check from Rego RX Pharmacy.

22             MR. REHN:  Ms. Pierre, can we go to page 27 of this

23   exhibit.

24   Q.  What do we see on page 27?

25   A.  Three more of the checks that are part of the nine checks

M8NCrah2                          O'Sullivan- direct

1    that make up the deposit for $198,765.

2    Q.  Are two of these checks from the Rego RX Pharmacy?

3    A.  Yes, they are.

4    Q.  Where is the third check from?

5    A.  Chaykhana 1 Inc.

6          MR. REHN:  Ms. Pierre, can we go to page 28 of

7    Government Exhibit 3001?

8    Q.  Mr. O'Sullivan, what's on page 28 of Government

9    Exhibit 3001?

10   A.  The last three checks that make up the total of $198,765,

11   and all three are from Rego RX Pharmacy.

12   Q.  Mr. O'Sullivan, did you also look at surveillance

13   associated with this deposit?

14   A.  Yes.

15         MR. REHN:  Ms. Pierre, could you bring up page 29 of

16   Government Exhibit 3001.

17   Q.  What do we see on page 29?

18   A.  It's a snapshot of the surveillance from TD Bank South

19   Flushing branch on July 29th, 2020, at approximately 12:03 p.m.

20         MR. REHN:  And if you could go to the next page,

21   Ms. Pierre.

22         THE COURT:  Mr. Rehn, do you want to tell me when it

23   would be a good time to take our morning break.

24         MR. REHN:  Yes, your Honor.  We're almost done with

25   this witness and I think that would be a good time.

1              THE COURT:  Sure.

2              MR. REHN:  Ms. Pierre, could you please go to page 30.

3    Q.  Mr. O'Sullivan, what's on page 30?

4    A.  This is a snapshot of the video surveillance at the TD Bank

5    South Flushing branch on July 29th, 2020, at approximately

6    12:03, 12:04 p.m.

7    Q.  What do we see in this image?

8    A.  It's a dark Mercedes Benz with New York plate, I believe

9    the first three letters are JPJ, but I can't make out the rest

10   of the numbers.

11             MR. REHN:  Ms. Pierre, if you could bring up

12   Government Exhibit 1501, and this is an exhibit that was

13   stipulated in.  It's an exhibit from the DMV.  So if you could

14   go to page 4 of exhibit 1501.  Ms. Pierre, if you could just

15   bring up the registration information in the middle of this

16   page to expand it.

17   Q.  Mr. O'Sullivan, is this a registration for a particular

18   vehicle?

19   A.  Yes, it is.

20   Q.  What type of vehicle?

21   A.  It's a 2017 Mercedes Benz E300, four-door sedan, black.

22   Q.  What's the license plate of this vehicle?

23   A.  JPJ3794.

24   Q.  And who is this vehicle registered to?

25   A.  DH Rahmankulov.

M8NCrah2                        O'Sullivan- direct

1    Q.  What's the address where it's registered?

2    A.  6584 Austin street, 4M, Rego Park, New York 11374.

3            MR. REHN:  Ms. Pierre, you can bring that down.

4    Q.  Mr. O'Sullivan, aside from your work in helping to prepare

5    and review this chart, Government Exhibit 3001, have you had

6    any other involvement with this case?

7    A.  Just limited.  I ran some bank record reports for one of

8    the prosecutors and I sat in on -- I guess it was witness prep

9    as a witness for the prosecutor all prior to being asked to

10   testify on this trial.

11           MR. REHN:  Thank you, no further questions.

12           THE COURT:  Why don't we take a short break.

13           Let me just ask you, are you going to have any cross

14   examination?

15           MR. MURRAY:  Very short.

16           THE COURT:  Why don't we do it after the break.  We'll

17   take a short break and we'll resume.

18           Just remember, folks, keep an open mind and don't

19   discuss the case.

20               (Continued on next page)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M8NCrah2                           O'Sullivan- direct

1              (Jury not present)

2              THE COURT:  Why don't we come back in ten minutes.  At

3    some point today, I'm hoping you can tell me what the status of

4    your negotiations with respect to the subpoenas are, but we

5    don't need to do it right now.  Thank you.

6              (Recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M8N6RAH3                         O'Sullivan - Cross

 1              THE COURT:  You can be seated.  We're just bringing

 2     the jury out.

 3              (Pause)

 4              (Jury present)

 5              THE COURT:  Everyone can be seated.

 6     Cross-examination, Mr. Murray?

 7              MR. MURRAY:  Yes, your Honor.  Thank you.

 8     CROSS-EXAMINATION

 9     BY MR. MURRAY:

10     Q.  Good afternoon, Mr. O'Sullivan.

11              First of all, I want to thank you for your prior

12     service to the FBI and your continued service to the

13     government.

14              MR. MURRAY:  Can I please ask for Exhibit 3001 to be

15     put back up?  Can we scroll to Page 9, please?

16              Thank you.

17     BY MR. MURRAY:

18     Q.  I want to commend you on the work you did here.  It looks

19     so professional, even to me, I thought at first this was

20     actually a bank record.  But this is something you just

21     prepared based on the information you were given, correct?

22     A.  Correct.

23     Q.  Okay.  And the information, if you look on Page 9 where, on

24     the left, it indicates withdrawal, do you see that section?

25     A.  Yes.

M8N6RAH3                          O'Sullivan - Cross

1   Q.  Okay.  And then date, destination and amount, those are the

2   columns, right?

3   A.  Correct.

4   Q.  Okay.  So in date 3/1/2018 to 3/2, the first one, it

5   indicates that Djonibek Rahmankulov personal TD Bank account,

6   $136,119.29, correct?

7   A.  Yes.

8   Q.  Where did you get that information from?

9   A.  From the bank statements.

10  Q.  Which bank statement?

11          Well, when I say -- I'm sorry.  Let me rephrase that.

12          When I say, "which bank statement," are you talking

13  about his personal TD Bank statement or this Jasmina Transport

14  statement?

15  A.  The Jasmina Transport statement.

16  Q.  Okay.  Did you ever look at the TD Bank personal account of

17  my client?

18  A.  Yes.

19  Q.  Okay.  Did you see that deposit reflected there?

20  A.  I know that the account numbers on the statement for

21  Jasmina indicated that it was the personal account of

22  Djonibek Rahmankulov.  I don't know the account number.  I

23  think it was --

24  Q.  No, it's fine.  I don't need the account number.

25          What I'm asking is, did you see that $136,000

M8N6RAH3                          O'Sullivan - Cross

1    reflected in the TD personal account?

2    A.  You wouldn't see $136,000 itself because it's composed of

3    five different numbers.  It's composed of four transfers and

4    one -- a withdrawal with one deposit, so that's a net number.

5    That is a single number.  That would be five different numbers

6    that would appear on the statement.

7    Q.  Okay.  So that explains why you have 3/1 to 3/2.  There was

8    a series of transactions between 3/1 and 3/2 that totaled

9    136,000?

10   A.  Right.  There were four withdrawals and one deposit.

11   Q.  Okay.  Now --

12   A.  Into his personal -- like, so, four withdrawals went into

13   his personal account, and one deposit came into the Jasmina

14   account from his personal account.

15   Q.  Okay.  Now, I just want to follow-up on this, because it

16   just -- I know you didn't intend it to be, but it seems a

17   little deceiving.  Isn't it a fact that most of that money was

18   frozen and returned to the bank?

19   A.  Um --

20   Q.  And when I say "most," everything except for the 15 and

21   30,000 withdrawals, because obviously, they're gone.  They were

22   already withdrawn?

23   A.  Well, they went into his personal account.

24   Q.  I'm sorry.

25   A.  I don't know what you're asking.

M8N6RAH3                       O'Sullivan - Cross

1   Q.  What I'm asking is, the summary of those four transactions

2   over that period, 3/1 to 3/2, that amounted to 136,000, isn't

3   it a fact that that money was returned?

4   A.  I don't know because I'm only reflecting on this chart what

5   happened on 3/1 and 3/2, not what happened to the money

6   subsequently, or if it's even the same money.

7   Q.  But did you look at -- that's why I asked you.  And I'm

8   sorry if you didn't look at it, that's fine.  You wouldn't

9   know.

10          Did you look at Djonibek Rahmankulov's personal

11  TD Bank statement where this would be reflected?

12  A.  I don't recall that, but if you want to bring it up, I

13  could definitely take a look at it.

14  Q.  No.  No.  No.  I'm just asking you if you recall looking at

15  that.

16  A.  I don't recall looking at it right now, no.

17  Q.  Okay.  So basically, if these were charged back or

18  frozen -- I'm not sure the terminology.  Maybe can you correct

19  me.  When the bank freezes assets and takes it back, what is

20  that called?

21  A.  I'd say a frozen -- frozen -- frozen account.  I don't

22  think they actually take the funds back.  They just freeze them

23  and don't allow you to withdraw them, if that's what you're

24  talking about.

25  Q.  Yes.

M8N6RAH3                        O'Sullivan - Cross

1    A.  Okay.  I mean, I think there are also times where the

2    government comes in and actually takes the money, but that's

3    something different.

4    Q.  Okay.  But to your knowledge, you did not see that in the

5    statement you were provided?

6    A.  I don't remember if I saw that.  I know on one of the

7    accounts, I saw something where the Marshals took some money,

8    but I don't recall specifically on which account it was.

9    Q.  Okay.  I'll move on.

10               MR. MURRAY:  If we could just scroll on down to 12, I

11   think it is.

12   BY MR. MURRAY:

13   Q.  I know you had very limited interactions with this case,

14   but I do recall at the end of your testimony, you said you sat

15   in on a witness prep or something like that.  So you do have

16   some knowledge of the case, correct?

17   A.  Yes.

18   Q.  Okay.  Can you look at what's on the screen as Page 12 from

19   Exhibit 3001?  Can you look at the picture?

20   A.  Yes.

21   Q.  Okay.  Do you recognize anyone in that picture?

22   A.  No.

23   Q.  Okay.  Have you ever heard the name Djonibek Rahmankulov

24   before viewing this picture?

25   A.  I've heard that name, but it's on these documents.

M8N6RAH3                      O'Sullivan - Cross

1    Q.  Well, I'm sorry.  One second.  I'm sorry.

2              When I say, "heard the name," did you make an

3    identification in this picture as to who that was in the

4    picture?

5    A.  No, I've never seen Djonibek Rahmankulov before.

6    Q.  So who told you to put that picture in there?

7    A.  This -- this chart was done at the request of the

8    prosecutors.  So I just put it together.

9    Q.  So the prosecutors said, "Hey, could you insert this in

10   this, you know, slide"?

11   A.  Yes, I don't know the defendant.

12   Q.  Okay.  So I wanted to ask you the person next to who is the

13   defendant, we'll acknowledge, in that picture, the person next

14   to that defendant, did you recognize that person at all as

15   maybe any witness that you viewed in your prep?

16   A.  No.  All the prep I did was on the phone, so I never saw

17   anyone.

18   Q.  Okay.  That clarifies that.  I was just going to ask if you

19   recall the name Odil Sharipov.

20   A.  I've heard that name I think in connection with doing

21   some -- remember, I said I did some bank record checks.  I've

22   heard the name, but I don't know who that is either.

23   Q.  Do you know whether or not you heard it in the context that

24   he's a business associate of Mr. Rahmankulov?

25   A.  I don't know who he is.  I just know that I was asked to

M8N6RAH3                      Wixsom – Direct

1   run that name on some sort of financial database to see if

2   there was anything on him.

3   Q.  And only because your incredible experience, 23 years with

4   the FBI doing this kind of work, were you asked at all about

5   any of the underlying allegations to give your thoughts on?

6   A.  No.

7   Q.  Okay.

8           MR. MURRAY:  Well, thank you very much.  I appreciate

9   it.

10          THE COURT:  Redirect?

11          MR. REHN:  No redirect, your Honor.

12          THE COURT:  Okay.  You can step down.  Thank you.

13          (Witness excused)

14          THE COURT:  The government may call its next witness.

15          MR. REHN:  Your Honor, the witness calls

16  Richard Wixsom.

17   RICHARD WIXSOM,

18       called as a witness by the Government,

19       having been duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  BY MR. REHN:

22  Q.  Good morning, can you please state your name?

23  A.  Richard Wixsom.

24  Q.  Where do you currently live?

25  A.  Centerville, Massachusetts.

M8N6RAH3                        Wixsom – Direct

1    Q.  What do you do for a living?

2    A.  I'm a retired chief information technology officer.

3    Q.  Where were you employed as a chief information technology

4    officer?

5    A.  At Cape Cod Community College for the last five years,

6    until July of 2022.

7    Q.  What is Cape Cod Community College?

8    A.  It is a community college for the state of Massachusetts.

9    It's one of the 15 state community colleges.

10   Q.  Could you please describe your work duties as chief

11   information technology officer at Cape Cod Community College?

12   A.  I was involved in all aspects of technology, which related

13   to things whether it be the classroom, the network, you know,

14   computers.

15   Q.  Were you involved in network security as well?

16   A.  I was, yes.

17   Q.  I want to direct your attention to the time period of

18   November 2018.  Were you the chief IT officer at Cape Cod

19   Community College at that time?

20   A.  I was.

21        MR. REHN:  Mr. Imperato, can you please show the

22   witness Government Exhibit 1303?

23   BY MR. REHN:

24   Q.  Do you recognize this exhibit?

25   A.  I do.

1    Q.  What is this document?

2    A.  This is a copy of an e-mail that was sent to our grants

3    accountant back on Monday, November, 26th of 2018.

4    Q.  Was this a document maintained by Cape Cod Community

5    College in the ordinary course of business?

6    A.  Yes, it was.

7             MR. REHN:  Your Honor, the government offers

8    Government Exhibit 1303.

9             THE COURT:  Any objection?

10            MR. MURRAY:  I have no objection.

11            THE COURT:  Admitted.

12            (Government's Exhibit 1303 received in evidence)

13            MR. REHN:  Bring that up, please.  And if we could

14   expand the top portion of the e-mail, the date and the "From"

15   and the "To," all that stuff up there.

16   BY MR. REHN:

17   Q.  So when was this e-mail sent?

18   A.  It was sent on Monday the 26th of November 2018 at

19   approximately 9:35 a.m.  It was sent to our grants accountant,

20   Maribeth Malloy.

21   Q.  Where it says, "To: mmalloy@capecod.edu," that's the e-mail

22   address for your grants accountant?

23   A.  Yes.

24   Q.  What's her general job description?

25   A.  She would be the one that did the bookkeeping on any grants

M8N6RAH3                          Wixsom - Direct

1    that the college was involved in.

2    Q.  And who is this e-mail from?

3    A.  This is from an associate from a sister school,

4    Massasoit Community College.  It is something that Maribeth

5    would have corresponded with in the course of her business.

6    Q.  In your capacity as chief IT officer at Cape Cod Community

7    College, was this e-mail brought to your attention in November

8    of 2018?

9    A.  It was brought to my attention on the following day in the

10   afternoon.

11   Q.  Did you subsequently commission a forensic investigation

12   into this e-mail and a network security incident in connection

13   with it?

14   A.  The college contracted with EY to do a forensic analysis on

15   not only on this e-mail, but the entire security breach that

16   happened.

17   Q.  Based on that forensic analysis, do you have an

18   understanding of where this e-mail was sent from?

19   A.  Hold on.  If I could reference my notes here?

20   Q.  Would that help you refresh your recollection?

21   A.  Yes.

22            So Ernst & Young found that the initial e-mail was

23   sent from an IP block that is associated with an ASN in Bosnia

24   and Herzegovina.

25   Q.  Now, you mentioned that this e-mail comes from an e-mail

1   address associated with a sister college; is that correct?

2   A.  That's correct.

3   Q.  Is that a real e-mail address and a real person?

4   A.  This is a real e-mail address.  And Maribeth actually, from

5   my recollection, sent a response back to this person, saying,

6   "Did you really send me this" after she had opened up the Word

7   document and it didn't work properly for her.

8   Q.  But even though this is from a real e-mail address at a

9   Massachusetts college, you're saying that the actual sender was

10  physically located in Bosnia?

11  A.  That's correct.  The assumption is that the e-mail address

12  was compromised.

13           MR. REHN:  Mr. Imperato, can you scroll down to the

14  body of the e-mail.

15  BY MR. REHN:

16  Q.  Mr. Wixsom, can I ask you to read the body of this e-mail?

17  A.  You want me to what?  I'm sorry.

18  Q.  If you could read the text of the e-mail through

19  "Respectfully."

20  A.  Well, "respectfully" is spelled wrong, which is an

21  indicator of a phishing attack.

22  Q.  If you just could read the first two lines of the e-mail?

23  A.  Sure.  It's --

24           MR. MURRAY:  Your Honor, can I just object to, he's

25  not qualified as a witness.  He's giving opinions as to what

M8N6RAH3                    Wixsom – Direct

1    things represent.  I'm just asking that he answer the question

2    that's asked.

3              THE COURT:  I'm going to overrule the objection to the

4    specific responses thus far.  But I'll be thoughtful to your

5    objection, going forward.

6              MR. MURRAY:  Thank you.

7    BY MR. REHN:

8    Q.  If you could just read the first two lines of this e-mail?

9    A.  Tina Vogel Pransky?

10   Q.  No, sorry.  The top two lines.

11   A.  Oh, the top two lines.

12             "Sorry for the delay.  Make arrangements to pay the

13   balance as soon as possible."

14             MR. REHN:  And if we could go to the top part of the

15   e-mail again.

16   BY MR. REHN:

17   Q.  Mr. Wixsom, was there an attachment connected to this

18   e-mail?

19   A.  Yes, it was a Microsoft Word document that was attached.

20   Q.  Based on the forensic examination, what did you learn about

21   the nature of this attachment?

22   A.  The attachment was a -- had a macro associated with it.

23   And from the analysis, the macro initiated a PowerShell script

24   when it was opened up.  And the macros were enabled, and the

25   PowerShell script downloaded a malware called Emotet.

M8N6RAH3                         Wixsom - Direct

1   Q.  And so did Maribeth Malloy actually open this attachment

2   and enable the macro?

3   A.  She did.  She opened the attachment, and she enabled the

4   macros.  And the screen came up blue, so she -- that's when she

5   contacted the person at Massasoit.

6   Q.  I'm sorry.  I didn't catch the name of the malware that you

7   mentioned.

8   A.  It's called Emotet, E-M-O-T-E-T.

9   Q.  And what is your understanding of what the Emotet virus

10  does?

11  A.  The Emotet virus is a -- what they call a downloader virus.

12  So it downloads other viruses.  In this particular case, the

13  Emotet virus also downloaded a piece of malware called

14  IcedID -- IcedID, which is a banking Trojan virus.

15  Q.  Now, I believe you said earlier that you became aware of

16  this e-mail on November 27, 2018, the next day?

17  A.  That's correct.

18  Q.  Did something unusual happen with the Cape Cod Community

19  College network on November 27, 2018?

20  A.  It did.  It actually -- the network went down around a

21  quarter after 12:00 in the afternoon during the course of our

22  normal business, so IT then started initiating a call to our

23  Internet service provider, Comcast, to see if there were

24  problems with the Internet.

25  Q.  And what, if anything, did you learn about the reason for

1    the network to go down on that day?

2    A.  So after a few hours, Comcast called us back and said that

3    we actually had a saturation of our bandwidth in our network,

4    in our Internet network, and that immediately caused me to

5    think that we were being attacked with a denial-of-service

6    attack.

7    Q.  What did you do after you formed that conclusion?

8    A.  I initiated a contact with my network people, and I told

9    them to please physically disconnect that one building from the

10   network.  And as soon as we did that, the Internet came back up

11   for the other remaining buildings.

12   Q.  The building that you physically disconnected, what offices

13   are located in that building?

14   A.  That's where our finance office is.  That's where

15   Maribeth Malloy was seated.  And we ended up having to pull

16   about 35 hard drives from the various machines in that building

17   because the Emotet virus also does a propagation to multiple

18   machines within your subnet.  And that's how the

19   denial-of-service attack occurred.  So we immediately pulled

20   all the hard drives out and replaced them with --

21             THE COURT:  Could repeat that.  Replaced them with...

22             THE WITNESS:  With new hard drives.

23             THE COURT:  New hard drives.  Thank you.

24   BY MR. REHN:

25   Q.  Mr. Wixsom, did you become aware of any financial

M8N6RAH3                         Wixsom - Direct

1    transactions that took place in Cape Cod Community College's

2    bank account on November 27, 2018?

3    A.  I did.

4         MR. REHN:  If could you show the witness what's been

5    marked for identification Government Exhibit 1301.

6    BY MR. REHN:

7    Q.  Do you recognize this document?

8    A.  I do.  It's the bank statement for November of 2018.

9    Q.  And is this a bank statement for a bank account in the name

10   of Cape Cod Community College?

11   A.  That's correct.

12   Q.  Is this a record that Cape Cod Community College maintained

13   in the course of its ordinary business?

14   A.  Yes, it is.

15        MR. REHN:  Your Honor, the government offers

16   Exhibit 1301.

17        THE COURT:  Any objection?

18        MR. MURRAY:  No objection.

19        THE COURT:  Admitted.

20        (Government's Exhibit 1301 received in evidence)

21        MR. REHN:  If we could publish this to the jury.

22   BY MR. REHN:

23   Q.  On the first page here, is this the first page of the bank

24   statement showing the date rage of November 2018?

25   A.  It is.

M8N6RAH3                          Wixsom - Direct

1    Q.  And again, that says "Cape Cod Community College" --

2    A.  That's correct.

3    Q.  -- in the upper left.

4         Why does it say "Commonwealth of Massachusetts" above

5    that?

6    A.  Because Cape Cod Community College is an agency -- higher

7    education agency of the Commonwealth Of Massachusetts.

8    Q.  If I could turn your attention to Page 15 of this document?

9         MR. REHN:  And Mr. Imperato, if you could expand the

10   portion of this page that has the header, "Other Withdrawals."

11   BY MR. REHN:

12   Q.  Mr. Wixsom, does this reflect that there were a number of

13   outgoing wire transfers on November 27, 2018?

14   A.  That is correct.

15   Q.  And do you see anything -- do you notice anything in

16   particular about those transactions?

17   A.  They were all just under $100,000.  $100,000 was our

18   maximum withdrawal before we would be contacted.

19   Q.  Are those transactions typical business transactions for

20   Cape Cod Community College based on your experience?

21   A.  Ones from November 27 are not.

22   Q.  Did you learn, in the course of your employment, the total

23   amount of money that was wired out of the Cape Cod Community

24   College account on this date?

25   A.  Yes, I did.  It was approximately $807,000.

M8N6RAH3                          Wixsom – Direct

1   Q.  And was any of that money actually recovered by the

2   college?

3   A.  Yeah.  We recovered all but $129,000 of that.

4   Q.  So was the total loss to the college 129,000?

5   A.  It was, approximately 129,000.

6   Q.  Now, I'd like to direct your attention to the fourth

7   outgoing wire transfer on November 27.

8   A.  Okay.

9           MR. REHN:  If could you highlight that, Mr. Imperato.

10  No, the fourth one, sorry.  On the date of the 27th, the one

11  that says, "Sadullo transfer."

12  BY MR. REHN:

13  Q.  Mr. Wixsom, do you see that particular wire transfer?

14  A.  I do.

15  Q.  And is that a wire transfer from Cape Cod Community College

16  to Sadullo Transportation Inc. in the amount of $99,100?

17  A.  I'm sorry.  Can you repeat that, please?

18  Q.  Is that a wire transfer that took place on

19  November 27, 2018 from Cape Cod Community College to

20  Sadullo Transportation Inc. in the amount of $99,100?

21  A.  Yes, it is.

22  Q.  In your work at Cape Cod Community College, did you learn

23  whether Sadullo Transport is an authorized vendor of the

24  college?

25  A.  From what I have found out, no, they are not.  We had never

M8N6RAH3

1    done any transactions with them prior to this.

2              MR. REHN:  Thank you.  No further questions.

3              THE COURT:  Any cross-examination?

4              MR. MURRAY:  Just a couple, Judge.  I'm sorry.

5    CROSS-EXAMINATION

6    BY MR. MURRAY:

7    Q.  I'm sorry.  I just want to be quick with you.

8              Did you ever, in the course of this hacking that you

9    experienced, identify anything that was sent to

10   Jasur Transport?

11   A.  Did I identify anything that was sent to?

12   Q.  Jasur Transport?

13   A.  I did not.  Whatever was on the bank statement was --

14   Q.  Does New York Consulting sound familiar?

15   A.  (Shakes head)

16   Q.  No?

17   A.  No.

18   Q.  EZ Seven?

19   A.  No.

20             MR. MURRAY:  Thank you.  I have nothing further.

21             THE COURT:  Anything further from the government?

22             MR. REHN:  Nothing for the government, your Honor.

23             THE COURT:  You can step down.  Thank you, sir.

24             (Witness excused)

25             MR. REHN:  And the government calls Alena Volynkina.

M8N6RAH3                          Volynkina - Direct

1    ALENA VOLYNKINA,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4              THE WITNESS:  Alena Volynkina, A-L-E-N-A

5    V-O-L-Y-N-K-I-N-A.

6              THE COURT:  Good afternoon.  It can be very difficult

7    to hear in this courtroom, so I'm just going to ask you to

8    speak very loudly and clearly into the microphone.  Thank you

9    so much.  You may proceed.

10   DIRECT EXAMINATION

11   BY MR. REHN:

12   Q.  Good morning, Ms. Volynkina.  Where do you currently live?

13   A.  I live on Cape Cod, Massachusetts.

14   Q.  What do you do for a living?

15   A.  An accountant, certified public accountant.

16   Q.  Where do you work?

17   A.  Massachusetts Maritime Academy.

18   Q.  How long have you been in that position?

19   A.  Since March of this year.

20   Q.  Where did you work prior to March of this year?

21   A.  Cape Cod Community College.

22   Q.  Can you describe your work duties at Cape Cod Community

23   College?

24   A.  Well, I was accounts payable and procurement manager.

25   Q.  I want to direct your attention to the time period of

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M8N6RAH3                          Volynkina - Direct

1   November 2018.  Were you working at Cape Cod Community College

2   at that time?

3   A.  I was.

4   Q.  Can you describe your physical office space?

5   A.  It was a fairly small office space with two people sitting

6   in the office space.

7   Q.  Who were you sharing the office space with?

8   A.  I shared it with the grant accountant, Maribeth Malloy.

9   Q.  Directing your attention to November 27, 2018, do you

10  recall a telephone call that came in at that time?

11  A.  I do.

12  Q.  Who did the telephone call go to?

13  A.  It went to Maribeth Malloy.

14  Q.  What happened after that call came in?

15  A.  The phone call came from with a caller ID saying TD Bank,

16  so Maribeth took the phone call.  The person on the call said

17  that he was calling from the bank.  And he knew that someone

18  from the college tried to log into the bank, and there was a

19  failure.  And Maribeth said that since it wasn't her, she knew

20  it was me.  And I was sitting right next to her, so she

21  transferred the phone call to me.

22  Q.  And what happened when she transferred the call to you?

23  A.  The ringer rang on my call, with the same caller ID that's

24  TD Bank.  I answered the phone, and the person said, "I'm

25  trying to help you.  I know that you're trying to log into the

M8N6RAH3                        Volynkina - Direct

1    bank, and let me walk you through the steps."

2    Q.  And so what did you do after they told you that?

3    A.  He -- that person just said, "The reason you're having an

4    issue logging into the bank is because the bank is going

5    through some maintenance.  And if you want -- if you need to

6    got into the bank, let me help you to do so.  So please open

7    the browser, go to the link that was the regular link."

8          And he started walking me through the steps.

9    Q.  Did you open the login page for the TD Bank account while

10   you were on the call?

11   A.  Yes.  Yes.  I opened my regular -- there was a saved that

12   link I used, and I opened that saved link, which looked very

13   similar to the one that I would normally use.  The only

14   difference that was there is that the boxes, the three boxes I

15   would usually need to enter my information in had a red square

16   around them, which I voiced my concern on the phone that that

17   looked slightly different.  And the person on the phone

18   reassured me that this was normal due to the maintenance.

19   Q.  And so did you then enter your login information for the

20   bank account?

21   A.  I did.

22   Q.  What happened after that?

23   A.  After that, the screen with the security questions came up,

24   which was unusual for me to be asked for the security

25   questions.  But Maribeth, who was sitting right next to me and

M8N6RAH3                          Volynkina - Direct

1    heard me talking to the caller, she mentioned that it was very

2    normal for her.  Any time she would need to log into the bank,

3    she would have to answer the security questions.  So that made

4    us believe it was okay.  So I entered the security questions

5    that were asked.

6            Since I had not been required to enter the security

7    questions in -- prior to the incident, I was not sure whether

8    my answers were right because it had been a while after I set

9    up these questions.  But I -- I, answered the questions, the

10   answers to the questions.  And I -- I forget what exactly

11   happened next, but I must have entered them correctly.

12   Q.  Now, in your position at Cape Cod Community College, were

13   you authorized to execute wire transfers out of the TD Bank

14   account?

15   A.  I was not.

16   Q.  After you entered your login information, did anything

17   further happen on the telephone call?

18   A.  The person on the call said, "Could" -- "thank you.  It was

19   good.  But now we need someone else to verify the account, so

20   could someone else do it?"

21           In the meantime, Maribeth was there, also trying to

22   log into the bank with her own credentials, and she also was

23   asked for the security questions.  And her login was not -- her

24   steps were not quite following the process, I forget what

25   exactly, didn't quite get to the screen.  She even used a

M8N6RAH3                         Volynkina – Direct

1    different browser, and the person said, "Okay, well, is there

2    anyone else at the college who could log into the bank?"

3             And we -- I -- I believe it was me.  I asked

4    Laura Ball who was the accounts payable clerk to come in and

5    log in into the bank.  The person did say that whoever is going

6    try to log into the bank should try to log in from my computer.

7    Q.  Okay.  And so what was Laura Ball's position?

8    A.  Laura was accounts payable clerk.

9    Q.  Was she authorized to make wire transfers out of the

10   account?

11   A.  She was not.

12   Q.  Did you observe her entering her login information during

13   the call?

14   A.  I was not watching when she was entering her security

15   questions, but I was next to her.

16   Q.  After that happened, what happened -- did anything further

17   happen on the call?

18   A.  The person said, "Okay, well, Laura Ball is not" -- "was

19   not the right person.  Is there anyone else who could log into

20   the bank?"  And that's when Maribeth got up and went to get

21   Yuliya Garcia.

22   Q.  Did you say Julia Garcia?

23   A.  Yuliya Garcia.

24   Q.  Yuliya Garcia.

25             What was Yuliya Garcia's position?

M8N6RAH3                          Volynkina - Direct

1   A.  She was assistant comptroller.

2   Q.  In her position as assistant comptroller, was she

3   authorized to make wire transfers out of the bank account?

4   A.  She was.

5   Q.  And what happened when Maribeth brought Yuliya Garcia into

6   the office?

7   A.  Yuliya came over and entered her credentials into the login

8   screen, also from my computer, and she also needed to enter her

9   answers to the security questions, which she did.  And at that

10  point, she received a new screens -- I forget what exactly what

11  it was saying, but it was like a ticking line, saying you have

12  to wait, or something like that.

13  Q.  Do you recall anything else about that screen that showed

14  up on your computer?

15  A.  No, it was pretty -- I think it was a white screen with a

16  ticking line -- a ticking part -- with some statement, but

17  unfortunately at this point, I don't remember what exactly it

18  said.

19  Q.  Did you have any difficulty accessing your computer or the

20  Internet after that call?

21  A.  I -- I'm trying to -- no, I think I was -- I was a little

22  tired because it was after lunchtime, and I wanted to take my

23  lunch.  So I probably did not try to use my computer right

24  away.  I definitely didn't try to log into the bank at that

25  point, but I think I was able to use my computer as it was

M8N6RAH3                         Volynkina - Direct

1    before.

2    Q.  Okay.  Now, did your job duties at Cape Cod Community

3    College include reconciling the college's bank accounts?

4    A.  Yes.

5    Q.  Did you become aware of a number of transactions that took

6    place after this telephone call you described on

7    November 27, 2018?

8    A.  I became aware that there were fraudulent wires going out

9    from the Cape Cod Community College account, but I was told

10   about them.  I did not see the bank statement itself for, I

11   think two or three months due to the fact that the fraudulent

12   wires happened, the bank denied the access.  We did not have

13   access to the bank account.  And there was a lot going on in

14   between.  So by the time I got to reconcile the bank account, I

15   think it was two months later, and that's where I saw the

16   actual wires on the bank statement.

17           MR. REHN:  Okay.  Mr. Imperato, can you please bring

18   up Government Exhibit 1301?

19   BY MR. REHN:

20   Q.  Do you recognize this document?

21   A.  Yes.

22   Q.  Is this the bank statement for Cape Cod Community College

23   for November 2018?

24   A.  Correct.

25           MR. REHN:  Can we please go to Page 15, and if you

M8N6RAH3                          Volynkina – Direct

1    could pull up the portion of the statement that says, "Other

2    Withdrawals."

3    BY MR. REHN:

4    Q.  Ms. Volynkina, do you see certain wire transfers outgoing

5    from Cape Cod Community College in November 2018?

6    A.  Yes, I do.

7    Q.  And I'd like to direct your attention to the first three

8    wire transfers that took place on November 1, November 9th, and

9    November 21.  Are those typical transactions for Cape Cod

10   Community College?

11   A.  This is correct.  These are typical wires to the state

12   account.

13   Q.  Do you have an understanding of what those wires represent?

14   A.  They are payroll transfers.  This is how we fund the

15   payroll for the college.

16   Q.  I see a transfer of 420,000 on November 9.  That was to pay

17   payroll?

18   A.  Correct.  This is biweekly.

19   Q.  And a similar transfer on November 21?

20   A.  Correct.

21   Q.  Now, do you also see a number of outgoing wire transfers on

22   November 27?

23   A.  I do.

24   Q.  Are those typical transactions that you would see in the

25   course of your work at Cape Cod Community College?

1   A.  These are not typical transactions.

2           MR. REHN:  And, Mr. Imperato, can you highlight the

3   outgoing wire transfer to Sadullo Transportation?

4   BY MR. REHN:

5   Q.  Looking in particular at the transfer to

6   Sadullo Transportation, is that a typical transaction for

7   Cape Cod Community College?

8   A.  This is not.

9   Q.  And these were the transfers that took place the day of the

10  phone call you described?

11  A.  Correct.

12          MR. REHN:  No further questions.

13          THE COURT:  Any cross-examination?

14          MR. MURRAY:  No cross.  Thank you, your Honor.

15          THE COURT:  All right.  You can step down.  Thanks

16  very much.

17          (Witness excused)

18          THE COURT:  Government can call its next witness.

19          MR. RAYMOND:  Thank you, your Honor.  The government

20  calls Lisa Terry.

21   LISA TERRY,

22       called as a witness by the Government,

23       having been duly sworn, testified as follows:

24  DIRECT EXAMINATION

25

M8N6RAH3                          Terry - Direct

 1  BY MR. RAYMOND:

 2  Q.  Good afternoon, Ms. Terry.

 3          Where are you from?

 4          THE COURT:  Can you please state and spell your name

 5  for the record, please?  Thank you.

 6          THE WITNESS:  Lisa Terry, L-I-S-A, T-E-R-R-Y.

 7          THE COURT:  Thank you.  You may proceed.

 8          MR. RAYMOND:  Thank you, your Honor.

 9  BY MR. RAYMOND:

10  Q.  Ms. Terry, where are you from?

11  A.  Ohio.

12  Q.  Is it possible for to you speak a little closer to the

13  microphone?

14  A.  Is that better?

15  Q.  Yes.  Thank you.  Ms. Terry, what do you do for a living?

16  A.  I'm a co-owner of a title company.

17  Q.  What is the name of the title company?

18  A.  Home Services Title LLC.

19  Q.  Where is the -- where is Home Services Title LLC located?

20  A.  Beavercreek, Ohio.

21  Q.  And do you have any ongoing responsibilities with

22  Home Services Title?

23  A.  I do.  I'm the manager of the closing department, and I

24  oversee all the operations.

25  Q.  What does Home Services Title do?

M8N6RAH3                         Terry - Direct

1   A.  We do real estate closings.

2   Q.  And what does it do for real estate closings?

3   A.  Please repeat the question.

4   Q.  What does Home Services Title do with respect to real

5   estate closings?

6   A.  We do the title search.  We issue the title insurance

7   policies.  We prepare all the closing documentation for

8   signatures and receive the dispersal funds.

9   Q.  You mentioned that you co-owned.  Do you have any other

10  owners of the company?

11  A.  I do.  49 percent of our company is owned by the local

12  Caldwell Banker franchise.  The other 51 percent is owned by me

13  and my two business partners.

14  Q.  What are your business partners' names?

15  A.  Tyler Pyle and Michelle Pyle.

16  Q.  Ms. Terry, directing your attention to August 2018, what

17  was your title -- were you working at Home Services Title at

18  that time?

19  A.  Yes, sir.

20  Q.  And what was your title at that time?

21  A.  Closing operations manager.

22  Q.  Do you recall anything out of the ordinary regarding

23  Home Services Title's computer services that month?

24  A.  Yes.  My business partner Michelle Pyle was having trouble

25  getting connected from home on the VPN.

1    Q.  What is your understanding of what a VPN is?

2    A.  It's a secure network that allows us to access our desktop

3    from home.

4    Q.  What happened after you learned about Ms. Pyle's problems?

5    A.  I had returned to the office from a closing, and she was in

6    the office, trying to get connected because she couldn't from

7    home.  And she could not get logged into our bank's online

8    service, Huntington National Bank.

9    Q.  Do you recall what day this was?

10   A.  It was August 7, 2018.

11   Q.  Did you go to her office while she was having these

12   problems?

13   A.  I did.  Our offices are right next to each other.  Our door

14   is separated by a wall, so she asked me to come over.  She was

15   on the phone with the fraud department at Huntington, and she

16   asked me to -- asked her to have another person log in and just

17   see if it was her login or just her computer.

18   Q.  What did you do after you heard this on the phone?

19   A.  I went to my office to get my login credentials, and my

20   bank token and went back into her office and tried to log in.

21   And I had the same trouble she did.

22   Q.  And where was your office related to Ms. Pyle's?

23   A.  Literally separated by a wall.

24   Q.  You mentioned a bank token.  What's your understanding of

25   what a bank token it?

M8N6RAH3                          Terry - Direct

1    A.  It has a rolling code on it.  When we go to log in, we have

2    to verify at that moment in time.  And we have to put that

3    number in so that we can securely log into business online

4    banking.

5    Q.  What did you do after you returned to Ms. Pyle's office

6    with the banking token?

7    A.  I logged in.  I tried to log in, and it kept circling.  It

8    was saying "authenticating."  Never went all the way through.

9              (Continued on next page)

M8NCrah4                        Terry – direct

1    BY MR. RAYMOND:

2    Q.  You said you were on the phone.  Do you recall who the

3    person was that identified themselves on the phone?

4    A.  Yeah, after I couldn't get logged into hers, I returned to

5    my office and tried on log in on my computer and it was

6    successful, and I said to her, through the wall, are you sure

7    you're on the phone with Huntington, and she said that's what

8    it says on the caller ID.

9    Q.  What happened after that?

10   A.  They told her that it would be fixed in approximately three

11   hours and they hung up.

12   Q.  What did you do after that?

13   A.  I left and went to another closing, and as I was leaving

14   that real estate office, I received a call from one of my

15   employees saying she received a call from our bank branch, a

16   credit union in Texas had contacted them because they received

17   a wire from that particular bank and they knew that it was a

18   fraudulent account and they were going to return the wire to us

19   and they wanted the bank information.  So the bank

20   automatically called our office to let us know about it.

21   Q.  You mentioned Huntington Bank.  Where is Huntington Bank

22   located?

23   A.  We deal with the branch in Beavercreek, Ohio.

24   Q.  Do you know where the main Huntington branch is located?

25   A.  In Columbus, Ohio.

M8NCrah4                         Terry - direct

1  Q.  What happened after you received the call from your

2  employee?

3  A.  I left the real estate office I was at and went straight to

4  the bank branch, dealt with the bank manager and his assistant

5  manager.  I took a screenshot of several wires and called my

6  office and was trying to get her to authenticate the amounts.

7  There were 12 distinct amounts that we did not have in our

8  system that matched.

9            MR. REHN:  Ms. Pierre, can you show Ms. Terry what has

10  been marked for identification as Government Exhibit 1702.

11  Q.  Ms. Terry, do you recognize Government Exhibit 1702?

12  A.  Yes, it's our bank statement.

13  Q.  What month is it for?

14  A.  It's for August of 2018.

15  Q.  And did you receive this bank statement at or near the time

16  that it's dated in August 2018?

17  A.  Yes, sir.

18  Q.  Was receiving such records a regular practice of Home

19  Services Title?

20  A.  Yes.

21  Q.  Have these records been maintained in course of Home

22  Service Title's regularly conducted activities?

23            Ms. Terry, I note that the records have been redacted

24  from pages 1 through 29.  For those portions that are

25  unredacted, have you compared those records with this redacted

M8NCrah4                         Terry - direct

1    version?

2    A.  Yes, I have.

3    Q.  Are they the same?

4    A.  They are.

5        MR. RAYMOND:  Your Honor, the government offers

6    Government Exhibit 1702.

7        THE COURT:  Any objection?

8        MR. MURRAY:  No objection, your Honor.

9        THE COURT:  Admitted.

10       (Government's Exhibit 1702 received in evidence)

11   Q.  So Ms. Terry, first on page 1, can you read what the name

12   of this account is?

13   A.  Home Services Title agent IOTA.

14   Q.  What is IOTA?

15   A.  It's an acronym for interest on trust account.

16   Q.  What is an interest on trust account?

17   A.  It's a trust account meaning all funds that go in have to

18   also come back out.

19   Q.  I'm going to direct your attention --

20       MR. RAYMOND:  Mr. Imperato, if you can turn to page 30

21   of the document.

22   Q.  What are the dates on page 30, Ms. Terry?

23   A.  August 1 through August 6th.

24   Q.  Have you, going through your records, verified that these

25   were normal?  Are these normal transfers of Home Services

M8NCrah4                          Terry - direct

1    Title?

2    A.  No, there are several of them that end in zero, and that's

3    very abnormal in our industry.

4    Q.  Why is that abnormal?

5    A.  It's very rare that anything ends in zero because they're

6    just such random numbers, as far as sellers proceeds or

7    mortgage payoffs, it's very rare to be ending in zero.

8            MR. RAYMOND:  Mr. Imperato, can you turn to the next

9    page.  And Mr. Imperato, can you highlight the number $99,390,

10   it's about eight levels down.

11   Q.  Ms. Terry, can you see that on the screen?

12   A.  I can.

13   Q.  What's the date of that wire transfer?

14   A.  August 7th.

15           MR. RAYMOND:  Mr. Imperato, can you pull up, in

16   evidence, Government Exhibit 703-02-F.

17   Q.  Ms. Terry, can you read the first page of this document,

18   what is the account name?

19   A.  Sadullo Transportation Inc.

20   Q.  Where is this located, what's the address?

21   A.  Rego Park, New York.

22           MR. RAYMOND:  Mr. Imperato, can you turn to page 3.

23   Can you expand under other credits.

24   Q.  Ms. Terry, can you read that portion.

25   A.  Wire transfer incoming, Home Services Title agent IOTA,

M8NCrah4                              Terry – direct

1   $99,390.

2   Q.  What's the date?

3   A.  August 7th.

4   Q.  Ms. Terry, do you know a man named Sadullo Karimov?

5   A.  No.

6   Q.  Do you know a man named Djonibek Rahmankulov?

7   A.  No.

8   Q.  Do you know a company called Sadullo Transportation?

9   A.  No.

10  Q.  Has home Services Title, to your knowledge, ever done any

11  business with the men I named or with the company I named?

12  A.  No.

13  Q.  Ms. Terry, after the money was transferred, what happened?

14  A.  There were 12 wires in total that went out.  I returned to

15  the office, called my insurance person, the police, and

16  retained a digital investigative firm and legal counsel.

17  Q.  Was any of the money ever returned?

18  A.  Not this particular wire, it was 100 percent unrecoverable.

19  We did get some of the other money back, yes.

20  Q.  Do you recall, in total, approximately how much money Home

21  Services Title lost?

22  A.  $1.3 million.

23  Q.  And how much was ultimately refunded, what was the ultimate

24  loss to Home Services Title?

25  A.  $200,000.

1            MR. RAYMOND:  No further questions, your Honor.

2            THE COURT:  Cross examination?

3            MR. MURRAY:  No cross, your Honor.

4            THE COURT:  You can step down.  Thank you so much.

5            (Witness excused)

6            Government may call its next witness.

7            MR. RAYMOND:  Yes, your Honor.  The government calls

8    Heather Waldroup.

9     HEATHER WALDROUP,

10         called as a witness by the Government,

11         having been duly sworn, testified as follows:

12            THE DEPUTY CLERK:  Please state and spell your name

13    for the record.

14            THE WITNESS:  My name is Heather H-e-a-t-h-e-r,

15    Waldroup, W-a-l-d-r-o-u-p.

16    DIRECT EXAMINATION

17    BY MR. RAYMOND:

18    Q.  Good afternoon, Ms. Waldroup.

19    A.  Good afternoon.

20    Q.  Ms. Waldroup, where do you live?

21    A.  Hainsville, North Carolina.

22    Q.  What do you do for a living?

23    A.  I work for a local power company.

24    Q.  What's the name of that power company?

25    A.  Blue Ridge Mountain EMC.

M8NCrah4                          Waldroup - direct

1   Q.  What is Blue Ridge Mountain EMC?

2   A.  Electric power distributor.

3   Q.  Where is Blue Ridge Mountain EMC located?

4   A.  Young Harris, Georgia.

5   Q.  Is Young Harris, Georgia, close to the

6   North Carolina-Georgia border?

7   A.  Yes.

8   Q.  What regions does Blue Ridge Mountain EMC serve?

9   A.  We serve five counties, three in Georgia, two in

10  North Carolina.

11  Q.  What is your current title with Blue Ridge Mountain EMC?

12  A.  Supervisor of accounting.

13  Q.  How long have you served as the supervisor in accounting?

14  A.  Two years.

15  Q.  What did you do for work before you were supervising and

16  accounting in Blue Ridge EMC?

17  A.  I was a plant accountant for Blue Ridge Mountain EMC.

18  Q.  How long, in total, have you worked at Blue Ridge Mountain

19  EMC?

20  A.  21 years.

21  Q.  Directing your attention to June and July 2018, what was

22  your position at Blue Ridge Mountain EMC at that point?

23  A.  Plant accountant.

24  Q.  What were your responsibilities at Blue Ridge Mountain EMC

25  as of June or July of 2018?

1   A.  Daily work order, clerk work, which consisted of inventory

2   for the company, plant assets for the company, and when we

3   experienced a storm, I was in charge of disaster relief.

4   Q.  In your role as plant accountant, did you have access to

5   Blue Ridge Mountain EMC bank accounts?

6   A.  Yes.

7   Q.  With whom did Blue Ridge Mountain EMC bank at the time?

8   A.  United Community Bank.

9   Q.  Do you know where united community bank was located?

10  A.  The headquarters we deal with is located in Blairsville,

11  Georgia.

12  Q.  Directing your attention to June or July 2018, did you have

13  any issues with your email?

14  A.  Yes.

15  Q.  What was the issue?

16  A.  I received an odd email, which I thought was from GEMA, our

17  agent that I was dealing with, GEMA, at that time.  I clicked

18  on a link which did not seem to work that day.  The day after,

19  I started receiving an influx of emails into my inbox.

20          MR. RAYMOND:  Mr. Imperato, can you show the witness

21  what's been marked for identification as Government

22  Exhibit 907.

23  Q.  What is past the header, what is Government Exhibit 907?

24  A.  This is an email that I forwarded to you, which shows an

25  example of the email that I received.

M8NCrah4                          Waldroup - direct

1        MR. RAYMOND:  Mr. Imperato, can you scroll, is there

2    another page to this document?  Mr. Imperato, can you blow up

3    what is marked from Marty Itzkowitz from the middle, above

4    that, just above that.

5    Q.  Ms. Waldroup, do you recognize this email?

6    A.  Yes.

7    Q.  And what is it?

8    A.  That is an email from Marty Itzkowitz with GEMA, which was

9    my assigned agent at that time for disaster relief that we were

10   going through.

11       MR. RAYMOND:  Your Honor, the government respectfully

12   moves to admit Government Exhibit 907.

13       THE COURT:  Any objection?

14       MR. MURRAY:  No objection, your Honor.

15       THE COURT:  It will be admitted.

16       (Government's Exhibit 907 received in evidence)

17       MR. RAYMOND:  Mr. Imperato, can you go back to the

18   email from Ms. Waldroup, sent Monday July 9th, 2018, at 9:45

19   a.m. and blow that up.  Thank you.

20   Q.  Ms. Waldroup, can you read this email?

21   A.  It's from me to Marty Itzkowitz.  I stated I just wanted to

22   let you know that I have received another odd email.  I have

23   not attempted to click on the link.

24   Q.  What is the date of this email?

25   A.  July 9th, 2018.

M8NCrah4                        Waldroup - direct

1    Q.   Who is Marty Itzkowitz?

2    A.   He works with Georgia Emergency Management and he was my

3    assigned agent at the time.

4    Q.   The statement you made earlier, you mentioned GEMA, does

5    GEMA stand for the Georgia Emergency Management Agency?

6    A.   Yes, sir.

7    Q.   So after you received the email, what happened?

8    A.   The next day is when I noticed an influx of emails into my

9    inbox and I contacted our IT supervisor.

10   Q.   The original email, did you ever determine if it was really

11   from Marty Itzkowitz?

12   A.   The original email, I believe an example of the image was

13   on another page of the email that you have pulled up.

14        MR. RAYMOND:   Mr. Imperato, can you go to the next

15   page, then.

16   A.   And I did forward that to Marty, an image of it, and he

17   confirmed that it was not his and he was getting in touch with

18   his IT department, also.

19        MR. RAYMOND:   Mr. Imperato, can you just blow up the

20   email here.

21   Q.   Where does it say the email is from at the very top?

22   A.   Marty.Itzkowitz@gema.ga.gov, and Andrew.Dube@fwwebb.com.

23   Q.   Did you click on that link in there?

24   A.   I did.

25   Q.   Was it after that that you began receiving many other

M8NCrah4                    Waldroup - direct

1    emails?

2    A.  I do not believe it was that day.  I believe it was the

3    following day.

4    Q.  Can you estimate how many emails did you receive the

5    following day?

6    A.  Thousands, and I don't recall an exact number.

7    Q.  And what did you do after you started receiving these

8    thousands of emails?

9    A.  Contacted our IT department supervisor.

10   Q.  Do you recall anything specifically about the content of

11   the emails?

12   A.  No, I do not.

13   Q.  And what happened after you contact your IT supervisor?

14   A.  He came to my desk and unplugged my computer from our

15   network.

16   Q.  What happened after that?

17   A.  I wasn't able to use my machine that day.  And then the

18   following week, my supervisor notified me that we had had a

19   breach in our bank account.

20   Q.  Who was your supervisor?

21   A.  Amanda Holdaway.

22   Q.  After you learned about the breach in the bank account, did

23   anything else happen?

24   A.  Not that I recall.

25   Q.  Ms. Waldroup, do you know anyone by the name of Djonibek

M8NCrah4                        Waldroup - direct

1    Rahmankulov?

2    A.  No, sir.

3    Q.  Do you know anyone by the name of Sadullo Karimov?

4    A.  No, sir.

5    Q.  Do you know about any companies named Sadullo

6    Transportation?

7    A.  No, sir.

8    Q.  Jasmina Transport?

9    A.  No, sir.

10   Q.  To your knowledge, did Blue Ridge and EMC do any business

11   with any of those individuals or companies that I named?

12   A.  No, sir.

13   Q.  To your knowledge, does Blue Ridge Mountain EMC have any

14   connection to trucking companies in New York City?

15   A.  No, sir.

16          MR. RAYMOND:  No further questions, your Honor.

17          THE COURT:  Any cross examination?

18          MR. MURRAY:  No cross, your Honor.  Thank you.

19          THE COURT:  You can step down.  Thanks so much.

20          (Witness excused)

21          I know the government wanted to call certain witnesses

22   before we broke for lunch.

23          MR. REHN:  I was about to say, your Honor, the next

24   witness is a longer witness.  These were the witnesses that

25   needed to go.

M8NCrah4                          Waldroup - direct

1              THE COURT:  Why don't we take our break for lunch now.

2         Folks, keep an open mind and don't discuss the case.

3         (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M8NCrah4                          Waldroup – direct

1              (Jury not present)

2              THE COURT:  Why don't we say 2:15 that we'll get

3    started right then.  Thanks, folks.

4              (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M8NCrah4

AFTERNOON SESSION

(2:19 p.m.)

1     (In open court; jury not present)

2     THE COURT:  Is everyone ready to proceed?

3     MR. REHN:  Your Honor, we have two quick issues.  The first is that the next witness will be a cooperating witness. We discussed with defense counsel and we understand that the defense intends to impugn the witness's credibility, and for this and the other cooperating witnesses, we intend to introduce their cooperation agreements on direct, and we confirmed with defense counsel they don't plan to object to that.

THE COURT:  In that case, that's fine.  Normally, if there is an objection, we would do it on redirect, but I'm fine with that on consent.

MR. REHN:  The second thing is, pursuant to our discussion yesterday morning, we've agreed to only call one cooperating witness today.  Because of that, we expect this will be our last witness today.  That may result in an earlier end time than otherwise we would have.  We don't know if we'll go all the way to 5:00 or not, but this will be the end of witnesses.

THE COURT:  I understand.  I'm glad to see that there is cooperation and willing to make those adjustments to address the other issues Mr. Murray had raised.

M8NCrah4

1          MR. MURRAY:  Thank you, your Honor.  I appreciate it.

2     It's working out quite well because the one cooperator, there

3     will be one tomorrow, one Thursday, it just gives me a chance

4     to really dig in and catch up.

5          THE COURT:  I'm glad to hear that.  Thank you.

6          MR. REHN:  One more issue, if we have a moment.  We

7     recently served some trial subpoenas for bank records relating

8     to one of the defense witnesses.  We obtained those records

9     last night.  There may be some more incoming over the course of

10    the trial.  These aren't part of the government's case, we

11    don't think they're Rule 16, but even though we may only be

12    using them for impeachment, we're going to be producing them to

13    the defense as they may come in.  We talked about that with the

14    defense.

15         THE COURT:  What's the quantity, approximately?

16         MR. REHN:  It is fairly voluminous.  The records that

17    came in last night are close to 5,000 pages.  We don't think

18    there is anything that would be used by the government, but we

19    just wanted to make a note of that.

20         THE COURT:  Understood.

21         MR. MURRAY:  I already wrote out my letter, I'm ready

22    to file it.  Just kidding.

23         THE COURT:  What was the last thing you said?

24         MR. MURRAY:  I said I had already wrote out my letter,

25    I was about to file it.  Just kidding.

M8NCrah4

1          THE COURT:  Got it.  Got it.  All right.  Just make

2     sure the "just kidding" part is on the record.  Thank you.

3          I want to make sure that when the jury is here that

4     everyone in the gallery is very quiet because I think some of

5     the jurors have been a little bit distracted looking around the

6     courtroom.  I want to make sure everyone is quiet.  Thank you.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M8NCrah4                         Kamalov - direct

1             (Jury present)

2             THE COURT:  Everyone can be seated.  Government can

3    call its next witness.

4             MR. RAYMOND:  Your Honor, the government calls Anashon

5    Kamalov.

6     ANASHON KAMALOV,

7         called as a witness by the Government,

8         having been duly sworn, testified as follows:

9             THE DEPUTY CLERK:  . please state and spell and state

10   your name for the record.

11            THE WITNESS:  It's A-n-a-s-h-o-n, Anashon.

12            MR. RAYMOND:  And what's your last name?

13            THE WITNESS:  Kamalov, K-a-m-a-l-o-v.

14   DIRECT EXAMINATION

15   BY MR. RAYMOND:

16   Q.  Good afternoon, Mr. Kamalov.

17            Mr. Kamalov, do you go by any nicknames?

18   A.  Yes, Anas.

19   Q.  Mr. Kamalov, are you here, in part, because you committed

20   crimes?

21   A.  Yes.

22   Q.  Generally speaking, what types of crimes did you commit?

23   A.  Fraud, banking fraud, wire fraud.

24   Q.  Any other types of crimes?

25   A.  Yeah, SBA fraud, and also credit card fraud.

M8NCrah4                          Kamalov - direct

1    Q.  What did you do with the money you made from these frauds?

2    A.  Say that again.

3    Q.  Did you do anything with the money you made from these

4    frauds?

5    A.  What did I do with the money?

6    Q.  I'll move on.

7             Did you commit these crimes by yourself or with other

8    people?

9    A.  With other people.

10            MR. RAYMOND:  Ms. Pierre, can you pull up the exhibit

11   marked 2503-A, which is in evidence.

12   Q.  Mr. Kamalov, do you recognize this person?

13   A.  Yes.

14   Q.  Who is it?

15   A.  Djonibek.

16   Q.  Who is Djonibek?

17   A.  He was in a part where we did credit card fraud and also

18   the wire transfer fraud.

19   Q.  You mentioned credit cards.  About when did you work with

20   him on the credit cards?

21   A.  Around 2017, the end.

22   Q.  Who sent the credit card information?

23   A.  Can you ask again?

24   Q.  Yes.  Who sent the credit card information?

25   A.  Djonibek send me credit card information.

M8NCrah4                         Kamalov – direct

1    Q.  What did you do with the credit card information?

2    A.  Forward it to a hacker by the name Eugene.

3    Q.  Where was Eugene located when you spoke with him?

4    A.  In Moscow, Russia.

5    Q.  Did you ever tell Djonibek beck about Eugene?

6    A.  Yes.

7    Q.  You also mentioned a wire transfer.  Did you ever arrange

8    for someone to send Djonibek beck money to his bank account?

9    A.  Yes.

10   Q.  What was your understanding of where that money came from?

11   A.  It was a general understanding that it was coming from the

12   hackers.

13   Q.  Did you have any legitimate business with Djonibek beck?

14   A.  No.

15   Q.  Mr. Kamalov, how old are you?

16   A.  38.

17   Q.  Where are you from?

18   A.  Kurdistan.

19   Q.  How far did you go in school?

20   A.  Two years of university.

21   Q.  Did you go to university in the United States or somewhere

22   else?

23   A.  No, back in Kurdistan.

24   Q.  When did you move to the United States?

25   A.  2002.

1   Q.  What is your immigration status now?

2   A.  Citizen.

3   Q.  What status did you come over back in 2002?

4   A.  As a student.

5   Q.  Was there a time in which you were supposed to leave after

6   you were a student?

7   A.  Yes.

8   Q.  Did you leave at that time?

9   A.  No.

10  Q.  But what is your immigration status now?

11  A.  Citizen.

12  Q.  When did you become a U.S. citizen?

13  A.  2014.

14  Q.  What do you do for work?

15  A.  I'm a limo driver.

16  Q.  Do you drive for a specific company or for --

17  A.  Yeah, I do it for Uber and Lyft.

18  Q.  How long have you done that?

19  A.  2013.

20  Q.  Have you been driving consistently since 2013 or has it

21  been on and off, sometimes you've been doing it, sometimes

22  you've been doing something else?

23  A.  It was on and off.

24  Q.  Mr. Kamalov, where do you live?

25  A.  Rego Park, Queens.

M8NCrah4                          Kamalov - direct

 1   Q.  How long have you lived there?

 2   A.  Since 2013.

 3   Q.  Are you married?

 4   A.  Yes.

 5   Q.  Do you have children?

 6   A.  Yes.

 7   Q.  Now, did there come a time in which you were arrested in

 8   New York?

 9   A.  Yes.

10   Q.  About when was that?

11   A.  2021.

12   Q.  Do you recall what month?

13   A.  March, I believe.

14   Q.  For what crimes were you arrested?

15   A.  Defrauding and money laundering and submitting falsified to

16   the SBA.

17   Q.  How did you ultimately decide to handle your criminal case?

18   A.  A lawyer.

19   Q.  What happened to your criminal case, did you go to trial,

20   did you plead guilty?

21   A.  I plead guilty.

22   Q.  Ultimately, did you agree to cooperate with the government?

23   A.  Yes.

24   Q.  Was it your decision to cooperate immediately or did you

25   first discuss with your attorney?

M8NCrah4                          Kamalov – direct

1    A.  I discussed with my attorney.

2    Q.  As part of that process, did you meet with law enforcement

3    agents and prosecutors?

4    A.  Yes.

5    Q.  After those meetings, did you enter into an agreement with

6    the government?

7    A.  Yes.

8              MR. RAYMOND:  Ms. Pierre, could you show the witness

9    what's been marked for identification as Government

10   Exhibit 1407.

11   Q.  Mr. Kamalov, do you see that?

12   A.  Yes.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

M8N6RAH5                         Kamalov – Direct

| 1 | BY MR. RAYMOND: |
|---|---|

1   BY MR. RAYMOND:

2   Q.  Do you recognize that document?

3   A.  Yes.

4   Q.  What is it?

5   A.  It's my agreement with the government.

6           MR. RAYMOND:  Ms. Pierre, can you turn to the 15th

7   page, the last page?

8   BY MR. RAYMOND:

9   Q.  Is that your signature?

10  A.  Yes.

11  Q.  When did you sign this agreement?

12  A.  It was yesterday.

13  Q.  Before you signed it, did you review it with the assistance

14  of an attorney?

15  A.  Yes.

16  Q.  Is this document an accurate copy of your agreement with

17  the government?

18  A.  Yes.

19          MR. RAYMOND:  Your Honor, the government offers

20  Government Exhibit 1307.

21          MR. MURRAY:  No objection, your Honor.

22          THE COURT:  Admitted.  Thank you.

23          .

24          (Government's Exhibit 1307 received in evidence)

25          MR. RAYMOND:  Can you publish it to the jury?

1    Ms. Pierre, can you go back to the first page of the agreement?

2    Thank you.

3    BY MR. RAYMOND:

4    Q.   Now, Mr. Kamalov, can you read what is described as

5    Count One, and on the next page, Count Two?

6    A.   Yes.  It's conspiracy to commit bank fraud.

7    Q.   And on the next page -- we'll go down to the next page --

8    what is Count Two?

9    A.   Conspiracy to commit money laundering.

10   Q.   Generally speaking, what did you do that made you guilty of

11   these crimes?

12   A.   Between 2017 and 2020, meet with other coconspirators --

13   conspirators.  We laundered the money and with the -- multiple

14   accounts.

15   Q.   Mr. Kamalov, I should actually make clear, after you signed

16   this agreement, did you plead guilty to the crimes listed?

17   A.   Yes.

18   Q.   Sorry.  I didn't hear that.

19   A.   Yes.

20   Q.   And when did you plead guilty?

21   A.   Yesterday.

22        MR. RAYMOND:  Ms. Pierre, can you pull back up

23   Government Exhibit 1307, which we're going to stay on for a

24   little bit.

25

M8N6RAH5                         Kamalov - Direct

BY MR. RAYMOND:

Q.  Now, for falsified documents and the money laundering you
mentioned, approximately how much money, if any, did you
personally receive?

A.  Me or?

Q.  You.

A.  Can you ask the question again?

Q.  Sure.  Did you receive any money for your participation in
these crimes?

A.  My participation, yes, I received money.

Q.  Approximately how much money did you receive?

A.  15,000.

        MR. RAYMOND:  Moving onto the next page, Ms. Pierre.
Actually, could you go back, Ms. Pierre, just one page up?
Let's go back to Page 3, actually.

BY MR. RAYMOND:

Q.  Mr. Kamalov, can you read Count Three and Four?

A.  Conspiracy to submit false statement to Small Business
Administration.  And Count Four is conspiracy to commit money
laundering.

Q.  Generally speaking, what did you do that made you guilty of
these crimes?

A.  We falsified -- I falsified the -- we falsified the
information to SBA, the government agency.  And it was money --
money was sent to the accounts where I had access.  I had

M8N6RAH5                         Kamalov - Direct

1  control of the different business information.

2  Q.  And you mentioned the SBA.  Do you know what that stands

3  for?

4  A.  Yeah.  It's Small Business Administration, I believe.

5  Q.  How much money did you personally -- were you compensated

6  for your involvement in the crimes charged in counts three and

7  four?

8  A.  Yes.

9  Q.  Approximately how much money did you personally receive?

10  A.  Around 12,000.

11           MR. RAYMOND:  Ms. Pierre, can you go onto the next

12  page?  Thank you, Page 4.

13  BY MR. RAYMOND:

14  Q.  Mr. Kamalov, can you read what's under Counts Five and Six.

15  A.  Yeah, Count Five is conspiracy to commit wire fraud.  And

16  Count Six is conspiracy to commit money laundering.

17  Q.  Generally, can you describe what you did that makes you

18  guilty of these offenses?

19  A.  I have given company information to a group of hackers, and

20  they have -- they have -- they have sent the money, fraud money

21  to these accounts.

22  Q.  Did you do anything with the money after it entered into

23  those accounts?

24  A.  Yes.  We have withdrawed the money, and then we have sent a

25  10 percentage back to Russia.

M8N6RAH5                          Kamalov - Direct

1  Q.  Finally, Count Seven, can you read what Count Seven is?

2  A.  Yes, aggravated identity theft.

3  Q.  What did you do that made you guilty of this offense?

4  A.  I had a license with a different person's identity, and it

5  was my picture on it.

6  Q.  But the information on it was not actually about you; is

7  that correct?

8  A.  Yes.

9  Q.  Did you use this license to do anything?

10  A.  Yes.

11  Q.  What did you use it to do?

12  A.  I opened a bank account.

13  Q.  And what was sent to the bank account?  What, if anything,

14  was sent to the bank account?

15  A.  It was a wire -- supposed to be sent to the account.

16  Q.  Was the wire part of a legitimate business?

17  A.  No.

18  Q.  So it was part of an illegal business; is that correct?

19  A.  Correct.

20  Q.  Mr. Kamalov, under the agreement that you've signed, what

21  is your understanding of your obligations?

22  A.  Tell the truth.

23  Q.  Are you required to do anything else?

24  A.  No.  If asked -- if asked to -- sorry.  Say that again.

25  Q.  Are you required to do anything else under the agreement

1    besides tell the truth?

2    A.   If asked to -- what I'm doing now, what do you call that?

3    Q.   Well, come to court --

4    A.   Testify.  Testify, there you go.

5    Q.   If you comply with your obligations under this agreement,

6    what is your understanding of what the government will do?

7    A.   Provide the 5K letter.

8    Q.   What is your understanding of what a 5K letter is?

9    A.   Basically just saying that I have been truthful and judge

10   take it easy on him, something like that.

11   Q.   What is your understanding of what happens to the

12   cooperation agreement if you lie?

13   A.   It will be ripped up.

14   Q.   What is the understanding of what happens to you if the

15   agreement is ripped up?

16   A.   I might go to jail, yeah.

17   Q.   Would you still receive a 5K letter if the letter becomes

18   ripped up?

19   A.   Say that again.

20   Q.   Would you still receive a 5K letter if the agreement is

21   ripped up?

22   A.   No.

23   Q.   If the government does not write the 5K letter, are you

24   facing any mandatory period of incarceration -- of prison?

25   A.   Yes.

M8N6RAH5                          Kamalov - Direct

1    Q.  Do you know how much time?

2    A.  Two years.

3    Q.  Can you speak into the microphone?

4    A.  Two years, I think.

5           MR. RAYMOND:  Ms. Pierre, can you enlarge under

6    Count Seven B.?

7    BY MR. RAYMOND:

8    Q.  So is that the minimum amount of time you'd face in prison.

9    A.  Yes.

10   Q.  If the government does write the 5K letter, are those

11   two years in prison mandatory?

12   A.  Yes -- I mean, no.

13   Q.  If you live up to the agreement, what is your understanding

14   of how low the sentence can be?

15   A.  As low as nothing.

16   Q.  What sentence are you hoping to get?

17   A.  Nothing, nothing.

18   Q.  Who decides your sentence?

19   A.  Judge.

20   Q.  As you sit here today, have you been guaranteed a 5K

21   letter?

22   A.  No.

23   Q.  Has the government promised you a reduced sentence?

24   A.  No.

25   Q.  What is your understanding of whether the government will

M8N6RAH5                          Kamalov - Direct

1    recommend any particular sentence for you to the Court?

2    A.  Say that again.

3    Q.  Do you -- is it your understanding -- will the government

4    recommend a specific sentence, a specific number?

5    A.  Oh, no.

6    Q.  Have any promises been made to you at all about your

7    sentence?

8    A.  No.

9    Q.  Does your sentence depend in any way on the outcome of this

10   trial?

11   A.  No.

12   Q.  What have you promised to do as part of your cooperation

13   agreement?

14   A.  Tell the truth.

15   Q.  And when -- about when was the latest that you were

16   committing the crimes charged in the -- charged against you?

17   A.  The latest?  2019.

18   Q.  Well, any later points in which you were still involved in

19   the criminal activity in the -- that's been charged against

20   you, wire fraud or the SBA fraud?

21   A.  2020, I believe.

22   Q.  And, Mr. Kamalov, besides your arrest in New York in 2021,

23   were you ever arrested in New Jersey?

24   A.  Yes.

25   Q.  Do you recall what state -- approximately when was that?

1  A.  February 2020, I believe.

2  Q.  And was that a case from New Jersey or from another state?

3  A.  Another state.

4  Q.  What state was that?

5  A.  Maryland.

6  Q.  And were you -- at any point in time, were you required to

7  appear in court in Maryland?

8  A.  Yes.

9  Q.  Did you -- at that time, did you appear in court?

10  A.  No.

11  Q.  Why not?

12  A.  Because I had to travel.  I had emergency.

13  Q.  And did you inform the Court that you had an emergency, and

14  that was the reason why you couldn't appear?

15  A.  I didn't inform the Court, no.

16  Q.  And what did you tell the Court instead?

17  A.  I provided fake coronavirus document.

18  Q.  What did the document say?

19  A.  That I was positive with the virus.

20  Q.  And, in fact, were you?

21  A.  No.

22  Q.  Now, at the beginning of your testimony, you mentioned

23  credit cards with Djonibek.  How did you first meet Djonibek?

24  A.  Through our mutual friend by the name of Djamshed.

25  Q.  Who is Djamshed?

1   A.  He's known for a perevodchik.

2   Q.  What is a perevodchik?

3   A.  Perevodchik is the guy who transfers money overseas.

4   Q.  What language is the name perevodchik?

5   A.  Russian.

6   Q.  Now, you began by talking about the credit card transfers.

7   Can you describe how that agreement worked?

8   A.  Yes.  Basically, you would take a picture of the front of

9   the credit card.  And on the bottom of it, I would write the

10  limit of the credit card and how much owed the credit card, and

11  I would forward that to Eugene, a hacker.

12  Q.  And what would the hacker do with this information?

13  A.  Then he would take the information that he would send the

14  money to the credit card.

15  Q.  Did you ever learn how he sent the money to the credit

16  card?

17  A.  Yes.  Later I find out that he would just do a balance

18  transfer.

19  Q.  Can you describe what a balance transfer is?

20  A.  Yes.  If you have one credit card and if the limit is

21  $10,000, and if you use only $1,000 of that limit, you are

22  eligible to transfer to your different credit card if you owe

23  just the balance of that credit card.

24  Q.  In the example you gave, how much could you transfer?

25  A.  If you have a limit -- it depends on the limit.  If you

M8N6RAH5                          Kamalov - Direct

1  have 10,000, you are eligible to send 80 percent of that.

2  Q.  So what would Eugene do with the information he received

3  from you?

4  A.  He would -- from different credit card sources, which he

5  had, he would just transfer the balance to the credit card that

6  I have provided.

7  Q.  Did you ever meet Eugene in person?

8  A.  No.

9  Q.  How did you communicate with him?

10  A.  Through the Telegram app.

11  Q.  What is Telegram?

12  A.  It's just like a WhatsApp, Messenger app.

13  Q.  It's on your phone?

14  A.  On the phone, yes.

15  Q.  What was your role in the agreement with Eugene?

16  A.  My role was to provide a credit card and send his

17  percentage and in the middle, make ten percent.

18  Q.  How would you provide the credit cards?

19  A.  How?

20  Q.  Yes.

21  A.  What do you mean, "how"?

22  Q.  I can't hear you, Mr. Kamalov.

23  A.  What do you mean, "how"?

24  Q.  What would you do to obtain a credit card, your own credit

25  cards?

M8N6RAH5                          Kamalov - Direct

1   A.  Oh, I would get from the -- from the people, mostly from

2   Djamshed and other people.

3   Q.  These were people that you or another person knew?

4   A.  Yes.

5   Q.  What would you physically do with their credit card?

6   A.  After -- after getting the money?  I mean, after the

7   receiving the funds or?

8   Q.  I mean someone comes to you with a credit card.  What do

9   you do with it?

10  A.  I would take a picture of it, and I would explain how it

11  works and what is his obligation after the money comes.

12  Q.  And then what would you do with -- after you'd -- after you

13  had this credit card?

14  A.  Then I would take a picture and send it to a hacker.

15  Q.  And you mentioned that the person who received -- who

16  brought the credit card would have an obligation after the

17  transfer came.  What was their obligation?

18  A.  The obligation was to go to Apple Store and buy iPhones,

19  and for our percentage, he would go and buy -- in Apple Store.

20  Or if they have any other means of taking out -- using the

21  credit card, it was their obligation and bring the phones to

22  us.

23  Q.  Why would they have to buy Apple products or Apple iPhones?

24  A.  In order to take -- convert it to cash.

25  Q.  Why did the money need to be converted to cash?

M8N6RAH5                          Kamalov - Direct

1    A.  In order to get hacker's percentage and my percentage.

2    Q.  What would you do with the iPhones?

3    A.  I would sell it.  I would sell it to a -- to iPhone buyers,

4    and also I would sell it to Djamshed.

5    Q.  Sell it for the same amount of money that the iPhone was

6    bought for?

7    A.  No.  $150 less.

8    Q.  Why would it sell for less?

9    A.  Because they are -- they are paying cash, and they didn't

10   care where the iPhone came from or what means it came from.

11   That's the reason.

12   Q.  What would happen after the iPhone was sold?

13   A.  Then it would be sent 40 percent to the hacker, and

14   ten percent, I would have it.

15   Q.  You mentioned that you did not understand at the beginning

16   how the arrangement worked.  Did you ever learn how Eugene did

17   this?

18   A.  Yes.  At the end, I did learn it.

19   Q.  How did you learn that?

20   A.  Huh?

21   Q.  How did you learn that?

22   A.  Eugene told me himself.

23   Q.  What did Eugene say?

24   A.  He said he would -- he would buy it on the Internet.  They

25   had -- they had this site where all hackers, they meet and sell

1    people's information, such as credit card information, driver

2    license information, their address.  And he would specifically

3    buy elderly people's information from anywhere ages between

4    50 to 100.  These people, they were the target because they

5    didn't have the online access, and they would just use most of

6    their information through their bank statement, which they

7    receive every month one time.  So you will have time -- until

8    they figure out the balance transfer has been made, you still

9    have time to cash it out.

10   Q.  Did you ever provide any legitimate service to Eugene?

11   A.  What do you mean?

12   Q.  Did you ever sell Eugene any real items or --

13   A.  Send to Eugene?

14   Q.  Anything -- did you have any relationship with Eugene

15   besides the credit cards you're describing?

16   A.  Yes.

17   Q.  You mentioned Djamshed.  Why -- what did you do with

18   Djamshed?

19   A.  I transferred money to overseas.

20   Q.  And did you ever -- did there ever come a time in which you

21   told Djamshed about the credit cards?

22   A.  Yes.

23   Q.  About when was that?

24   A.  At the end of 2017, I believe.

25   Q.  What happened after that?

M8N6RAH5                          Kamalov - Direct

1    A.  He provided me multiple credit cards.

2    Q.  Did you tell him how Eugene was sending the balance

3    transfers?

4    A.  In the beginning, no.

5    Q.  Did you, at any point, tell him that?

6    A.  Yes.

7    Q.  You said at some point, Djamshed introduced you to

8    Djonibek?

9    A.  Yes.

10   Q.  How did that happen?

11   A.  At that time, we didn't have no big limit credit card.  The

12   most we had, it was 5 to $7,000 limit -- limit credit card.

13   And then one day he called me.  He said, I have -- I know

14   somebody who have a $20,000 credit limit, and he wants to find

15   out more.  So I would like to bring him over and introduce to

16   you.

17   Q.  Would a larger credit card be more helpful to you?

18   A.  Yes.  It meant more money.

19   Q.  What happened after Djamshed told you this?

20   A.  Then I agreed to meet.

21   Q.  And did you meet this person he was talking about?

22   A.  Yes.

23   Q.  Who was that person?

24   A.  Who was that?

25   Q.  Yes.

M8N6RAH5                          Kamalov - Direct

1   A.   Djonibek.

2   Q.   Did you meet -- where did you first meet him?

3   A.   They came to my apartment, I mean, to my building.

4   Q.   Where were you living at that time?

5   A.   Rego Park.

6   Q.   And when you met Djonibek, did he bring any information

7   about credit cards?

8   A.   Yes.  He said, I have $20,000 credit card, and I'm

9   interested.  We would like to work.

10  Q.   Do you recall the name of the person on the credit card?

11  A.   Yes.

12  Q.   Who was that person's name?

13  A.   Odil Sharipov.

14  Q.   Did you ever have a conversation with Djonibek about

15  Eugene?

16  A.   Yes.

17  Q.   What happened?

18  A.   I told him that there is a group of hackers and also one of

19  them is working -- his name is Eugene, and he's able to send

20  credit cards, the money, whatever the limit you have.

21  Q.   What, if anything, did Djonibek say in response?

22  A.   He said, I can get multiple credit cards, but first, here

23  you go.  This is the one I have, $20,000 limit.

24  Q.   What did you do after Djonibek brought you Odil Sharipov's

25  card?

M8N6RAH5                          Kamalov - Direct

1   A.  I take the picture of it, and I sent it over to Eugene with
2   the limit.  And I have forward the information to Eugene.
3   Q.  What happened after that?
4   A.  Eugene has sent the money to the credit card, and one day
5   after receiving the money -- after one day or two days,
6   Djonibek called me and said, listen.  I have my other means of
7   cashing out the credit card instead of going to the Apple store
8   and buying a phone.
9            I said, okay.  What is it?  He said, let's go.
10           So this is where we went to the owner of the credit
11  card's office, which he owned a trucking company, and also he
12  had from Chase, the -- the machine where you swipe your credit
13  card.
14  Q.  Now, did there come a time after you received the cash --
15  going back to the iPhones.  What did you do with the cash to
16  send it to Eugene?
17  A.  What do you mean?  I send it to Eugene.
18  Q.  How did you send it to?
19  A.  Through Djamshed.
20  Q.  And why did you send it through Djamshed?
21  A.  Because it was convenient and less percentage.
22  Q.  Convenient and less percentage than what?
23  A.  Because you don't have to provide the ID, or there's no
24  limit.  And also his people overseas would personally deliver
25  to whom you have sent.

M8N6RAH5                         Kamalov - Direct

1   Q.  And was -- besides Djamshed, was there any other way to

2   send money overseas?

3   A.  Yes, there was a Western Union.

4   Q.  Like when you sent money to Eugene, you always used

5   Djamshed; is that correct?

6   A.  I have used Western Union in the beginning.  Then I start

7   using Djamshed, yes, correct.

8   Q.  Now, at some point, did you stop working with Eugene?

9   A.  Yes.

10  Q.  Why?

11  A.  Because we have -- we start having the charge back.

12  Q.  What's a -- sorry.

13  A.  Go ahead.

14  Q.  What's a charge back?

15  A.  A charge back is where after receiving one, two times a

16  payment, and then the owner of the credit card would find out

17  through the statement, I guess.  And they would call their bank

18  and say, listen, I did not do this transaction.

19          So they would take back the money, which was sent to

20  our credit cards.

21  Q.  And what happened when they took back the money?

22  A.  Then the credit cards, the physical credit card would be

23  locked, or in some cases, it would be, like, minus 12,000,

24  minus 10,000, that you owed to the credit card.

25  Q.  After -- about when did this charge back occur?

1  A.  When?

2  Q.  About when?

3  A.  Probably around 2018.

4  Q.  Mr. Kamalov, were you ever introduced to a man named Kevin?

5  A.  Yes.

6  Q.  About when were you introduced to Kevin?

7  A.  In the beginning of 2018, I believe.

8  Q.  Who was Kevin?

9  A.  Kevin was introduced to me by Eugene.

10 Q.  Did you meet Kevin in person?

11 A.  No, I met his associate.

12 Q.  What did Eugene tell you about Kevin before when you were

13 introduced?

14 A.  When we were having a charge back issues, and then I --

15 I've lost the interest of working credit cards.  And I told

16 Eugene, I said, I don't want to work no more because it has

17 charge back, and this is not good.

18         Then he said, I'm working on something else.  He said,

19 I have been talking to a group of -- very big groups.  They are

20 sending a huge money to the U.S. to the business accounts.  So

21 I have been talking to one of their leader, and I have given

22 your phone number.  He's going to call you today.

23 Q.  And was that Kevin?

24 A.  No, that's what Eugene told me.

25 Q.  I'm saying did you receive a phone call later that day?

1    A.  Yes, later I received a phone call.

2    Q.  Who called you?

3    A.  Kevin.

4    Q.  Was this on your regular telephone, or was this through

5    another means?

6    A.  By other means.

7    Q.  What means?

8    A.  It was through Telegram.

9    Q.  And Telegram, besides sending messages, also made phone

10   calls?

11   A.  Yes.

12   Q.  Did Kevin tell you where he was living?

13   A.  Yes.  He said somewhere in Europe, but he didn't

14   specifically gave his location.

15   Q.  What did Kevin tell you about what he was doing?

16   A.  He said, I'm the biggest sender, and also I'm -- I have

17   group of people they work for me, and we can send a lot of

18   money.  And I have been doing this for a long time.  I have

19   multiple ways that we can make money.

20   Q.  Did Kevin ever tell you how he was making this money or

21   able to send it?

22   A.  Well, he told me that he has around ten people work for

23   him, and I knew immediately that they were hackers, group of

24   hackers.  And he said we would -- he didn't -- in the

25   beginning, he didn't specifically told me all the details

1    because he just speaking to me for the first time.  So he's not

2    going to give away any information.  So it was just an

3    introduction and briefly what he was doing and what his

4    capabilities are.

5    Q.  In that first conversation, did Kevin tell you why he was

6    interested in working with you?

7    A.  Yes.

8    Q.  Why?

9    A.  Because it was coming from Eugene recommendation.  And

10   Eugene has told him that I have been working with him a year

11   and always, he got his percentage.  So he said, this is an

12   honest guy, so you can -- I can -- I can be guarantor for him.

13   Q.  Did he say that he'd previously been working with anyone

14   else in the United States?

15   A.  Yes.

16   Q.  What did he say?

17   A.  He said, there was in California, one lady she was working

18   with.  And he said, even though I told her not to show off and

19   not to spend her money crazy, she start buying exotic cars and

20   apartments, and she eventually got arrested.  So he said, I'm

21   moving my business from LA to New York.

22   Q.  After that first conversation, did you begin working with

23   Kevin?

24   A.  No.  He says, I have my associate.  If -- you are going to

25   meet my associate, and if my associate says he's good, we can

M8N6RAH5                    Kamalov - Direct

1   get start working with him, then, he said, I'm going to work

2   with you.

3   Q.  Did you ever meet with his associate?

4   A.  Yes.

5   Q.  What was his associate's name?

6   A.  His name was Rustom Waifi.

7   Q.  Where did you meet with Rustom Waifi?

8   A.  In Brooklyn in a hotel.

9   Q.  About when was your meeting with Rustom Waifi?

10  A.  2018, I believe.

11  Q.  What happened at that meeting?

12  A.  Waifi told me that -- he briefly explained to me -- and

13  also he said -- we had the cases where we send the money.  Once

14  they receive the money, they would change their phone number

15  and they would run away.

16          He said, I need to make sure you're not going to do

17  that.  And also he said, there will be consequences if you do

18  that.  And he said, if you work honestly, you can make tons of

19  money.

20  Q.  What happened after -- did anything else happen at that

21  meeting.

22  A.  Yes.  And also he said -- he gave me the instructions how

23  they have done previously.  He said, when the money arrives,

24  you have to go immediately to the bank in the morning and

25  withdraw the money.

1           For instance, if 100,000 comes in, he said you can go
2    to the branch, first branch, and they not going give you 50,000
3    or 40,000, because if you want that kind of money, you have to
4    order in advance one, two days.  Since we don't have one or two
5    days what you do is you just walk in, withdraw as much as they
6    provide you, 20,000, 25, 15.  Do not argue with them.  Just
7    take the money and go to another branch, and you do the same
8    until you withdraw that whole amount.  And after that, he said,
9    I will meet up with you.  I'll pick it up, all the cash.
10   Q.  Now, at any of these conversations, did Kevin tell you --
11   Kevin or Rustom Waifi tell you precisely how they were
12   obtaining the money to send to you?
13   A.  I ask him many times since before this, we were having
14   charge back issues with the credit cards.  I ask Rustom, and
15   also I ask Kevin.  And Kevin -- he didn't want to give away the
16   whole process.  But Rustom, he mentioned that they do hacking
17   to big corporations, and they sent the money from there.
18   Q.  What happened after your meeting with Rustom Waifi?
19   A.  I met him.  It was afternoon.  And I believe after two days
20   or the next day, Kevin, he called me and he told me, My
21   associate is very happy with you.  We can get started working.
22   I will be calling next couple days, and I will need either
23   personal account information or business account information.
24   I'll let you know.
25   Q.  Did Kevin say if he preferred either a personal account or

1    a business account?

2    A.  He said I prefer brand new business accounts.

3    Q.  Did he explain why?

4    A.  Yes.  I said, why?

5         And he said the reason is when it's a business --

6    brand new business account, usually when you withdrawing, the

7    money, the tellers won't ask you too many questions.

8    Q.  What happened -- what happened after these conversations?

9    A.  Well, three days, four day passed, and he calls me all of a

10   sudden.  And then he says, I need business information now

11   because I need to put it in the system.

12   Q.  What did you do?

13   A.  I said, okay.  I hang up the phone, and then I call

14   Djamshed immediately.  I ask him -- I said, listen, I need the

15   business account.  Kevin, he called me, and I need the

16   information.

17        He said, okay.  Give me some time.  I'll get back to

18   you.

19   Q.  What happened next?

20   A.  Then through a WhatsApp, he -- after like 5, 10 minutes, he

21   send me banking information.

22   Q.  What was the banking information he sent you?

23   A.  Well, it was -- when I say "banking information," it means

24   the company name, the owner name, address, account number,

25   routing number, e-mail, et cetera.

1   Q.  And do you recall what that information was?

2   A.  Yes, it was Djonibek's business account.

3   Q.  Do you recall the name of the business?

4   A.  Yes.  It was Jasmina Transportation.

5   Q.  And do you remember what bank it was at?

6   A.  Yes, TD Bank.

7   Q.  What did you do after Djamshed sent you this?

8   A.  I copied it, and then I send it to Kevin.

9   Q.  Now, taking one step back, had you -- did you tell Djamshed

10  how Kevin got the money?

11  A.  At one point, yes, I did tell him.

12  Q.  Did you tell Djamshed that Kevin was a hacker?

13  A.  He knew he was a hacker, yes.

14  Q.  Well, just to be clear, did you tell him, or did he know?

15  How did he know?

16  A.  Well, by this time, we already working with the credit

17  cards, right?  We work with the credit cards.  So Djamshed knew

18  it was a hacker.  So when we got to Kevin, I told him that this

19  is bigger hacker group.  I explained to him what the -- Eugene

20  has told me I have told to Djamshed about it.  Yes, he knew.

21  Q.  What happened after you sent the information for

22  Jasmina Transport to Kevin?

23  A.  He called me after a couple of hours, and then he said, are

24  you sure about this, because I'm about to send big money, and

25  if anything happens, you are responsible for the funds.  I

M8N6RAH5                        Kamalov - Direct

1    said, yes, whoever gave me this information, he's a very

2    credible person, and if anything happens, he can -- your

3    percentage, he will pay out of his pocket, yes.

4    Q.  Had you talked to Kevin or Rustom Waifi about what his

5    percentage would be?

6    A.  Yes.

7    Q.  What was his percentage?

8    A.  60 percent.

9    Q.  Did you also have a percentage?

10   A.  Yes.  I told to Djamshed, I said, I want 10 percent.

11   Q.  What happened to the remaining 30 percent?

12   A.  30 percent, I said, it's up to you.  This is your

13   information, your people, so however you guys want to agree to

14   it, this is your problem.  It's not my problem.  And if you

15   guys agree, send me the information.  They agreed.

16   Q.  What happened after you spoke to Kevin?

17   A.  Nothing happened for couple of days after sending the

18   information.  And then he called me one day.  He said,

19   tomorrow, money is going to be arriving in the morning to your

20   account.

21   Q.  By "your account," what did he mean by that?

22   A.  By Djonibek's account.  And he said to make sure, here is a

23   screenshot of how much I have sent.  And he said, make sure you

24   call him and he is up in the morning, 6:00 in the morning, and

25   you can meet up with him before the bank opens.

M8N6RAH5                         Kamalov - Direct

1    Q.  I just want to unpack that a little.  I think you said "he"

2    and "him" a few different times there?

3    A.  Sure.

4    Q.  So, first of all, who called you?

5    A.  Kevin.

6    Q.  And what did he say for you to do?

7    A.  He said tomorrow is money coming into the account that you

8    provided, and make sure you call the owner of that account,

9    which is Djonibek and he's up 6:00 in the morning.  And you

10   guys have a coffee before the bank opens because once the bank

11   opens, you have to start withdrawing the money.

12   Q.  Do you recall when this conversation occurred?

13   A.  At night.

14   Q.  Do you remember what day or month?

15   A.  No, I don't remember.

16   Q.  What happened after that conversation with Kevin?

17   A.  I hang up, I called Djonibek, and I told him that tomorrow

18   is money is going arrive, so make sure you're up in the

19   morning.  And he was okay with that.

20   Q.  Now, by this time, had you had a conversation with Djonibek

21   about where the money was going to be coming from?

22   A.  I had the conversation with the Djamshed regarding that.

23   Q.  Ever specifically have a conversation with Djonibek,

24   though?

25   A.  About this?

M8N6RAH5                         Kamalov - Direct

1   Q.  About the fact that the money was coming from Kevin?

2   A.  Yeah, he knew that money was coming from --

3   Q.  Did you have a specific conversation with Djonibek in which

4   you told him that Kevin was a hacker?

5   A.  Yes.  He knew.

6   Q.  You said he knew.  Did you specifically tell him that?

7   A.  When it was a credit cards, I have told him.  And when --

8   when he send it -- when I called him at night and I told him

9   that, listen, this is a big group of hackers.  If we do the

10  right thing, they're going to be sending over and over and over

11  again.

12  Q.  But was that --

13  A.  I have mentioned hackers, yes.

14  Q.  Was that a conversation with Djonibek or with Djamshed?

15  A.  With Djonibek.

16  Q.  Did you tell -- when you had the conversation that night

17  with Djonibek, did you tell him what you needed to do?

18  A.  Yes.

19  Q.  I couldn't hear that.

20  A.  Yes.

21  Q.  What did you tell him?

22  A.  I told him that he needs to be up in the morning, and we're

23  going to go in the morning, branch to branch.  And we're going

24  to be withdrawing the money.

25  Q.  What did he say?

M8N6RAH5                      Kamalov - Direct

1    A.  He said, okay.  I'll be up 6:00 in the morning.

2              MR. RAYMOND:  Your Honor, can you give me one moment?

3              THE COURT:  Sure.

4              (Pause)

5    BY MR. RAYMOND:

6    Q.  What happened after that call you had that night?

7    A.  Then that night, I couldn't sleep.  I fall asleep around

8    4:00 o'clock, 4:00 a.m., and then I woke up 9:30 the next

9    morning, 10:00 o'clock, very late.  And I saw I had, like,

10   three missed call from Djonibek and 42 missed call from Kevin.

11   Q.  What did you do when you woke up?

12   A.  I called, immediately, Djonibek.  I said, listen, I just

13   woke up, and what are you doing?  We need to go immediately to

14   the bank.  He said, I already withdraw and they have blocked my

15   account.

16             I said, okay.  That's new.  I said, how much did you

17   withdraw?  He said, 45,000 was able to withdraw, and they have

18   locked my account.  I said, okay.  Bring the money over.

19             Then I called Kevin, and I said, Kevin, here's the

20   situation.  He withdraw 45,000, and his account is closed.  I

21   thought you said it's going to be back-to-back.  You're going

22   to be sending it, and we'll be able to withdraw without any

23   worries.

24             He says, who told you he withdraw 45,000?  I said, I

25   just spoke to him, and he's on the way bringing the money to

1   me.  And he said, really?  And I said, yeah.  He said, okay.

2   Once you get the money, let me know.  Rustom will come and pick

3   up the money from you.  I said, okay.  Fine.

4           Then I have my coffee, and he came over.  He brought

5   the 45,000, and he said here's 45,000.  And he took out his

6   phone and tried to log into the account, and the account it

7   says -- online, the user name, password was, you know, like,

8   invalid.  He said, see, they lock me out.  I can't even log in.

9   I said, okay, give me all the money.  I took the money, and he

10  said, what happens now?  Where is my percentage?

11          I said, listen, it's too early.  Let me have cup of

12  coffee, and then let me talk to Kevin.  I'll figure out.  Don't

13  worry.  You're going to get paid.  I took the money.  I went

14  upstairs, my apartment, and I called Kevin.

15          I said, Kevin, I got 45,000.  He went and withdraw it,

16  and he said that account is blocked.  And he tried in front of

17  me to log in, but it won't let him.  I said, what happened?

18          He's like, oh, don't worry.  I'm going to figure that

19  out.  Rustom is going to come and make sure you give the money.

20          I said, how much should I give?

21          You want me to keep going, the whole thing or?

22  Q.  Continue.  Yes.  Sorry.

23  A.  And then I said, okay.  And then I said, listen, I need to

24  keep our percentage plus Djonibek's percentage.  I said, our

25  agreement was whole different.  Now, it turn out to be

M8N6RAH5                          Kamalov - Direct

1   different.  I don't get it.

2          He's like, don't worry.  I'll fix it.  And then it

3   will be all okay.  Don't worry.

4          So I said, okay.  I'm going to keep 10,000 until you

5   figure out.  I'm going to give Rustom 35,000.

6          He said, okay.  No problem.

7          So Rustom showed up.  He called me.  I met him.  I

8   gave him 35,000, and he went.  And after that, I called Kevin.

9   I said, your guy came, Rustom, pick up the money, just left.

10  Can you confirm that he receive?

11         He said, yeah, yeah, he called me.  He's on his way to

12  Brooklyn, so everything is okay.  I call you later.  Just wait

13  for my call.

14  Q.  What happened after that conversation you had with Kevin?

15  A.  So the whole day, nobody calls, nothing.  I said, okay.

16  Because I was waiting a call from -- from Kevin.  And at the

17  same time, I didn't want to call Djonibek because I had no

18  answer.  I'm like what if he ask me what happened or what is --

19  I said, I have no answer.  So what I did, I waited.

20         So the whole night, the whole day passes and night

21  comes.  Around nine, 10:00 p.m., I called Kevin and at that

22  time, my number was blocked by Kevin.  I could not reach out to

23  him.  So then I said, okay, this is new.  And then I tried to

24  text message, and the messaging app says the other user has

25  blocked your number.  You cannot text message, or you cannot

M8N6RAH5                    Kamalov - Direct

1    call.

2              So then I said, okay, there's something wrong.  I

3    called Djonibek, and he as well blocked my phone number.  I

4    said, okay.  Then I called Rustom.  I said, Rustom, this is my

5    contact, and that Kevin has blocked my number.  Is everything

6    okay?

7              He says, yeah, I mean, it's not okay, everything.  I

8    say, what happened?

9              He said, listen, you did something wrong.  I said,

10   what's wrong.

11             He said, listen, I'm busy right now.  I have to meet a

12   couple of people.  How about you call me tomorrow or some other

13   time?

14             I said, can we meet.  I'd like to find out exactly

15   what happened.  He said, yeah, let's meet in Brooklyn after

16   two, three days.  I'm busy tomorrow.

17             I said, okay.  Fine, let me know.

18             So after two, three days, I meet Rustom at the coffee

19   shop.  I said, listen, what happened?  What did I miss?

20             And then he said, listen, apparently one day before

21   when he comes -- or when Kevin called me and said tomorrow,

22   money is going to come, at that time -- we have to go back a

23   little bit more.

24             When Djamshed send me the information, at that time --

25   on that information, there was Djonibek's phone number and

1    e-mail.

2    Q.  Mr. Kamalov, do you recall seeing that when Djamshed sent

3    you that?

4    A.  No.  I did not see that.  I saw that later after forwarding

5    to Kevin because I was driving at the Belt Parkway when Kevin

6    called me.  And I called Djamshed while I was driving.  And

7    when the Djamshed send me information, I was still driving.  So

8    what I did, I clicked on it.  I saw the beginning that it says

9    business account, Jasmina all that.  So I copied it.  Then I

10   paste it to Kevin.  So Kevin had it.

11          When I saw it later, and later, I was in Brooklyn, I

12   was doing something else.  And then later on, at that date,

13   when I opened it, and I -- when I looked into it, really, and

14   there was -- on the bottom, there was his phone number attached

15   to it.

16   Q.  Mr. Kamalov, okay.

17          Moving back to when us had met -- up, moving forward

18   to when you met up with Rustom Waifi, can you tell us what

19   Rustom Waifi told you had happened?

20   A.  Okay.  Apparently, the same day when Kevin called me and

21   said that the money is going to come tomorrow, he called

22   directly to Djonibek, making sure that he's aware of the

23   situation that he's going receive tomorrow, money.

24   Q.  You say, "apparently."  Who told you that?

25   A.  Rustom is telling me now, the whole story and what

M8N6RAH5                        Kamalov - Direct

1    happened.

2    Q.  How did Rustom know that?

3    A.  Because Rustom, his role here is to get the money from

4    the -- from us, and send it directly to Kevin.  So he's primary

5    person in New York.

6    Q.  Did Rustom say who had told him this?

7    A.  Kevin told him.

8    Q.  What did Rustom say that Kevin had told him?

9    A.  Rustom had said Kevin told him that the same day when he

10   called me that tomorrow, the money is going to come.  Notify

11   the owner of that account.  You guys are going to be

12   withdrawing and you guys are going to be up in the morning.

13   After our conversation, he called directly to Djonibek.  And he

14   said, are you aware of the situation that you're going receive

15   tomorrow, money?

16        He immediately said yes, I'm aware, and also he told

17   me and has told me that he has a plan.

18   Q.  I just want to be clear.  Rustom is telling you this, that

19   Kevin told him this?

20   A.  Yes.

21   Q.  And this was -- so then Kevin was relaying that Djonibek

22   had told Kevin?

23   A.  Yes.

24   Q.  And he said he has a plan tomorrow.  And he ask him, Kevin

25   ask him, what plan is he planning.  He said, well, I don't know

M8N6RAH5                         Kamalov – Direct

the details, but he's –– and I –– he said –– he's going to

reveal it tomorrow.  He said, okay.  We'll see tomorrow what's

this plan.

So then once I got the 45,000 from him, once I gave it

to him, the 35,000, then Kevin called to Djonibek.  He said,

why is he telling me that your account is closed?  He said, you

see, I told you his plan.  My account was never closed.  I

withdraw everything, and I gave to Anas 65,000.  So I'm like,

okay.  Now I'm really confused.  I'm like, you know I receive

45,000.  Where is this 65,000 is coming?  He said, well,

Djonibek apparently gave you 65,000.  I said, no, that didn't

happen.

He said I gave him 65,000, and my account is closed,

how much has he –– did he gave to Rustom.  And he said he gave

him 35,000.  He took the minus 10,000.  So then Djonibek

offered him, to Kevin, stating that, listen, I just made this

money, 30-something, change, thousand.  If you like, whatever

you lost with Anas, he kept it.  I'm offering you half of my

money, what I made to you, so I like to work with you further.

(Continued on next page)

M8NCrah6                         Kamalov - direct

1   BY MR. RAYMOND:

2   Q.  Now, you still had the $10,000 from the first transaction.

3   Did you ever split that one with Djonibek?

4   A.  No.

5   Q.  Since that time, have you ever spoken to Djonibek?

6   A.  No.

7   Q.  After that meeting you had with Rustom Waifi, did you have

8   any other conversations with Waifi?

9   A.  Yes.

10  Q.  About when did that next conversation happen?

11  A.  After a couple of days.

12  Q.  And what, if anything, did Waifi tell you at that next

13  conversation?

14  A.  Well, the next conversation, he said, listen, Kevin's not

15  working with Djonibek now because he likes Djonibek, Djonibek

16  is open and honest guy, he even offered from his own money

17  where you cheated.  He said after I pick up money from you, the

18  next day, for the -- in a row, two, three days, I came, I

19  picked up from Djonibek $40,000, $30,000.  At one point, he

20  said around $50,000 I picked up, the same week, he said, back

21  to back.  So Djonibek is really working with him.  They are

22  doing good.

23  Q.  Did you have a conversation after this with Djamshed about

24  Djonibek?

25  A.  Yes.

M8NCrah6                     Kamalov - direct

1    Q.  When was the next time you spoke to Djamshed about

2    Djonibek?

3    A.  Probably after two, three days.

4    Q.  What, if anything, did Djamshed tell you?

5    A.  Well, Djamshed, he told me that, look, you've been set up

6    very well and you lost it.  I was supposed to work with you and

7    we supposed to make all that money, but now look, you out of

8    business, I'm out of business, and Djonibek is bragging about

9    it, how much he's making money and he's been sending me

10   screenshot after screenshot.  So this is first conversation

11   after what happened we had.

12   Q.  Did you have any conversations thereafter in which Djamshed

13   said he was working with Djonibek?

14   A.  After long time, yes.  When I say long time, probably

15   months, like three months, four months, five months.

16   Q.  What did Djamshed say about his business with Djonibek?

17   A.  Well, he said I opened -- he said I reach out to Djonibek,

18   I said I need money, can you send money to my account, to my

19   business account.  He said, yes, open a new account.  He said I

20   went to open in Chase Bank and I have given to him and he send

21   it $50,000.

22   Q.  I want to be clear, when you say "he" there.

23   A.  Yes, Djonibek send $50,000 to Djamshed's account.

24   Q.  After these conversations after the incident with Djonibek,

25   did you have any discussions with Eugene?

M8NCrah6                          Kamalov - direct

1    A.  Yes.  I had conversation with Eugene.  Eugene was very

2    upset with me.  He called me after one week, and he called me

3    screaming and he was very unhappy because he's the original who

4    found -- I mean he's the one who introduced to me to Kevin.  He

5    said Kevin called him and he said listen, your guy in New York,

6    he tried to play game with me and, luckily, there was one

7    honest guy that he took over his role.  So I'm working with

8    him, so screw you and your people.  So he said because of you,

9    I lost his connection, too.

10   Q.  Did Djamshed ever send you anything related to Djonibek?

11   A.  Yes, he had sent me couple of screenshots of that

12   transaction.

13   Q.  And what did Djamshed tell you about these transactions?

14   A.  Well, Djamshed told me that, look at us, how Djonibek is

15   working and making money, unbelievable.  He, yesterday, couple

16   days ago, he received this money and then he send a screenshot.

17          MR. RAYMOND:  Ms. Pierre, can you pull up for the

18   witness what's been marked as Government Exhibit 3904.

19   Q.  Do you recognize Government Exhibit 3904?

20   A.  Yes.

21   Q.  What is it?

22   A.  This is the wire transfer.

23   Q.  What wire transfer?

24   A.  This is apparently Djonibek send it to Djamshed, bragging

25   that, how much he's been receiving.

M8NCrah6                          Kamalov – direct

1    Q.   Was it sent to you afterwards?

2    A.   Yes, the screenshot was send to me.

3    Q.   And who sent it to you?

4    A.   Djamshed.

5          MR. RAYMOND:  Your Honor, the government offers

6    Government Exhibit 3904.

7          THE COURT:  Any objection?

8          MR. MURRAY:  Your Honor, may I voir dire briefly on

9    this?

10         THE COURT:  Sure.  Go ahead.

11   VOIR DIRE EXAMINATION

12   BY MR. MURRAY:

13   Q.   Good afternoon, Mr. Kamalov.

14   A.   Good afternoon.

15   Q.   I just wanted to ask you about this screenshot you say you

16   received from Djamshed.

17   A.   Correct.

18   Q.   When did he send it to you?

19   A.   I do not recall when.

20   Q.   Well, can you estimate possibly, month, year?

21   A.   So this one was probably 2018, I believe.

22   Q.   I understand that when you met with the government, you sat

23   down and you discussed all of these events with the government;

24   correct?

25   A.   Yes.

M8NCrah6                          Kamalov - direct

1    Q.  And you also turned over your devices; isn't that correct?

2    A.  Correct.

3    Q.  And as part of turning over those devices, was the device

4    that this text message you received from Djamshed, was that

5    also turned over to the government?

6    A.  Can you repeat that, your question.

7    Q.  What are we calling this, a screenshot?

8    A.  Correct.

9    Q.  This screenshot that was sent to you from Djamshed, what

10   phone did you receive it on?

11   A.  On my phone.

12   Q.  What type of phone and what year of the phone, like what

13   model?

14   A.  I believe I had a Note, Samsung Note phone, S20 Note, I

15   think.

16   Q.  Did you also give the government permission to search the

17   data, the metadata that goes back and forth?

18   A.  Yes, I have given them permission.

19   Q.  And did they tell you that they were able to locate where

20   that screenshot originated from?

21   A.  Could you repeat your question.

22   Q.  This screenshot, did the government tell you they were able

23   to locate where that screenshot came from?

24   A.  No.

25            MR. MURRAY:  Thank you, your Honor.  Nothing further.

1    No objection.

2                    THE COURT:  It will be admitted.

3                    (Government's Exhibit 3904 received in evidence)

4                    Mr. Raymond, tell me when it's a good time for us to

5    take a short break in the afternoon

6                    MR. RAYMOND:  Yes, your Honor.  Probably about five

7    minutes.  Will that work?

8                    THE COURT:  Yes.

9                    MR. RAYMOND:  Thank you.  Ms. Pierre, can you publish

10   the exhibit.

11   BY MR. RAYMOND:

12   Q.  Mr. Kamalov, do you see the date of this transfer?

13   A.  Yes.

14   Q.  What's the date?

15   A.  04/16.

16   Q.  And below that, does it say the date of a prior

17   transaction?

18   A.  Oh, yeah, 04/11/2018.

19   Q.  So do you believe you received this in or about April 2018?

20   A.  I believe probably like after one week of this, my guess

21   would be.

22                    MR. RAYMOND:  Ms. Pierre, can you please show the

23   witness what's been marked for identification as Government

24   Exhibit 3902.

25   Q.  Mr. Kamalov, do you recognize what's been marked as

M8NCrah6                        Kamalov – direct

1   Government Exhibit 3902?

2   A.  Yes.

3   Q.  What is it?

4   A.  This is the screenshot that has been sent to me by

5   Djamshed, as well, same day.

6           MR. RAYMOND:  Your Honor, the government offers

7   Government Exhibit 3902.

8           MR. MURRAY:  No objection, your Honor.

9           THE COURT:  Admitted.

10          (Government's Exhibit 3902 received in evidence)

11  Q.  Mr. Kamalov, can you read the amount and to who the

12  transfer is made?

13  A.  Yes, it's $85,000 to Jasmina Transport Inc.

14          MR. RAYMOND:  Ms. Pierre, can you show Government

15  Exhibit 3903 to the witness.

16  Q.  Do you recognize this?

17  A.  Yes.

18  Q.  What is it?

19  A.  It's the same screenshot, it's being send over to me by

20  Djamshed.

21  Q.  Do you recall about when you received it?

22  A.  Say it again.

23  Q.  About when did you receive this?

24  A.  Same day that I have received it.

25          MR. RAYMOND:  Your Honor, the government offers 3903.

M8NCrah6                          Kamalov – direct

1          THE COURT:  Any objection?

2          MR. MURRAY:  No objection.

3          THE COURT:  Admitted.

4          (Government's Exhibit 3903 received in evidence)

5   Q.  Mr. Kamalov, what is the amount here and where is the wire

6   addressed to?

7   A.  $70,000 to Odil Sharipov.

8          MR. RAYMOND:  Your Honor, just a few more questions

9   and then the break.

10         THE COURT:  Sure.

11  Q.  When you were speaking to Kevin, in what language were you

12  speaking to him?

13  A.  Russian.

14  Q.  After your last conversation with Djonibek, did Eugene ever

15  send you anything related to Djonibek?

16  A.  Yes.

17  Q.  What did he send you?

18  A.  So, the end of 2018 or the beginning of 2019?  It was cold.

19  Q.  What was it, what did he send you?

20  A.  He send me a video.

21         MR. RAYMOND:  Ms. Pierre, can you pull up Government

22  Exhibit 3901 for the witness and just show the first moment or

23  so.

24         (Video played)

25         You can stop it right there.

M8NCrah6                        Kamalov - direct

1    Q.  Mr. Kamalov, do you recognize that video?

2    A.  Yes.

3    Q.  What is the video?

4    A.  This is sent to me by Eugene.  Kevin, he send this video to

5    Eugene and told him, look, my guy, how is he getting the job

6    done in New York.

7                MR. RAYMOND:  Your Honor, the government offers

8    Government Exhibit 3901.

9                MR. MURRAY:  We have no objection, your Honor.

10               THE COURT:  Admitted.

11               (Government's Exhibit 3901 received in evidence)

12               MR. RAYMOND:  Your Honor, perhaps we can take a break

13   now and we can come back.

14               THE COURT:  Sure.  Folks, remember, don't discuss the

15   case and keep an open mind.

16               (Recess)

17               THE COURT:  You may proceed when you're ready.

18               MR. RAYMOND:  Thank you, your Honor.

19               Ms. Pierre, can you now play the entirety of

20   Government Exhibit 3901.

21               (Video played)

22   BY MR. RAYMOND:

23   Q.  Mr. Kamalov, do you recognize the voice there?

24   A.  Yes.

25   Q.  Whose voice is that?

M8NCrah6                         Kamalov - direct

1     A.  This is Djonibek's voice.

2               MR. RAYMOND:  Your Honor, the government's going to

3     offer the stipulation at GX3506.

4               THE COURT:  Yes, go ahead.

5               MR. RAYMOND:  Ms. Pierre, could you pull it up and

6     I'll read it out.

7               It is hereby stipulated and agreed by and among the

8     United States of America, by Damian Williams, the United States

9     Attorney for the Southern District of New York, Cecilia Vogel,

10    Samuel Raymond, and Thane Rehn, Assistant United States

11    attorneys of counsel, and Djonibek Rahmankulov, the defendant

12    by his counsel, Joseph Murray, Esq., that, one, if called as a

13    witness, a Russian interpreter would testify that Government

14    Exhibit 2701-A_T contains true and accurate English

15    translations of the messages in Government Exhibit 2701-A,

16    which are written in Russian.

17              If called as a witness, a Russian interpreter would

18    testify that Government Exhibit 3901-A_T contains a true and

19    accurate English translation of the audio in Government

20    Exhibit 3901, which is in Russian.

21              And it is further stipulated and agreed that this

22    stipulation may be received in evidence at trial.

23              Your Honor, the government moves to admit Government

24    Exhibit 3901-A_T.

25              THE COURT:  It's admitted.

M8NCrah6                          Kamalov - cross

1              (Government's Exhibit 3901-A_T received in evidence)

2              MR. RAYMOND:  Ms. Pierre, can you pull up Government

3    Exhibit 3901-A_T.  Can you go to the third page.

4    Q.  Mr. Kamalov, could you read the portion for DR.

5    A.  Yes.  Here it is, Kevin.

6              You want me to read the whole thing?

7    Q.  Sure.

8    A.  Here it is, Kevin.  Like I told you, here is one hundred.

9    Here, you see it's stacked, flipping through stacks of money,

10   one, two, three.  I am putting them on the package.  Places

11   three stacks of money on top of a package.  To the left of him,

12   four, five, six, seven, eight, nine.  This is the one in the

13   envelope, ten.  One hundred.  Puts all ten stacks into a black

14   bag, stack ten is in a City Mobile envelope.  I, as I promised

15   you, I would send you a video.  I sent it.  Take a look.

16   Enjoy.

17             MR. RAYMOND:  No further questions, your Honor.

18             THE COURT:  All right.  Cross examination.

19             MR. MURRAY:  Yes, your Honor.  Thank you.

20   CROSS-EXAMINATION

21   BY MR. MURRAY:

22   Q.  Hello again, Mr. Kamalov.

23             So I just want to go back over a couple things.  You

24   were talking about the crimes that you committed.  Can you

25   explain in more detail and list them, there's the credit card

M8NCrah6                        Kamalov – cross

1    fraud; correct?

2    A.  Correct.

3    Q.  Then wasn't there like an airline ticket scam that you were

4    involved in?

5    A.  No.

6    Q.  No, you didn't tell the government you were involved in an

7    airline ticket scam?

8    A.  I was not involved in airline ticket scam.

9    Q.  Okay.  And did you tell the government about a $12,000

10   money laundering scheme with regards to jewelers in the diamond

11   district?

12   A.  Can you repeat your question.

13   Q.  Did you tell the government about a money laundering scheme

14   involving jewelers in the diamond district, $12 million worth?

15   A.  No, I was never part of it.

16   Q.  I'm asking if you told the government about that.

17   A.  If you referring to one agreement that I had with other

18   people, agreement, yes, we had agreement, but never took place

19   or never happened.  The government is aware of that.  I have

20   specified about that.

21   Q.  So you told them about these scams that you knew about, but

22   you never participated in?

23   A.  I didn't know about it, I never heard it, I never seen it.

24   Q.  So then how did you tell them about it?

25   A.  I didn't tell them any about scam, $12 million.  I have no

M8NCrah6                          Kamalov - cross

1    idea what you're talking about.

2    Q.  Let's talk about other things.  You say you're married now;

3    right?

4    A.  Correct.

5    Q.  And this is a second marriage for you, isn't it?

6    A.  Correct.

7    Q.  And the first marriage was a fraud marriage, wasn't it?

8    A.  No, it was not.

9    Q.  It was not?

10   A.  No.

11   Q.  Did you not pay her $5,000 before the marriage and then

12   $5,000 after you got married?

13   A.  I paid --

14   Q.  Answer the question, sir.

15   A.  No, it's not correct.

16   Q.  You did not pay her $5,000 before and $5,000 after?

17   A.  I supported her during our marriage.

18   Q.  Sir, my question to you -- do you remember, Michael

19   referred you to her?

20   A.  Michael, no.

21   Q.  A friend of yours, Michael, who said, hey, I know somebody

22   who needs cash and I know you need citizenship.  Do you

23   remember that?

24   A.  No, I don't remember that.

25   Q.  So how did you meet her?

M8NCrah6                          Kamalov - cross

1   A.  It was Michael's wife.

2   Q.  Yeah.

3   A.  She introduced me to her.

4   Q.  And didn't she tell you this woman needs money and she will

5   marry you for money?

6   A.  It was not introduced to me like that, no.

7   Q.  So tell me how it was introduced.

8   A.  It was introduced to me that she's a single and she's

9   looking for a serious relationship.  If you want, I'll

10  introduce you to her and let's see what happens.  That's how I

11  had been introduced.  So there was no money involved, no money

12  talk.

13  Q.  And you never told that to the government?

14  A.  No, I told them, the government, that I supported her, yes.

15  I gave her $5,000 because she needed the money to pay her car

16  off, so I gave her $5,000.  And after that, I gave her, again,

17  money because it was a real marriage, she was my wife.

18  Q.  So let's just be clear.  My question to you is you paid her

19  the $5,000 before you got married, right, and then you paid the

20  other $5,000 after you got married?

21  A.  The way you putting it before, it's not before.  We already

22  was in a relationship.  I was dating her and she was very

23  struggling to pay her bills and her car was almost in the

24  repossession, towing status, then I gave her the money, yes.

25  Q.  Yes.  Isn't that what I said?

M8NCrah6                        Kamalov - cross

1    A.  No.

2    Q.  You had a woman who needed money and you needed

3    citizenship?

4    A.  Well, at that time, I was not intending to give her money

5    to get the citizenship, no.

6    Q.  So we're expected to believe you that you meet this woman

7    and then you pay her and they get married and then you divorce

8    her a couple years later?

9    A.  Sir, you can believe or not, but I'm here to tell the

10   truth.

11   Q.  Is that true?  Is that true, you paid her, married her,

12   divorced her, and got your citizenship?

13   A.  No, that's not true.

14   Q.  That's not true?  What's not true about that?

15   A.  It was a real marriage.

16   Q.  Did I say anything about real marriage?  I said you paid

17   her, married, divorced her, and got citizenship.  What's wrong

18   with that?

19   A.  Nothing is wrong with that.

20   Q.  It's the truth; right?

21   A.  Well, I'm telling you what I have done, but the way you

22   putting up, it's different, no, it's not like --

23   Q.  And at the same time, you were seeing your real girlfriend;

24   right?

25   A.  No.  I was dating my wife only.

M8NCrah6                              Kamalov - cross

1    Q.  When you say your wife, you didn't marry her legally, you

2    just married her religiously; right?

3    A.  Correct.

4    Q.  And that's what you told the government, too?

5    A.  Sorry.  Say that again.

6    Q.  Isn't that also what you told the government?

7    A.  Yes, I told the government that I married her through,

8    yeah, our relation, yes.

9    Q.  Let's be clear.  You and I don't know each other; right?

10   A.  Correct.

11   Q.  Before today, we've never met?

12   A.  Correct.

13   Q.  And we've never spoken together?

14   A.  True.

15   Q.  So you've never given me information?

16   A.  True.

17   Q.  Okay.  Now, isn't it true, this is what you told the

18   government?

19   A.  What I told the government what?

20   Q.  That you were dating her at the same time you were married

21   to this other woman?

22   A.  No.

23   Q.  So when did you get divorced?

24   A.  My divorce, probably '12, I think, or '13.  I am not sure.

25   Q.  When did you get married through a religious ceremony to

M8NCrah6                          Kamalov - cross

1    your girlfriend?

2    A.  Probably 2015.

3    Q.  Let me ask you this, when you took your plea yesterday,

4    didn't this immigration issue come up during your plea

5    allocution?

6    A.  It did come up, yes.

7    Q.  And didn't they talk about that you are a citizen as of

8    now, but you could be deported if your citizenship changed;

9    correct?

10   A.  Can you repeat the question again, please.

11   Q.  I'm asking you, I know it was a long process yesterday, so

12   take your time.

13   A.  Right.

14   Q.  The judge was asking you if you're aware of the immigration

15   consequences to your plea.  Do you remember that?

16   A.  Yes.

17   Q.  And he pointed out the fact that you have this marriage

18   issue that might change; correct?

19   A.  Correct.

20   Q.  That's because you may lose your citizenship because of

21   this bogus marriage you had?

22   A.  I could, yes.

23   Q.  Yes.  Thank you, I appreciate that.

24           Just because the government is not holding you to be

25   truthful, don't think you can get away with it here in court.

M8NCrah6                          Kamalov - cross

                    MR. RAYMOND:  Objection, your Honor.

                    THE COURT:  Sustained.

Q.  I want to ask you about these charges.  There were seven

charges that you pled guilty to; correct?

A.  Correct.

Q.  And I remember you testifying during your direct that

you're only facing a two-year minimum if you don't get your

letter from the government?

A.  Yes.

Q.  So you're saying that if you don't get your letter, that's

the most you could possibly get?

A.  I didn't say that.  It's --

Q.  Let's talk about that, because it was a misunderstanding.

That's how I perceived it, that you would only get two years if

you didn't get the government's letter.

                    So what is your understanding of the agreement?

A.  My understanding on the agreement, if the government asks

to testify and I will testify and I will tell the truth no

matter the consequences.  So, in the future, it's judge's

decision.

Q.  When I say your understanding, was it your understanding

that that's the most time you could ever get if you failed to

get your letter from the government?

A.  That's judge's decision.  It's my understanding I might get

whole a lot more years.

M8NCrah6                         Kamalov – cross

1    Q.  How much?

2    A.  I don't know.  It's up to judge.

3    Q.  Didn't you sign this agreement?

4    A.  I did.

5    Q.  Did you read the agreement?

6    A.  Yes.

7            MR. MURRAY:  Can we bring up the agreement.  I don't

8    know if I have the same one you have.  Can we go to page 6.

9    Thank you.

10           I'm sorry.  Can we go back to page 1.  I want to walk

11   him through this.

12   Q.  Do you see under Count One, subdivision a, what is the

13   maximum penalty you could receive under that subdivision?

14   A.  What do you mean, subdivision?  I don't read here

15   "subdivision."

16           THE COURT:  I'm sorry.  Raise your hand if you

17   can't --

18           THE DEPUTY CLERK:  It's not displayed to them, but

19   should it be?

20           THE COURT:  Oh, did you want to show this to the jury?

21           MR. MURRAY:  Yes.  It's in evidence, your Honor.

22           THE COURT:  I know it's in evidence, but it hasn't

23   been published to the jury, so we're going to do that now.

24           MR. MURRAY:  I'm sorry.

25           THE COURT:  That's okay.  Thank you, all, for raising

1  your hands.  It was helpful.

2  BY MR. MURRAY:

3  Q.  So I want you to look at where it says Count One on the

4  middle of the page to the left.  Do you see Count One?

5  A.  Yes.

6  Q.  Read across, what is that count?

7  A.  Conspiracy to commit bank fraud.

8  Q.  Now, do you see a little "a," like a subdivision a?

9  A.  Yes.

10  Q.  What does that say?

11  A.  Maximum term of imprisonment, 30 years.

12          MR. MURRAY:  Can we go to page 2, please.

13  Q.  Can you look at Count Two?

14  A.  Yes.

15  Q.  In Count Two, what's the charge in Count Two?

16  A.  Conspiracy to commit money laundering.

17  Q.  What is the "a," if you could read that portion?

18  A.  Maximum term of imprisonment, 20 years.

19          MR. MURRAY:  Can we go to page 3.

20  Q.  Count Three, what was the charge for Count Three?

21  A.  Conspiracy to submit false statements to the Small Business

22  Administration.

23  Q.  And what is the, under the "a," maximum term of

24  imprisonment?

25  A.  5 years.

M8NCrah6                         Kamalov - cross

1    Q.  And below, you'll see Count Four.

2    A.  Yes.

3    Q.  What does that charge?

4    A.  Conspiracy to commit money laundering.

5    Q.  And in the "a," the first --

6    A.  20 years.

7    Q.  20 years for that.

8           MR. MURRAY:  Next page, please.

9    Q.  Count Five, what's that charge?

10   A.  Wire fraud.

11   Q.  Conspiracy to commit wire fraud?

12   A.  Yes.

13   Q.  And then under the "a" in that, Count Five, what does it

14   indicate there?

15   A.  20 years.

16   Q.  Count Six at the bottom, what's the charge?

17   A.  Conspiracy to commit money laundering.

18   Q.  And how about the "a," what's the maximum there?

19   A.  20 years.

20   Q.  Turning to the next page, Count Seven.  What's that charge?

21   A.  2 years.

22   Q.  Charge is aggravated identity theft; is that correct?

23   A.  Yes.

24   Q.  And the maximum term of imprisonment is 2 years for that;

25   correct?

M8NCrah6                          Kamalov - cross

1   A.  Yes.

2              MR. MURRAY:  Could we go to the next page.

3   Q.  Can you read paragraph G for me.

4   A.  Other penalties, removal as set forth below in paragraph

5   19.  The sentences in Counts One through Six may run

6   consecutively to each other, and the sentence imposed on Count

7   Seven must run consecutively to the sentence on any other

8   count.

9   Q.  Do you understand what that means?

10  A.  Yes.

11  Q.  What do you understand that to mean?

12  A.  It means these two years will be added on top of the other

13  charges, the other years.

14  Q.  But do you understand that what they're saying is that all

15  of the charges, Count One to Count Six, you can get consecutive

16  sentences for that?  Do you understand what I mean by that?

17  A.  Yes.

18  Q.  What do you understand consecutive sentences to mean?

19  A.  It means it will be added to each other.

20  Q.  Correct.  There will be added, each sentence you receive,

21  for each charge will be added on top of the other.  That's your

22  understanding?

23  A.  Yes.

24  Q.  And then the second part of that says that two years must

25  be added on consecutively; correct?

M8NCrah6                          Kamalov – cross

1   A.  Yes.

2   Q.  Now, can you go down to paragraph 3 and read that first

3   sentence.

4   A.  The defendant agrees not to file an appeal or otherwise

5   challenge.

6   Q.  That's just a comma.  Just keep reading.

7   A.  By petition pursuant to 28 U.S.C. 2255 or any other

8   provision, the conviction or sentence in the event that the

9   Court imposes a term of imprisonment at or below 102 months.

10  This waiver is binding without regard to the sentencing

11  analysis used by the Court.  The defendant further --

12  Q.  You don't have to read the whole paragraph.  That's fine.

13          Do you understand what that means in that paragraph?

14  A.  Yes.

15  Q.  What do you understand that to mean?

16  A.  It means I cannot appeal again when -- in my understanding,

17  I'm not a lawyer, but my lawyer would know better about it.  It

18  says that I cannot appeal when the sentencing comes.

19  Q.  Do you understand that it only says you cannot appeal if —

20  let me just take my glasses off — in the event the Court

21  imposes a term of imprisonment at or below 102 months.

22          Do you understand what that means?

23  A.  Yes.

24  Q.  What do you understand that to mean?

25  A.  It means if the Court is -- like I said, one more time, I'm

M8NCrah6                         Kamalov - cross

1   not a lawyer.  It's my understanding if the court is sentencing

2   me 102 months, that I cannot appeal.

3   Q.  Does that mean to you, in your mind, that that's the most

4   you could possibly get, and if you get something higher, you

5   can appeal it?

6   A.  Well, I don't know that.

7   Q.  Well, you signed this document in court yesterday

8   indicating to the Court that you read it and understood it.  Do

9   you not understand what this means?

10  A.  I understand, it was explained to me by my lawyers, yes.

11  Q.  So do you understand that if you receive a sentence of

12  102 months or less, you cannot appeal, but if you receive a

13  sentence above that, you can appeal that sentence?

14  A.  I can, yeah.

15        MR. MURRAY:  If we can go to page 15.  I know you

16  authenticated it, but I just want him to.

17  Q.  Do you see your signature?

18  A.  Yes.

19  Q.  It's above your attorney's signature?

20  A.  Yes.

21  Q.  And you signed this yesterday in court; correct?

22  A.  Yes.

23  Q.  And you fully understood what it meant when you signed it;

24  right?

25  A.  Yes.

M8NCrah6                          Kamalov - cross

1   Q.  And as part of that, you agreed to cooperate truthfully and

2   honestly with the government, didn't you?

3   A.  Yes.

4   Q.  And is it your testimony now that you have been truthful

5   and honest with the government?

6   A.  Yes.

7   Q.  I'm going to ask you, Djamshed, when is the first time you

8   met Djamshed?

9   A.  Around 2017.

10  Q.  You know what, let me pursue another line of questioning.

11  I'm sorry.  I don't mean to confuse you.

12          When you first came here, was it about 2002?

13  A.  Correct.

14  Q.  What did you do for work at that time?

15  A.  I did multiple jobs.  So I worked at cashier and I worked

16  at the gas station.  So numerous jobs.

17  Q.  Okay.  So you worked pretty much whatever you could get

18  your hands on; right?

19  A.  Correct.

20  Q.  You worked in a 7-Eleven, like, you didn't care, you just

21  wanted to work and make money?

22  A.  Yes.

23  Q.  And you're a recent immigrant, so you're trying to survive;

24  right?

25  A.  Correct.

M8NCrah6                        Kamalov – cross

1    Q.  Now, as you progressed, what type of jobs did you pursue

2    after that?

3    A.  What do you mean, when I pursued the job?

4    Q.  What other jobs did you have?  Are you still working at

5    7-Eleven or did you move to --

6    A.  No, I worked at the gas station and then I was a caretaker

7    for Michael for so long.

8    Q.  For many years?

9    A.  Many years, yes.

10   Q.  How much did you earn as Michael's caretaker?

11   A.  How much?

12   Q.  Yes.

13   A.  I believe he was $600 a week.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M8N6RAH7                         Kamalov - Cross

1   BY MR. MURRAY:

2   Q.  And did you file tax returns every year?

3   A.  No.

4   Q.  Did you declare that income?

5   A.  No.

6   Q.  Did you tell the government "I'm a tax cheat"?

7   A.  That question was never asked, so...

8   Q.  Well, let me ask you this:  When you sit down with the

9   government, don't they ask you to tell us all crimes that

10  you've been involved in?

11  A.  Yes.  And at that time, I was in a -- not a legal status.

12  So until I became legal, until I obtained legal status, so even

13  though I wanted to pay the tax, but there was no means to pay

14  the tax, so I was advised by the people who does -- the tax

15  accountants, that once you become legal, then you're going

16  to -- you're going to -- I believe when I filed my first taxes,

17  I have mentioned, and I remembered it was something about it

18  for the past, not paying taxes.  I think I did the bill.  I'm

19  not sure, but I have to go and look in my papers.

20  Q.  Thank you for paying your taxes.  But did you report that

21  to the government?

22  A.  What do you mean?  Did I report it to the government?

23  Q.  That you file your tax returns every year.

24  A.  Yes.

25  Q.  When did you tell them that?

M8N6RAH7                          Kamalov - Cross

 1    A.  To who?

 2    Q.  The government?

 3    A.  When they ask.

 4    Q.  Okay.  So during this proffer session, you sat down with

 5    them and said to them, yes, I file my tax returns every year?

 6    A.  Yes.  Since I -- since I obtain legal status, since then,

 7    yes.

 8    Q.  Sir, I just wanted to be clear.  I'm not asking you if you

 9    do file.  I'm asking you if when you sat down with the

10    government you told them that I file my tax returns every year?

11    A.  Yes.

12    Q.  I'm sorry?

13    A.  Yes.

14    Q.  Okay.  After you were working with Michael, you left at

15    some point, right?

16    A.  Yes.

17    Q.  Where did you go?

18    A.  I -- I got my license, and I start working for a limousine

19    company.

20    Q.  And what was the name of that company?

21    A.  Green Stars.

22    Q.  And how long did you work there?

23    A.  I believe three years or two years.  I don't remember.

24    Q.  Can you give me roughly the range of years you worked

25    there?

M8N6RAH7                         Kamalov - Cross

1  A.  Probably two years.

2  Q.  I'm sorry.  Say which years, 2015?  2017?

3  A.  Probably 2013 to 2014, the end, I believe.

4  Q.  Okay.  And did you then move on from that job to another

5  job?

6  A.  No.  It was a limo company.  I just changed the limo

7  company because it was better paying.

8  Q.  So you worked at another limo company?

9  A.  Correct.

10 Q.  Okay.  And are you still working at that limo company?

11 A.  No.

12 Q.  Okay.  How long did you stay at that second limo company?

13 A.  I don't recall it -- how long, but it was couple months

14 maybe, couple years, maybe year.

15 Q.  Isn't it a fact you don't know because you weren't working

16 there?

17 A.  I mean, if you want me to get a proof, I can get a proof

18 that I was working there.

19 Q.  So I want to know if you were working at this limo company.

20 A.  Right.  I was working with them.

21 Q.  Okay.  And what were your duties at this limo company?

22 A.  As a driver.

23 Q.  Okay.  Did you have a TLC license?

24 A.  Correct.

25 Q.  And you did -- do you also do an Uber?

M8N6RAH7                          Kamalov - Cross

1   A.  At that time, I wasn't doing Uber.  I was doing limo only.

2   Q.  Just limo?

3   A.  Yes.

4   Q.  Did you leave that job, that limo company, and go somewhere

5   else?

6   A.  At one point, yes.

7   Q.  And where did you go?

8   A.  After I left limo company, I bought a car, and I started

9   working with Uber and Lyft.

10  Q.  Okay.  When you say you bought a car, were you doing the

11  driving, or you had other people driving for you?

12  A.  I was driving myself in the beginning.

13  Q.  Okay.  So can I just ask you, what is your income during

14  these years that you're working the limo and the Uber?  What's

15  your annual income?  Just an estimate.

16  A.  I have to look into my tax papers.

17  Q.  You just don't know?

18  A.  I know.  I mean, I have to look into it, but I cannot give

19  you specific number.

20  Q.  Did you make 250,000 or did you make 30,000?  Do you know

21  what I'm saying?  Can you give me an estimate?

22  A.  I don't know.  40, maybe.  30,000.

23  Q.  Okay.  And what years are we talking about that you're

24  making 30, 40,000?

25  A.  '14, '15, '16.

M8N6RAH7                          Kamalov - Cross

1   Q.  And then did that change at some point?

2   A.  Change what?

3   Q.  Did you either go to a different job or your income change?

4   A.  No.  It was same.

5   Q.  Where are you currently working is what I'm getting at.

6   A.  Right now, I'm a Lyft driver.

7   Q.  Okay.  And have you -- I know you indicated you have filed

8   your tax returns.  Are you saying that you have earned

9   approximately 30 to 40,000 each year?

10  A.  Yes.

11  Q.  And that's what you report?

12  A.  I'm not doing the tax myself.  So the tax people, they do

13  that, and I bring all the papers and I give them all the

14  receipts, my expenses.  So after that, yeah, it's there.  So I

15  have nothing to hide.

16  Q.  Fair enough.

17          Did you also have a Mercedes-Benz that you drove

18  around with?

19  A.  Correct.  I had.

20  Q.  When was that?

21  A.  I think I bought that in 2019, summertime.

22  Q.  And in 2019, how much were you earning?

23  A.  2019, I was on-and-off working and probably 2019 -- how

24  much I made?

25  Q.  Yes.  How much were you earning in 2019 that you could

M8N6RAH7                         Kamalov - Cross

1    afford a Mercedes?

2    A.   2019, I didn't really work.  I work little.

3    Q.   You only worked a little?

4    A.   Yes.

5    Q.   Okay.  When did you start this life of crime that you've

6    engaged in?

7    A.   I would say 2017.

8    Q.   2017.  And what was your first criminal act that brought

9    you to the other side?

10   A.   Credit card.

11   Q.   And how did you learn that credit card?

12   A.   How did I learn?

13   Q.   How did you learn how to do this credit card --

14   A.   Oh, there is one person.

15   Q.   -- withdrawn.  Let me just ask you something.

16           You were an honest person up to that point, correct?

17   A.   Yes.

18   Q.   Except for the bogus marriage, but that, whatever, and

19   maybe the taxes.  Who cares?  But, essentially, you're not

20   stealing from people, right?  You're an honest guy.  What

21   changed you?

22   A.   I mean -- excuse me.  What do you mean what changed me?

23   Q.   You were a home attendant.  You took care of Michael.  You

24   worked jobs that you have to care to work those jobs.  What

25   changed you that now you started stealing from people, stealing

M8N6RAH7                         Kamalov - Cross

1   from everyone?

2   A.  Well, there was one evil person came to my life, 2017, and

3   reached out to me, and I didn't have no intentions to being

4   involved in this.  I had no idea.  But I got involved not

5   knowingly, if that's what you're asking.

6   Q.  Let me ask you this:  At the highlight of your criminal

7   career, you have millions of dollars, didn't you?

8   A.  Surprisingly, I never even -- it's -- it sounds very

9   unbelievable, but I never even made it -- at a time 30,000 or

10  40,000, no.

11  Q.  Let me ask you, because I think I may have misheard you,

12  you were asked by the government during your direct testimony

13  how much you earned from these particular scams.  Do you

14  remember those questions?

15  A.  Yes.

16  Q.  I thought I heard you say 15,000, and then in regards to

17  another scam, 12,000.

18  A.  Yes.

19  Q.  Was that correct?

20  A.  Correct.

21  Q.  So the most you've earned from 2017 to 2020 in all of these

22  scams was $27,000?

23  A.  2017 to 2021, the total, if you add up 10,000 -- 15,000,

24  12,000, and then I got 35,000.  So probably around 100,000 and

25  some change.  I might be wrong.

1    Q.  Time out a second.  Time out.

2    A.  I'm talking all, everything, if you add up from the

3    beginning to the end.

4    Q.  So when you were asked how much you earned from these

5    scams, why did you say 15,000, 12,000?

6    A.  Because they were referring to a specific -- one

7    transaction.

8    Q.  Oh, okay.  So now you're telling us that -- from 2017 to

9    2021, four or five years, how much did you make?

10   A.  Less than 100,000.

11   Q.  Less than 100,000, yet you bought a brand new

12   Mercedes-Benz.

13   A.  It was not brand new.

14   Q.  Traveling all around?

15   A.  It was not brand new.  It was 2014 or '15, used car,

16   accident.  Had been in accident.  So it was not a brand new

17   car.  I remember what I bought.

18   Q.  I want to ask you about a couple of people -- I'm sorry.

19       I want to ask but a couple of people.  We talked about

20   Djamshed.  Do you know someone named Farrukh?

21   A.  I've heard about him, yes.

22   Q.  Well, when you say you've heard about him, isn't it a fact

23   that you actually met him and worked with him?

24   A.  I met him, and I think I worked with him, yes.

25   Q.  So just for my own clarification, when I asked you about

M8N6RAH7                    Kamalov - Cross

Farrukh, you said you think you heard about him.  Why wouldn't
you say yes, I know him?
A.   The reason I said that, because there was another --
Djamshed's partner by the name of Farah.  He used to refer to
Farah, but his full name could have been Farrukh, or that's
what I thought you are leaning towards.  So that's why I said
I've heard about him.  I thought maybe you were talking about
Djamshed's -- so now I know who you're talking about.  Yes, I
know.
Q.   Okay.  Thank you.  So you are familiar with Farrukh -- I'm
going to try to pronounce his name -- Khazratkulov.
A.   I don't remember his name -- his last name.
Q.   Just the first name?
A.   First name, yeah.  I know Farrukh.
Q.   Fair enough.
A.   I hope I'm talking about the right person because Farrukh
can be anyone.  So I hope you are referring to Djonibek's
friend, Farrukh.
Q.   Yes.  I'm referring to the person that you dealt with
directly with the credit card scam.
A.   It was not directly.  It was through Djonibek.  It was
never direct.
Q.   Isn't it a fact that you approached my client and asked him
to partner with you and he said no?
A.   And when was that?

M8N6RAH7                          Kamalov – Cross

1   Q.  I'm asking you.  Did he -- did you approach him?  It was

2   around the time you scammed Farrukh.

3   A.  No.

4   Q.  And didn't my client confront Djamshed because it was

5   Djamshed working together with you that screwed Farrukh?

6   A.  I don't know what you're talking about.

7   Q.  Of course you don't.

8   A.  There's nobody --

9   Q.  Because that kind of information wouldn't get you a

10  cooperation deal, will it?

11              MR. RAYMOND:  Objection, your Honor.

12              THE COURT:  Sustained.  You can rephrase that.

13  Q.  Isn't it a fact that you scammed Farrukh and charged up his

14  credit cards, and he gave you the money, and then when the

15  charge backs came, you cut him loose; isn't that true?

16  A.  No, that's not true.

17  Q.  And he's still in debt today because of that?

18  A.  That's not true.

19  Q.  That's not true?  He's not in debt now?

20  A.  I don't know if he's in debt or not.

21  Q.  Oh, okay.  And isn't it a fact that Farrukh came to my

22  client and told him what you guys did to him and he confronted

23  you?

24  A.  Farrukh, his credit card was given to us by Djonibek.  So I

25  don't know what you're talking about.

M8N6RAH7                         Kamalov - Cross

1   Q.   Okay.  But you never met with Farrukh on -- in the

2   apartments -- was it 98th?

3   A.   Not in my apartment.  He brought Farrukh to where I was

4   living, then he introduced me to his friend by the name of

5   Farrukh.  He said he has a credit card and it's maxed out, can

6   you please help him too so he can make money too?

7   Q.   Isn't it a fact that you and your cohorts despise my client

8   so much, you're so envious of him for his wonderful family and

9   the way that he's so respected in the community, that you're

10  now attacking him and trying to bring him down?

11  A.   Respected in the community?

12  Q.   Yes.

13  A.   You might want to --

14  Q.   Are you respected in the community?

15  A.   I don't know if I'm respected in -- I'm sure.  I believe

16  so.

17  Q.   Oh, you are?  Because you're an honest guy, right?  You

18  don't screw anyone?  You don't steal people's money and then

19  buy --

20            MR. RAYMOND:  Objection, your Honor.

21            THE COURT:  Sustained.  You've got to, number one, ask

22  questions, and number two, not have compound questions.

23  Q.   How about Odil Sharipov, do you remember meeting with him?

24  A.   Yes.

25  Q.   Do you remember screwing him out of money?

M8N6RAH7                          Kamalov - Cross

1    A.  I do not recall.

2    Q.  Okay.  You don't recall.  Very interesting.  How about

3    Sara Sakhrani?

4    A.  Who?

5    Q.  Sara Sakhrani.

6    A.  One more time.

7    Q.  I'll spell it for you because I may not be pronouncing it

8    correct.  The first name Sara, s-A-K-H-R-A-N-I.

9    A.  I don't know who that is.

10   Q.  And how about Kevin?  Can I talk to you about Kevin,

11   please?

12   A.  Sure.

13   Q.  Okay.  That video that you say you received from Djamshed,

14   right?

15   A.  I receive from Eugene.

16   Q.  Oh, Eugene.  My mistake.  You received that video from

17   Eugene.  When did you receive that?

18   A.  I do not recall the time or the month.

19   Q.  How about the year?

20   A.  Probably --

21   Q.  Isn't it a fact that it's about five or six years old?

22   A.  I don't think so -- that long.  I believe it's 2019,

23   beginning, or '18, end.  It's over there.

24   Q.  Do you have that on your phone now?  Is that on your phone?

25   A.  What do you mean?  The video?

M8N6RAH7                          Kamalov - Cross

1   Q.  The video.

2   A.  Yes.

3   Q.  And you're saying that you received that on your phone in

4   2019?

5   A.  Yes.

6   Q.  Okay.  Isn't it a fact that Kevin also sells cell phones,

7   electronics?

8   A.  Sells?  I don't know.

9   Q.  Did doesn't Kevin deal with electronics?

10  A.  I don't know.  Maybe.  I have never talked to him about the

11  phones.

12  Q.  You never talked to my client about cell phones?

13  A.  (Shakes head)

14  Q.  You never talked to him, and he said he was buying

15  cell phones from Kevin?

16  A.  He was buying cell phone from Kevin?

17  Q.  Cell phones, plural.

18  A.  Cell phones?

19  Q.  Yes.

20  A.  He was buying cell phones from Kevin?

21  Q.  Yes.

22  A.  I don't know.  This is something new you telling me, so I'm

23  just hearing this.  I don't think he sells the cell phone.  I

24  think he's a -- he's a -- he's a completely different business

25  he's in.

M8N6RAH7                    Kamalov – Redirect

1    Q.  Do you know the person by the name of Sadullo Karimov?

2    A.  Can you repeat the name.

3    Q.  Sadullo Kamalov.  I'm sorry.  It's Sadullo Karimov.

4    A.  Never heard that name before, no.

5    Q.  Sadullo?

6    A.  No.

7    Q.  Okay.

8         MR. MURRAY:  Your Honor, may I have a second to talk

9    to my client?

10         (Defendant and counsel confer)

11         MR. MURRAY:  Your Honor, I have nothing further.

12         Thank you, sir.

13         THE COURT:  Thank you.  Any redirect?

14         MR. RAYMOND:  Yes, your Honor.  Pretty briefly.

15   REDIRECT EXAMINATION

16   BY MR. RAYMOND:

17   Q.  Mr. Kamalov, under your agreement, what have you agreed to

18   do today with the government?

19   A.  Tell the truth.

20         MR. RAYMOND:  And, Ms. Pierre, can you pull up

21   Government Exhibit 1407?  Can you turn to Page 7?

22   Q.  Can you read Paragraph 4, just the first sentence?

23   A.  The defendant will provide truthful.

24   Q.  And then -- sorry, that's a comma, so just the next --

25   A.  The defendant will provide truthful, complete, and accurate

1    information, and will be -- cooperate fully with the office.

2    This cooperation --

3    Q.  That's it, Mr. Kamalov.  Thank you.

4           Is it your understanding that you will receive the 5K

5    letter regardless of the outcome of this trial?

6    A.  Say that again.  Sorry.

7    Q.  Is it your understanding that you will -- that the -- you

8    will receive the 5K letter regardless of the outcome of this

9    trial?

10          MR. MURRAY:  Objection.  Leading, Judge.  I'm sorry.

11          THE COURT:  Sustained.

12          MR. RAYMOND:  Thank you.

13   Q.  What do you need to do to receive the 5K letter?

14   A.  Be honest, tell the truth, and if asked, testify.

15   Q.  Anything else that you're required to do under the

16   agreement?

17   A.  No.

18          MR. RAYMOND:  No further questions, your Honor.

19          THE COURT:  Any recross?

20          MR. MURRAY:  Real quick, if I can.

21          THE COURT:  Yes.

22   RECROSS EXAMINATION

23   BY MR. MURRAY:

24   Q.  When they talked about what you're required to do, did they

25   tell you about paying back taxes or being truthful about that

M8N6RAH7                              Kamalov - Recross

1   bogus marriage that you were involved in?

2   A.  What's your question?

3   Q.  When you were told by the government that you have to tell

4   the truth?

5   A.  Yes.

6   Q.  Did you -- are you required to now tell the truth about all

7   of your crimes?

8   A.  Everything.  Yes.

9   Q.  Including the bogus marriage --

10           MR. RAYMOND:  Objection, your Honor.  Objection on the

11  bogus marriage.

12           THE COURT:  Sustained.

13  Q.  Did the government give you a pass on that, is what I'm

14  asking.

15           MR. RAYMOND:  Objection, your Honor.

16           THE COURT:  Could you just rephrase that?

17  Q.  When you mentioned that to the government, and they raised

18  it as an issue, correct?  I'm sorry, let me rephrase that.

19           When you mentioned this marriage that you paid for to

20  the government, did they --

21           MR. RAYMOND:  Objection.

22           THE COURT:  Sustained.  If you could just ask short

23  questions without an underlying premise that it's hard to

24  differentiate.

25           MR. MURRAY:  I'll withdraw it.  I'm beyond it anyway.

M8N6RH7

1          THE COURT:  Okay.  Thank you.  You can step down.

2          (Witness excused)

3          So, folks, we are done for the day.  Thank you for

4    your attention.  I want to start a few minutes late.  We're

5    going to start tomorrow at 10:10.  Just remember, don't discuss

6    the case, keep an open mind, and I'll see you in the morning.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M8N6RH7

1                    (Jury not present)

2                    THE COURT:  Are there any issues you want to talk

3    about now?

4                    MR. REHN:  Just the one thing.  You mentioned this

5    morning that you wanted an update on the subpoena.

6                    THE COURT:  Yes, please.

7                    MR. REHN:  We did have further discussions today, but

8    we don't yet have an agreement how to proceed, but we're

9    working towards that.

10                   THE COURT:  Thanks.  If you could let me know tomorrow

11   at least where you are, even if you haven't completed your

12   discussions.  I just need to know if it's something that I'm

13   going to need to rule on.  I just want a little bit of advance

14   notice of where you are in your discussions.  Okay?

15                   MR. MURRAY:  Okay.

16                   THE COURT:  So as you heard, I'd like to get started

17   at 10:10 tomorrow instead of 10:00.

18                   Any other issues anyone wants to raise?

19                   MR. MURRAY:  No, your Honor.

20                   THE COURT:  All right.  Have a nice evening.

21                   (Adjourned to August 24, 2022, at 10:10 a.m.)

22                                    * * *

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     WILLIAM SCHULZ

 4    Direct By Mr. Raymond  . . . . . . . . . . .61

 5    Cross By Mr. Murray  . . . . . . . . . . . .69

 6    PAULO GRECO

 7    Direct By Mr. Raymond  . . . . . . . . . . .70

 8    Cross By Mr. Murray  . . . . . . . . . . . .77

 9     CONOR O'SULLIVAN

10    Direct By Mr. Rehn . . . . . . . . . . . . .79

11    Cross By Mr. Murray  . . . . . . . . . . . 111

12     RICHARD WIXSOM

13    Direct By Mr. Rehn . . . . . . . . . . . . 117

14    Cross By Mr. Murray  . . . . . . . . . . . 128

15     ALENA VOLYNKINA

16    Direct By Mr. Rehn . . . . . . . . . . . . 129

17     LISA TERRY

18    Direct By Mr. Raymond  . . . . . . . . . . 137

19     HEATHER WALDROUP

20    Direct By Mr. Raymond  . . . . . . . . . . 147

21     ANASHON KAMALOV

22    Direct By Mr. Raymond  . . . . . . . . . . 159

23    Cross By Mr. Murray  . . . . . . . . . . . 210

24    Redirect By Mr. Raymond  . . . . . . . . . 239

25    Recross By Mr. Murray  . . . . . . . . . . 240
```

```
 1                    GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3    3401     . . . . . . . . . . . . . . . .66

 4    3501, 3504  . . . . . . . . . . . . . . .80

 5    3001  . . . . . . . . . . . . . . . . . .89

 6    3503  . . . . . . . . . . . . . . . . . .91

 7    2503-A   . . . . . . . . . . . . . . . . .99

 8    1303  . . . . . . . . . . . . . . . . . 119

 9    1301  . . . . . . . . . . . . . . . . . 125

10    1702  . . . . . . . . . . . . . . . . . 144

11    907  . . . . . . . . . . . . . . . . . 150

12    1307  . . . . . . . . . . . . . . . . . 165

13    3904  . . . . . . . . . . . . . . . . . 205

14    3902  . . . . . . . . . . . . . . . . . 206

15    3903  . . . . . . . . . . . . . . . . . 207

16    3901  . . . . . . . . . . . . . . . . . 208

17    3901-A_T  . . . . . . . . . . . . . . . 210

18

19

20

21

22

23

24

25
```