UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 20 CR 653(RA)

DJONIBEK RAHMANKULOV,

Defendant.

Trial

------------------------------x

New York, N.Y.
August 24, 2022
10:32 a.m.

Before:

HON. RONNIE ABRAMS,

District Judge
-and a Jury-

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: THANE REHN
CECILIA VOGEL
SAMUEL RAYMOND
Assistant United States Attorneys

JOSEPH MURRAY
Attorney for Defendant

NERLANDE PIERRE, USAO Paralegal
ANTHONY IMPERATO, USAO Paralegal
MUHITDIN AHUNHODJAEV, Uzbek Interpreter
SANJAR BABADJANOV, Uzbek Interpreter
FERUZ USMANOV, Uzbek Interpreter
FARANGIZ ABDUQODIROVA, Uzbek Interpreter

(In open court; jury present)

THE COURT: Good morning, everyone. Everyone can be seated.

First of all, I just want to apologize that we're getting started a little bit late today. We're having some technological difficulties. Our first witness today is testifying remotely. I think we have sorted all of our issues out and we are ready to proceed. The government may call its next witness.

MR. RAYMOND: Thank you, your Honor. The government calls Amanda Holdaway.

AMANDA RUTH HOLDAWAY,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: Can you please state and spell your name for the record?

THE WITNESS: Amanda Ruth Holdaway. Amanda, A-m-a-n-d-a, Ruth, Holdaway, H-o-l-d-a-w-a-y.

DIRECT EXAMINATION

BY MR. RAYMOND:

Q. Good morning, Ms. Holdaway.

A. Good morning.

Q. Where do you live?

A. Young Harris, Georgia.

Q. What do you do for a living?

A. I'm the director of finance for the local power company.
Q. What's the name of the company that you work for?
A. Blue Ridge Mountain Electric Membership Corporation.
Q. Is that sometimes called Blue Ridge Mountain EMC?
A. It is.
Q. Where is Blue Ridge Mountain EMC located?
A. In Young Harris, Georgia.
Q. What regions does Blue Ridge Mountain EMC serve?
A. We serve five counties. Three counties in Georgia, Towns County, Union County, and Glynn County, and two counties in North Carolina, Clay County and Cherokee County.
Q. You mentioned that you're the director of finance and accounting. How long have you been in that position?
A. Since October 2017.
Q. And in total, how long have you been at Blue Ridge Mountain EMC?
A. 27 years.
Q. So directing your attention to July 2018, what was your position then?
A. Director of finance and accounting.
Q. What were your responsibilities as the director of finance and accounting?
A. I oversee the accounting department, do memos for all of the financial transactions for the company. I oversee the human resource department and our warehouse for all the

purchase and tech supplies.

THE COURT: Excuse me one second. Good morning, Ms. Holdaway. This is Judge Abrams. It's a little bit difficult to hear just because of the way we're doing this remotely. So I'm just going to ask you to speak very slowly, if you could, which I think may help. Thank you, ma'am.

THE WITNESS: I will.

MR. RAYMOND: Thank you, your Honor.

BY MR. RAYMOND:

Q. Ms. Holdaway, as part of your tasks, were you generally aware of transactions that Blue Ridge Mountain EMC was participating in?

A. Yes.

Q. Now, directing your attention to July 2018, did you learn of any issues with Blue Ridge Mountain EMC's bank accounts?

A. Yes, I did.

Q. With whom did Blue Ridge Mountain EMC bank as of July 2018?

A. United Community Bank in Blairsville, Georgia.

Q. Did you have a specific liaison at United Community Bank in Georgia?

A. Yes.

Q. What was that person's name?

A. Pam Murray.

Q. How many bank accounts did Blue Ridge Mountain EMC maintain at United Community Bank?

A. Five accounts.
Q. Why did Blue Ridge Mountain EMC have five accounts?
A. To safelight funds for the different functions of the electric co-op.
Q. Did you personally have access to all five accounts?
A. Yes.
Q. Now, you said that there was an issue with one of Blue Ridge Mountain EMC's accounts. Do you recall which account had the issue?
A. The consumer deposit account.
Q. What was the consumer deposit account?
A. The consumer deposit account is where deposits and memberships from the members that have service with our electric company are held.
Q. So how is that account normally used?
A. We deposit membership deposit funds in that account as they're received from the member and hold them until the member no longer has service in our area. Once the member leaves our area, we will refund deposits and memberships by check from that account.
Q. As of 2018, were transfers made out of that account only by check or were there any other means?
A. Only by check.
Q. Now, you mentioned that in July 2018, there was an issue. What did you learn about what happened?

A. I received a call late in the day that afternoon from Pam Murray saying that it appeared some fraudulent wires were being transferred from the consumer deposit account. We don't wire money from that account and I asked her to stop those wires if at all possible.
Q. Do you recall what day this occurred?
A. It was July 9th.
Q. And what did you do after you spoke with Ms. Murray?
A. I called the general manager, who was out of town, to let him know what had happened.
Q. And what happened after that?
A. We closed all access online to all Blue Ridge Mountain EMC bank accounts for all users.
Q. Was any money withdrawn from Blue Ridge Mountain EMC?
A. Yes.
Q. Do you recall how much?
A. Just over $636,000.
Q. And did Blue Ridge mountain -- Ms. Holdaway, do you have in front of you what's been marked for identification as Government Exhibit 901?
A. Yes, I do.
Q. Do you recognize Government Exhibit 901?
A. Yes. This is our bank statement from July 2018.
Q. Did you personally receive the bank statement?
A. Yes.

Q. When did you receive it, about when did you receive it?
A. About the first day of August.
Q. In 2018?
A. In 2018.
Q. Was this kept in the regularly conducted course of business of Blue Ridge Mountain EMC.
A. Yes.
Q. Is keeping this record a regular practice of Blue Ridge Mountain EMC's business?
A. Yes.

MR. RAYMOND: Your Honor, the government offers Government Exhibit 901.

THE COURT: Any objection?

MR. MURRAY: No objection, your Honor.

THE COURT: 901 will be admitted.

(Government's Exhibit 901 received in evidence)

Q. Ms. Holdaway, can you walk through the first page of Government Exhibit 901. Just put aside the red at the top, but where is the bank?
A. The bank is United Community Bank in Blairsville, Georgia.
Q. Does it describe what account this relates to?
A. This statement is for the consumer deposit account.
Q. Now, Ms. Holdaway, there is some yellow marks and some red writing. Who made that red writing and yellow marks?
A. I did.

Q. Ms. Holdaway, can you turn to page 3 of Government Exhibit 901. Can you read, is there a line that says other debits?
A. Yes.
Q. What do these debits describe?
A. These debits are wire fees for outbound transactions.
Q. And then below that, does it say "wire out"?
A. Yes, there are four "wire out" transactions below those fees.
Q. Are those the transactions that you described that were unauthorized?
A. Yes, they are.
Q. Can you read the first of the "wire out," can you read the number and what it says after BNF?
A. The numbers shows wire out, 201819000372 (technical interruption) transportation incorporated, $83,540.
Q. It says the date July 10th, but you mentioned the date was July 9th. Do you know why that is?
A. Probably mistaken on the date, misspoke. July 10th, July 9th. It was late in the day that day when she called me.
Q. Ms. Holdaway, you mentioned that more than $600,000 was taken from Blue Ridge Mountain EMC. Did Blue Ridge Mountain EMC ever retrieve any of that money?
A. We did. We were able to retrieve all of those funds except the $83,540.

Q. So that money Blue Ridge Mountain EMC lost; is that correct?
A. Yes.
Q. Now, Ms. Holdaway, do you also have in front of you what's been marked Government Exhibit 906?
A. Yes, I do.
Q. Do you recognize Government Exhibit 906?
A. I do.
Q. What is Government Exhibit 906?
A. This is information supplied to us from United Community Bank concerning their actions to retrieve the funds fraudulently wired from our account.
Q. Did you personally receive this from United Community Bank?
A. Yes, I did.
Q. About when did you receive these records?
A. It was late July, early August. I don't recall the exact date.
Q. In 2018, though, contemporaneously?
A. Yes, in 2018.
Q. Were these records maintained in the regularly conducted course of Blue Ridge Mountain EMC business?
A. Yes.
Q. Was keeping a record like this a regular practice of Blue Ridge Mountain EMC's business?
A. Yes, it is.

MR. RAYMOND: Your Honor, the government offers Government Exhibit 906.

THE COURT: Any objection?

MR. MURRAY: No objection.

THE COURT: 906 will be admitted.

(Government's Exhibit 906 received in evidence)

Q. Ms. Holdaway, can you walk through the first page of Government Exhibit 906, can you just read where it says the amount in the upper section of the document?

A. The amount shows as $83,540 even.

Q. And then all the way down at the bottom where it says free text, can you read that portion?

A. (9000) ATTN INV RE YR FED IMAD 0709L1LFBL6 C000108 for $83,540 dated 7/9/2018. Please be advised that we have tried to contact BNF several times, require return of funds. We have not received any response. Please contact them directly if matter remains, one half of --

Q. Ms. Holdaway, that's okay. Just to be clear, are you precisely sure if it was July 9th or July 10th of 2018?

A. I couldn't -- I know these transactions posted to our bank account on July 10th. I remember the call coming in on July 9th.

Q. So it was possible it was posted another day and you received the call --

A. Probably the next day.

Q. Okay. And then Ms. Holdaway, if you can turn to page 5. Can you read at the bottom, free text, I'll stop you halfway through, too.
A. At the bottom of your message text?
Q. It says free text at the below message text on page 5. Could you read that out loud.
A. Per our federal IMAD --
Q. You don't have to read the number.
A. Okay. Original wire sent out on 7/9, 83,540 USD. Original requesting funds be returned in full ASAP --
Q. Ms. Holdaway, right there is fine. Thank you.
Ms. Holdaway, do you know anyone by the name of Djonibek Rahmankulov?
A. No, I do not.
Q. Do you know anyone by the name of Sadullo Karimov?
A. No, I do not.
Q. Beside what you've seen, do you know anything about a company called Sadullo Transportation?
A. No, I do not.
Q. Have you ever heard of a company called Jasur Transport?
A. No, I did not.
Q. In July 2018, did Blue Ridge Mountain EMC do business with any of the individuals that I named?
A. Not that I know of.
Q. Did it ever do business with companies called Sadullo

Transportation and Jasur Transport?
A. No.
Q. In your role as director of finance, would you have known about business relationships between Blue Ridge Mountain EMC and these businesses or individuals?
A. Yes, I would have.
Q. Just generally, did Blue Ridge mountain have any connection to trucking companies located in New York City?
A. No.
MR. RAYMOND: Your Honor, no further questions.
THE COURT: Any cross examination?
MR. MURRAY: Just a couple, Judge.
CROSS-EXAMINATION
BY MR. MURRAY:
Q. Good morning, Ms. Holdaway.
A. Good morning.
Q. I have just a couple questions for you.
By the way, you can't see them here, so please explain to the jury how this impacted you and your business.
A. These funds being transferred from this bank account, the funds are membership and deposit funds held for our members as an electric membership corporation. All of those funds being transferred out would be funds that we no longer have to refund to our members when they leave our area. It would cause an increase in rates to cover membership and deposit funds --

Q. And what -- I'm sorry. I'll let you finish.
A. It's okay. I'm finished.
Q. What kind of hardship does that cause your members?
A. As the electric company, when we have to raise rates, the hardship is experienced by our members when their electricity bills go up.
Q. When I say that, are a lot of your members on fixed income so that this really hurt them?
A. Yes, most of our members in our area, we're a retirement community, so most of our folks are on fixed income.
Q. Can you estimate about how many people were impacted by this hacking?
A. It would be hard to estimate, but probably a small portion of our membership base, 56,000 members at the current time, so probably eight to ten-thousand members.
Q. How about the organization itself, did you have to hire lawyers or other forensic people to work on this hacking?
A. No. We worked all this in-house with our current IT department. So it was overtime for those folks would be the main cost in-house.
Q. But it was an additional cost that you had to absorb now because of this?
A. Yes, we had to absorb the costs for the IT department and for damaged equipment in our home office.
Q. Did you have to purchase any additional protection to

prevent this from happening again?
A. Yes, we did.
Q. Do you have any idea how much that cost?
A. That was upwards of $30,000.
Q. And has the government informed you that they have declined to prosecutes one of the parties involved in this?
MR. RAYMOND: Objection, your Honor.
THE COURT: Sustained.
MR. MURRAY: I have nothing further, Judge. Thank you.
Thank you Ms. Holdaway.
THE COURT: Any redirect?
MR. RAYMOND: No, your Honor.
THE COURT: Thank you very much for your testimony today.
(Witness excused)
The government can call its next witness.
MS. VOGEL: Your Honor, the government calls Kristina Bitsadze.
KRISTINA BITSADZE,
called as a witness by the Government,
having been duly sworn, testified as follows:
THE DEPUTY CLERK: Please state and spell your name for the record.
THE WITNESS: Kristina Bitsadze, K-r-i-s-t-i-n-a

B-i-t-s-a-d-z-e.

DIRECT EXAMINATION

BY MS. VOGEL:

Q. Good morning, Ms. Bitsadze.

A. Good morning.

MS. VOGEL: Your Honor, may I approach briefly. I believe I handed my own copy to the witness.

THE COURT: Yes.

Q. Is Bitsadze your married name?

A. Yes, it is.

Q. What is your maiden name?

A. Potrosyan.

Q. What do you do for work now?

A. I am a fraud investigator.

Q. Where are you a fraud investigator currently?

A. Currently, I'm with Municipal Credit Union.

Q. When did you start working there?

A. September of 2020.

Q. Where did you work before?

A. At TD Bank.

Q. When did you start working at TD Bank?

A. July 2013.

Q. What roles over time did you have at TD Bank?

A. I started as a customer service representative, I progressed to store supervisor, and then I went to global

security department and worked as an investigative support specialist and I was promoted to a fraud investigator.
Q. In 2018 at TD Bank, what role did you have?
A. I was an investigator.
Q. What were your responsibilities as an investigator at TD Bank?
A. Investigate financial crimes that were done against the TD Bank.
Q. When were you in that role, were you working in a particular department within the bank?
A. Yes, global security investigations department.
Q. What does that department do?
A. Investigate financial crimes.
Q. Have you testified before?
A. Yes, I have.
Q. About how many times?
A. Two, three.
Q. In what context did you testify?
A. I testified on behalf of TD Bank, as well as a witness for law enforcement.
Q. And were those civil or criminal cases?
MR. MURRAY: Judge, I'm going to object to relevance on this.
MS. VOGEL: I can move on, your Honor.
THE COURT: Very well.

Q. I'd like to focus on your time working at TD Bank as an investigator.

How, typically, did an investigation start?

A. Investigation would normally start either with a claim that a bank would receive or a referral from law enforcement.

Q. What steps did you take, typically, during an investigation?

A. Well, first a case would be created in our corporate office and then it would be assigned based on the zip code. Once we would get the case, we would review the case, we would review the documents that were provided, and then just go from there.

Q. What would be the possible outcomes of an investigation?

A. No action taken against the customer or the expulsion of the customer's account.

Q. Based on your experience --

A. I'm sorry. Sometimes it would be even referred to law enforcement.

Q. Based on your experience as a TD Bank investigator, are you familiar with the business practices of TD Bank with respect to keeping investigative records?

A. Yes.

Q. Did TD Bank maintain a case file for each investigation?

A. Electronic files, yes.

Q. What was typically included in an electronic case file?

A. Images, signature cards, case notes, videos, claims.

Q. Are electronic case files created at or near the time TD Bank was conducting an investigation?
A. Yes.
Q. For how long does TD Bank keep electronic case files?
A. I believe seven years.
Q. Is it TD Bank's regular practice to create these electronic case files?
A. Yes.
Q. Were the electronic case files kept by TD Bank in the normal course of its business?
A. Yes.
Q. You mentioned that case notes are part of an electronic case file. What are case notes?
A. Case notes is something that we input into our case anytime we have a conversation, whether with a customer, whether we had to speak to our employees just to make sure everything is notated.
Q. Was it bank policy to keep case notes for each case?
A. Yes.
Q. Did you follow that policy?
A. Yes.
Q. At what stage in the investigative process would case notes be created?
A. As soon as the case is open.

MS. VOGEL: If we can please pull up for the witness

Government Exhibit 604-06, which you also have, Ms. Bitsadze, in front of you in printed form.
Q. Have you reviewed this document before today?
A. Yes.
Q. What is it?
A. This is a case report.
Q. Does it relate to the investigation of a particular account?
A. Why.
Q. What account?
A. Looks like Jasmina Transport Incorporated.
Q. Who conducted the investigation?
A. I was assigned investigator.
Q. Is this a fair and accurate copy of the TD Bank case file?
A. Yes.
Q. So you also have in front of you what's marked as Government Exhibit 604-06-R. Do you see that?
A. Yes.
Q. What is the difference between 604-06 and 604-06-R?
A. 604-06-R is redacted and 604-06 is not.
Q. So aside from the redactions, is Government Exhibit 604-06-R a fair and accurate copy of the TD-Bank case report?
A. Yes.
MS. VOGEL: Your Honor, the government moves to admit

604-06-R at this time.

THE COURT: Any objection?

MR. MURRAY: No objections. This is the redacted one, I just want to be clear.

MS. VOGEL: That's right.

THE COURT: Yes, it is indicated, I believe, by the R. But yes, it will be admitted. Thank you.

(Government's Exhibit 604-06-R received in evidence)

MS. VOGEL: If we could please publish 604-06-R for the jury. If we could turn to page 15 of this document.

Q. What, generally, is reflected on this page?

A. I'm sorry?

Q. What, generally, is reflected on this page?

A. Incident report. Actually includes the incidents or claims we have received.

Q. And towards the top where it says ICNSADMI, Kristina Bitsadze, what does that mean?

A. I was assigned to this case.

Q. Do you see at the top, there is listed a case ID?

A. Yes.

Q. What is that?

A. It was the case ID assigned to this particular case, to this particular investigation.

Q. Do you see, as well on the top, it says new account fraud and then Jasmina Transport Inc.?

A. Yes.
Q. What does that indicate?
A. At TD Bank, any accounts that were opened less than six months would be considered new account fraud.
Q. A little bit further down, it says date occurred. February 28, 2018. What does that indicate?
A. This is the claim we have received for ACH, and this is when the ACH came into account on February 28th of 2018.
Q. What is the ACH at issue here?
A. I'm sorry?
Q. What is the ACH at issue here?
A. Looks like the exposure of wire -- so it's an incoming ACH for $93,451.
Q. Where it lists payee towards the bottom, what's listed there?
A. This right here is -- so the payee would be Jasmina Transport Incorporated, and the sender of that particular ACH was Paulo Sergio Greco.
Q. Does this document show what was the subject of the investigation?
A. Yes, Jasmina Transport Incorporated.
Q. Does this case file include case notes?
A. Not on this page.
Q. But does the file as a whole include case notes?
A. Yes.

Q. Did you create these case notes?
A. I did.
Q. Which case notes did you create?
A. You want me to tell which dated?
Q. Generally, are there case notes written by you?
A. Yes.
Q. And are there case notes written by other people?
A. Yes.
Q. For the case notes written by you, did you make these case notes at or near the time of the events that you recorded them?
A. Yes.
Q. Do the case notes accurately represent your summary of certain events that took place during your investigation?
A. Correct.
Q. Were these case notes maintained in the course of TD Bank's regularly conducted activities?
A. Yes.
Q. Is it a regular practice of TD Bank to make them keep such case notes?
A. Yes.
Q. Without reference to your case notes, can you remember the details of events that took place during your investigation?
A. I will not be able to.

MS. VOGEL: Your Honor, the government would like to ask permission to have the witness read portions of her case

notes into the record.

THE COURT: Will that refresh your recollection? All right. So I'll let you do that.

MR. MURRAY: No objection, your Honor.

MS. VOGEL: Just to be clear, we're doing this as recorded recollection, your Honor.

THE COURT: Understood. Understood.

MS. VOGEL: So if we could please turn to page 9 of the document. Ms. Bitsadze you should be referring to 604-06, which is the unredacted version.

THE WITNESS: What page did you say?

MS. VOGEL: 9. I actually think the pagination -- it's page 9 of the document, but the pagination says page 8 at the bottom.

BY MS. VOGEL:

Q. We're looking at the entry that's dated March 13th, 2018 at 10:37 a.m. Is this your first case note entry of the investigation?

A. Yes.

Q. Can you read the case note out loud.

A. Contacted RC5825 and spoke to store supervisor, Chris Bow, (ph.) who reviewed this account opening on 10/24/2017. When asked Chris what kind of business this was, he answered I don't know. I didn't open this account, you should refer to the employee who did. When asked where is the proof of address

that the paperwork states that collected, he stated, I don't know, maybe you should ask Mehet (ph.). I advised Chris the reason I was calling with these questions because according to such a new business account, he was the one who reviewed and approved this account to remain open. Christ seemed to be confrontational and sent it to educate Chris that, as a part of management team, he should be asking questions and making sure we, as a bank, are in compliance.

Q. You mentioned RC5825. What is that?

A. That is retail center 5285, and that would belong to a branch. That's how we identify the branches.

Q. Why did you start your investigation by contacting the store supervisor?

A. By the looks of my note, I didn't like how the signature card looked like and this particular account was approved to remain open.

Q. As part of your investigation, did you contact the account holder?

A. Yes.

Q. Why did you do that?

A. To question and maybe get a better understanding as to why we received the claim.

Q. How did you get the identity and contact information of the account holder?

A. From his signature card.

Q. So staying on this page, if we can go, please, to the entry that's March 19th, 2018 at 4:12 p.m. Can you please read that out loud?

A. Contacted customer at (917)717-9492 and spoke to Djonibek. According to Djonibek, the funds came from his friend, Jack, because he sold him a 2016 roller truck. As per Djonibek, he sold his truck last year, but Jack only paid him in February. Djonibek claims that he lost contact with Jack until mutual friend got them together and that's when Jack said that he will be wiring money from his business account to Djonibek. I advised Djonibek that his accounts will remain restricted until he provides us with proof of sale.

Q. Based on your experience as a bank investigator, does anything strike you as suspicious about this conversation?

A. I mean, the fact that he waited almost two years to get paid for a truck he sold, that was suspicious to me.

MS. VOGEL: So if we could move to page 7. This is going to be paginated as page 6, but it's page 7 of the document. We're looking at the entry that's April 2nd, 2018, at 11:50 a.m. Let me know when you're there.

A. April 2nd, 11:50?

Q. Yes.

A. Yes.

Q. Could you please read this case know entry out loud.

A. Contacted customer at (917)717-9492 and spoke to Djonibek.

According to him, he's still looking for proof of sale. In addition, he's claiming that he's trying to reach his friend of the family who send him the wire. He stated that he will try to find the paperwork by Thursday, April 5th, and drop them off at the TD Bank.

Q. Why did you reach out to the account holder again?

A. I was attempting to get the proof of sale from the customer.

Q. Based on your experience as a TD Bank investigator, what, if anything, is suspicious to you about this conversation?

A. He's not naming any people, he's saying -- basically referring to people as friend of the family and just not being able to find the proof of sale.

Q. Staying on this page, if we can look at the entry on April 13th, 2018, at 4:33 p.m. If you could please read that entry out loud.

A. No proof of transaction has been provided.

Q. And the next entry on this page, May 23rd, 2018, at 10:56 a.m. Could you read that out loud.

A. Denial letter sent to Bank of America for $93,451. Funds were depleted before March 2nd of 2018.

Q. Can you explain what that means?

A. Prior to us receiving a claim from Bank of America, the customer was able to remove funds from his account.

Q. If we could move ahead now to page 5, which, again, for

pagination, is page 4. I'm looking at the entry that's May 23rd, 2018 at 11:10 a.m. Do you see that?
A. Yes.
Q. Can you please read out loud the first two sentences of this entry?
A. Remaining funds are proceeds from another ACH, dated March 2nd of 2018. Email was sent to ACH research to inquire about ACH and requested more information.
Q. Can you explain that.
A. This particular account appears to have received another credit into the account and I was trying to find out if it was properly paid and where it came from.
Q. So let's move ahead now to page 3, which is paginated as page 2. I'm looking at the entry on July 11th, 2018, at 2:15 p.m.
A. Okay.
Q. Could you please read that one out loud.
A. Based on the facts presented to GSI in this matter, it has been concluded no further investigation is required. GSI considers the account holder suspect of wire and ACH fraud. GSI has established contact with this customer by telephone and was not satisfied with the answers received. The customer is a risk and no longer permitted to bank with TD Bank in the future.
THE COURT: I'm sorry. Could you just slow down a

tiny bit.
A. This customer will remain tagged as a suspect. Remaining funds have been requested to be escheated and accounts to be closed. Case closed, KP, 7/11/2018.
Q. What is GSI?
A. Global security investigations department.
Q. Why did you decide to close the account?
A. Customer was not able to provide us with any supporting documents that we have requested. In addition to that, we received one claim that was considered to be a fraud.
Q. Can I please to ask you to reread one of the sentences, which starts "the customer" in the middle of the paragraph.
MR. MURRAY: I'm going to object, your Honor. It's in evidence, she already read it. You asked her to slow down. Why are we doing this again?
MS. VOGEL: Your Honor, I don't think it came through clearly when she read that out loud.
THE COURT: All right. I'll allow it. I'm overruling the objection.
A. I'm sorry, from where?
Q. If you could just please start at "the customer is."
A. The customer is a risk and no longer permitted to bank with TD Bank in the future. The customer will remain tagged as a suspect. Remaining funds have been requested to be escheated and accounts to be closed. Case closed, KP, 7/11/2018.

Q. What does it mean to escheat funds?
A. Anytime there is an ongoing investigation or closed investigation and customer is viewed as suspect, unless they can provide us with proof that these funds do belong to them, we are required to escheat funds and put them in a holding GL where we keep them until the financial institution comes and claims the funds or the customer will provide us with proof that these funds do belong to them.
Q. What is a GL?
A. General ledger.
Q. What is a general ledger?
A. I won't be able to explain that. I'm sorry.
Q. Was the account holder, Djonibek Rahmankulov, permitted by TD Bank to open any accounts after this?
A. I'm sorry?
Q. Was the account holder, Djonibek Rahmankulov, permitted by TD Bank to open any accounts after this?
A. No.
Q. Why not?
A. He was deemed as a suspect.
Q. Was this particular bank account for Jasmina Transport closed?
A. Yes.

MS. VOGEL: So I would like to turn to page 16, if we could pull that up in the redacted version that's available to

the jury.
Q. Do you see that in front of you, Ms. Bitsadze?
A. Yes.
Q. Can you explain what is reflected on this page?
A. On 7/11, we debited customer's account, all the funds that were in their account and credited are held in GL or escheat GL.
Q. What else is reflected on this page?
A. Account numbers, name.
Q. Is this a record of the bank escheating funds from this bank account?
A. Correct.
Q. Does it reflect that the bank escheated funds from any other account?
A. Just Jasmina Transport Incorporated.
Q. Is more than one bank account number listed here?
A. Yes.
Q. Are there funds escheated from more than one bank account?
A. Yes.
Q. So you mentioned the $352. What is the $89,874.96?
A. This is the proceeds of the ACH credit the customer -- the account received and we were not able to verify if they were properly payable to our customer at that time.
Q. Did the bank escheat these funds, as well?
A. Correct.

MS. VOGEL: Just one moment, please.

No further questions.

THE COURT: Any cross examination?

MR. MURRAY: Yes, your Honor.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. MURRAY:

Q. Good morning, Ms. Bitsadze. Can we just go real quick -- let's stay where we are on page 15. I just want you to explain, because I want this to be clear and it was confusing to me. This $89,874.96, that money was returned to the sender; correct?

A. No.

Q. Where did it go?

A. The funds were put in holding GL of TD Bank.

Q. Is it still there?

A. I wouldn't be able to tell you if it's still there. I don't work there anymore.

Q. I'm sorry. When did you leave the bank?

A. September 2020.

Q. In the course of your practice working in the bank, how long would it take to return funds that have been held or denied, whatever the word is you used?

A. Until the claim is received from a financial institution where the funds were left from.

Q. Is it possible that to this date, those funds have not been returned?

MS. VOGEL: Objection.

THE COURT: Overruled.

A. Possible.

Q. Can you give an estimate as to how long it ordinarily takes to have these funds returned?

A. Once the claim is received?

Q. Yes.

A. Usually within 30 days.

Q. Does the fact that you closed the account, which, in essence, cuts him off completely from making a claim for that money, does that expedite the money being sent back to the person?

A. I'm sorry. Can you repeat your question.

Q. The fact that you closed the account, you made a determination that he failed to provide proof and you closed his account, what more do you need to send that money back?

A. As a financial institution, we have to receive a claim before we can send anything to avoid a lawsuit.

Q. So it's possible they never made a claim directly to you?

A. Directly to me as in Kristina?

Q. I'm sorry. Obviously not directly to you, but to TD Bank?

A. Possible.

Q. Have you ever had that happen before?

A. Yes.

Q. Let me just direct you back, I think it was page 2, the July 11th entry. There is an entry, it's the third from the bottom. Can you read that 2/13.

A. Spoke to ASM Amatha Balagopal (ph.) adviser savings account, 6767532253. Must be closed at the store level and check mailed to the address on file.

Q. Doesn't that mean that you mailed the check to my client?

A. Yes.

Q. And why would you mail it back to him if you thought he was committing fraud?

A. So this is not -- most likely, the check that was mailed to this customer, what was left over of the fraudulent transaction.

Q. When you say left over, it looks like they took the exact amount, that $89,000 figure.

A. So there was an ACH and there is a wire. The ACH was for $88,439.76. We can only hold that. We cannot hold more unless we have proof that the rest of the funds do not belong to the customer. So most likely, judging from this particular note, whatever was left in the account belonged to the customer, hence why we asked for the account to be closed.

Q. So when you testified earlier that that money was escheated, that was incorrect?

A. The funds that currently in the report, those funds were

escheated.
Q. I'm talking about the 323.
A. 352?
Q. I'm sorry. I take your word for it, the 352.
A. 352 were escheated.
Q. When you say escheated, doesn't that mean it's compensated by the bank?
A. -- from customer's account and placed in a holding GL.
Q. And that other note on page 2 on 7/11, that means that money is now out of jail and it was returned to the owner?
A. I'm sorry, it's out of where?
Q. Did you say it was in jail? Or maybe I didn't hear you.
A. Not jail. I did not use that word.
Q. I'm sorry. Whatever you sent that money is on hold --
A. GL. GL. General ledger.
Q. I'm sorry. I'm sorry. I'm in the box here.
A. Not a problem. So the accounts that have -- the funds have been escheated from two checking accounts. The account that it listed in the note 7/11 at 2:13, that seems like a savings account. That particular savings account, I don't know how much money it had, I don't see it from here, so I'm going to assume the funds that were in that account belonged to the customer. That's why we closed it and sent it to him. That's the only why way we would do it.
Q. You have no independent recollection?

A. No.
Q. It's just based on your knowledge of your notes?
A. Correct.
Q. One other thing, you indicated that my client told you he was buying a truck or selling a truck?
A. He sold a truck.
Q. He sold a truck and he was waiting for a wire to hit his bank to pay for the truck; correct?
A. So yes, according to my notes, your client sold the truck to Jack and he was waiting for the funds to hit his account from 2016, correct.
Q. Did you have any difficulty reaching him?
A. I've made contacts with this customer, with your client.
Q. What I'm saying is, did you make numerous calls and receive no answer and left messages or did you just call and get him right away?
A. Looks like I would call and get him right away.
Q. Do you know how many times you actually called back to talk to him?
A. According to my case notes, it looks like twice.
Q. Did he ever refuse to talk to you, ask for a lawyer or anything like that?
A. Not to my notes.
Q. It seems very forthcoming as to what happened?
MS. VOGEL: Objection.

Q. In your opinion as an investigator, did you find him to be forthcoming when you asked him questions?

THE COURT: I'll allow that question.

THE WITNESS: I'm sorry?

THE COURT: Can you answer that question?

A. Not from my experience, no.

Q. So what about his responses led you to believe he was not answering your questions?

A. He refused, basically, to provide us with anything proving that the transaction took place, that he did sell a truck, proving to us that the funds that he received into his account were his funds.

Q. Didn't he indicate it was a friend of his?

A. He sure did, yes.

Q. So is that suspicious that a friend wouldn't ask for a contract?

A. Not when you're receiving $90,000.

MR. MURRAY: Nothing further. Thank you very much. I appreciate it.

THE COURT: Any redirect?

MS. VOGEL: Yes, your Honor.

REDIRECT EXAMINATION

BY MS. VOGEL:

Q. So staying on the page that's currently on the screen, the itemized recovery report, this $89,874.96, do you know if this

money was returned to the sender?
A. I do not know. While I was at the bank, no.
Q. So defense counsel asked you about the case note entry that's on page paginated 2, July 11th, 2018, at 2:13. It references an Amatha Balagopal (ph.). Is that the account holder for Jasmina Transport?
A. No, that's an assistant store manager of the branch where this account was opened.
Q. Where it says 6767532253, in that case entry, is that a bank account number?
A. That's a savings account, yes.
Q. If we look at the itemized recovery report, is that either of the bank accounts listed on this page?
A. Only checking accounts are listed there.
Q. So you were asked on cross examination about the conversations you had with the account holder. Do you recall that?
A. Yes.
Q. Did you ever receive documentation from the account holder for this transaction?
A. Not judging from my case notes.
Q. Just returning back to the entry on July 11th, 2018, at 2:13 p.m. regarding the check for the savings account, the check referenced here was not tied to the accounts that we've looked at for which there was escheated funds; is that right?

A. Correct.

MS. VOGEL: No further questions.

THE COURT: Anything else?

MR. MURRAY: No. Thank you, your Honor.

THE COURT: Thank you, you may step down. Thanks very much.

(Witness excused)

Government may call its next witness.

MR. RAYMOND: Thank you, your Honor. The government calls Suzanne Miller.

SUZANNE MILLER,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE DEPUTY CLERK: Please state and spell your name for the record.

THE WITNESS: My name is Suzanne Miller.

THE COURT: You may proceed.

DIRECT EXAMINATION

BY MR. RAYMOND:

Q. Ms. Miller, do you go by any nicknames?

A. Pardon?

Q. Do you go by any nicknames?

A. Yes, I do. Peggy.

Q. Ms. Miller, where do you live?

A. Weyers Cave, Virginia.

Q. What do you do for a living?
A. I do accounting, but I also substitute teach.
Q. How long have you worked as a substitute teacher?
A. I just started doing that when I stopped working for May Supply or Winsupply in April.
Q. What is Winsupply?
A. Winsupply is a larger group that purchased May Supply --
Q. And what --
A. -- organization.
Q. What is May Supply?
A. May Supply is a wholesale retail plumbing supply house.
Q. And how long did you work at May Supply before it became Winsupply?
A. 18 years.
Q. Where was May Supply located when you worked there?
A. Harrisonburg, Virginia.
Q. Could you describe your work responsibilities as of about March 2018.
A. Yes. I did the accounts payable for May Supply.
Q. And what was your title?
A. Accounts payable.
Q. What was your specific responsibilities on a daily basis?
A. I would process the invoices for the materials that were brought into the warehouse and make sure that the vendors were paid in a timely manner.

Q. As of March 2018, how long had you worked in accounts payable in May Supply?
A. 16 years.
Q. Directing your attention to that period in about February or March of 2018, how did May Supply pay its vendors?
A. Before they went with the buying group, they paid the vendors individually and I wrote the checks to the vendors.
Q. When did May Supply begin working with the buying group?
A. I'm thinking it was right around 2008.
Q. What is a buying group?
A. They have a group of the vendors for different purchasers to make it so they get better pricing and everything and we send the check to or the monies to the buying group and they take care of paying the vendors on our behalf.
Q. Did May Supply use a specific buying group?
A. Pardon?
Q. Did May Supply use any specific buying group, was there a name for the buying group?
A. Yes.
Q. What was the name?
A. Wit Limited.
Q. Do you know where the Wit buying group was located?
A. It's in Texas.
Q. Directing your attention to the period about March or February 2018, how precisely did May Supply send money to Wit

buying group?
A. We did an interbank transfer of funds from our bank to the Wit buying group bank.
Q. What was your role in sending money to the Wit buying group?
A. I would process the invoices, submit the online to Wit what was to be paid to each individual vender, then I would do the interbank transfer with a token that the bank had provided us so that the monies could be transferred and I would stipulate the given dollar amount.
Q. When you say process the invoices, does that mean process the invoices for May Supply's vendors?
A. Yes.
Q. You would inform the Wit buying group which vendor had to be paid which amount of money?
A. Right. They had a list of vendors and I would go in and select which vendor was the one we were paying on our behalf and then put that dollar amount in per vendor.
Q. Where did May Supply bank?
A. United Bank.
Q. Where is United Bank located?
A. South Main Street, Harrisonburg, Virginia.
Q. So how long had you been sending money to Wit buying group?
A. Approximately 10 years.
Q. How often did you send money to the Wit buying group?

A. Weekly.
Q. Did United Bank have any information about how to pay Wit buying group?
A. Yes, they did.
Q. Was that stored in United Bank's systems?
A. Pardon?
Q. Was that information stored in United Bank's systems, where to route the money?
A. Yes.
Q. What would your role be with information stored in United Bank's systems?
A. I would have to access the bank account and there was a token with a specific number that I had to enter before the funds were transferred.
Q. Once you confirmed, the money would be transferred to Wit buying group; is that correct?
A. Correct.
Q. Could you estimate, as of February or March 2018, how many times you sent money to the Wit buying group?
A. Once a week.
Q. And over the 10 years you described, approximately, could you estimate hundreds of times, thousands of times?
A. Probably hundreds of times.
Q. Was it also by interbank transfer?
A. Correct.

Q. Had you ever had a problem with the money not being received by the Wit buying group?
A. Not until that particular time.
Q. So what happened in that particular time?
A. I thought that I was sending the money to the Wit buying group and Wit called me, their people called me and said hey, where's our money, we haven't gotten it yet. I went to the accounts receivable guy that did the bank reconciliations and said I need a copy of the sheet that I gave you that shows what the money was supposed to be for Wit, and he gave it to me and I looked at it closely and saw that it didn't go to Wit and took it to Mr. Schultz and he had to go to the bank and submit the funds again.
Q. So just to unpack a little bit of that. First of all, who's Mr. Schultz?
A. He was the secretary treasurer of the company, and he's also a CPA.
Q. What's his first name?
A. William. We call him Bill.
Q. Can you recall exactly what day this was?
A. I normally submitted on a Tuesday or a Wednesday, and the money was to be transferred and be there no later than Friday.
Q. I guess I mean not day of the week, but the month and day.
A. The end of February. I think it was like the 27th or 28th. I'm trying to remember what day of the week. It was a Tuesday

or a Wednesday, and then that Friday, the money should have been in the Wit account.
Q. And what happened after you told Mr. Schultz?
A. He was not very happy. He had to go to the bank and then he had to resubmit the $88,400-something dollars to Wit to the bank in person.
Q. Do you know if the money was ever directed to another bank account?
A. Pardon.
Q. Was the money ever directed -- the money that you had sent that you thought was going to Wit, did you ever learn that it was instead somewhere else?
A. When I got the paper back from Dennis to look at it, it said Jasmin or Jasmina Transport, and we had never done any business with them.
Q. You mentioned Dennis. Who's Dennis?
A. Dennis Miller is the accounts receivable, payroll, did the bank reconciliations and a lot of the accounting reports for the company.
Q. Before you saw that document, had you ever heard of Jasmina Transport?
A. Never.
Q. Had you ever attempted to pay Jasmina Transport?
A. Never.
Q. Ms. Miller, have you ever heard of a man named Djonibek

Rahmankulov?

A. No.

Q. Have you ever tried to send money to Djonibek Rahmankulov?

A. Never.

MR. RAYMOND: Your Honor, just give me one moment.

No further questions, your Honor.

THE COURT: Any cross examination?

MR. MURRAY: None, your Honor. Thank you.

THE COURT: You can step down. Thanks very much.

(Witness excused)

Is this a good time for the morning break?

MR. REHN: The next witness will be the longer witness with the interpreter.

THE COURT: Why don't we take our morning break. Remember, folks, please keep an open mind and don't discuss the case.

(Continued on next page)

(Jury not present)

THE COURT: Is there anything we need to discuss?

MS. VOGEL: Yes, your Honor. I just wanted to raise, if you recall, you signed an order last week in connection with one of our witnesses --

THE COURT: Immunity order?

MS. VOGEL: Yes. We anticipate that witness will testify tomorrow. I discussed with defense counsel our proposed procedure, and I believe we're on the same page, which is that Mr. Khazratkulov will take the stand initially when the jury is not present and we'll begin questioning him, I expect he will take the Fifth. At that time, I would ask that your Honor read the order into the record and any other questions or inquiries that you think are appropriate, and either at that point bring out the jury or take a break and then later bring the witness back, and we could also do it first thing in the morning potentially before the jury comes in in the morning, and then obviously have the witness on the stand once the jury is here and then just proceed.

THE COURT: Do you have any objection?

MR. MURRAY: Judge, my issue is I have no practice in this area and I don't know what the custom is of the Court, but what I was going to ask, to not run afoul of any ruling, what is my scope of how I can bring this to the jury's light?

THE COURT: Government will bring that to the jury's

light. Is that not right?

MS. VOGEL: Yes, I intend to ask the witness if he's testifying pursuant to the order and to ask him what his understanding is of what the order says.

MR. MURRAY: Can I just say that you asserted your Fifth Amendment or don't even go near that? I don't want to run afoul --

THE COURT: I appreciate you asking.

MS. VOGEL: Your Honor, I believe that inquiring regarding the order without getting into whether the witness asserted the Fifth would be appropriate. I'm not sure that then asking him about whether he asserted the Fifth --

THE COURT: Why don't you all look into that and see what your position is as to what the parameters are in your view of what Mr. Murray can ask and I'll do the same and then we'll touch base about it, either later today. But I do think it would be a good idea if you can call the witness first thing in the morning, if that works with our schedule otherwise, otherwise we can call the witness after a break, but I can get in early if we want to do it in the morning. I'm flexible in that respect.

MR. MURRAY: Judge, I agree. I don't think that he should be taking the Fifth in front of the jury.

THE COURT: Right.

MR. MURRAY: I don't think that's necessary.

THE COURT: Right.

MR. MURRAY: But I want them to understand about his potential liability. I don't know if just reading the order will be enough to make them understand that. If you want to craft something else -- I don't want to run afoul of your ruling and doing something improper.

THE COURT: I appreciate that. So I think we should all go back and look at what the legal parameters are of questioning the witness who's testifying pursuant to an immunity order and come back and regroup before the individual testifies.

MS. VOGEL: In terms of logistics, your Honor, there is no issue, we can have the witness here first thing in the morning before the jury comes out to --

THE COURT: Why don't we see where we are at the end of the day. If you're in the middle of a different witness, you might not want to do that. You might want to call the person after a break. In any event, let's work it around. If it's going to be first thing in the morning, we should all get here 15 minutes early. If it's going to be later, we don't need to do that. Why don't we talk about it at the end of the day.

MS. VOGEL: Sure.

THE COURT: Great. Thank you. Why don't we come back at 11:55.

(Recess)

THE COURT: Just let us know when we can bring out the jury.

The issue with respect to the remaining orders are for tomorrow, correct?

MR. REHN: Yes.

THE COURT: So we can proceed with this witness, I believe.

(Jury present)

THE COURT: Everyone can be seated. Government may call its next witness.

MS. VOGEL: The government calls Sadullo Karimov.

SADULLO KARIMOV,

called as a witness by the Government,
having been duly sworn, testified through the
Uzbek interpreter as follows:

THE COURT: All right. You may proceed.

DIRECT EXAMINATION

THE WITNESS: My name is Sadullo.

MS. VOGEL: One moment. I'm having trouble hearing the interpreter.

THE INTERPRETER: Hello? That's better.

THE WITNESS: First of all, hello. My name is Sadullo.

BY MS. VOGEL:

Q. Mr. Karimov, can you please spell your name for the record?
A. (In English) First name S-A-D-U-L-L-O.
A. My first name is spelled S-A-D-U-L-L-O.
A. (In English) My last name is K-A-R-I-M-O-V.
A. My last name is K-A-R-I-M-O-V.
Q. Good afternoon, Mr. Karimov.
A. Hello.
Q. Can you see me? Thank you. Where are you from?

A. I am from the Republic of Uzbekistan, and I reside in the city of Samarkand.
Q. When did you move to the United States?
A. In the year 2016, in the month of July.
Q. What is your immigration status?
A. Green card holder.
Q. What country were you educated?
A. In the Republic of Uzbekistan, namely in the city of Samarkand. That's where I got my education.
Q. How far did you go in school in Uzbekistan?
A. I graduated from high school, and then I went to a college for four years.
Q. What did you study in college?
A. Auto transportation and roads.
Q. What language do you speak?
A. Uzbek, Tajik, and Russian.
Q. Are you married?
A. Yes, I am married.
Q. Do you have children?
A. May I move my chair?
Q. Yes. As long as you can still speak directly into the microphone.
A. I am done.
Q. Do you have children?
A. Yes, I have three.

Q. Where did you live when you moved to the U.S.?
A. In the city of Queens, in New York, in Queens.
Q. Where in the U.S. do you live now?
THE INTERPRETER: The interpreter would like to repeat the question, please.
Q. Where in the United States do you live now?
A. I currently reside in the State of Ohio in the town -- in the City of Loveland.
Q. When you were living in Uzbekistan, what did you do for work?
A. In Uzbekistan, I work with my father, as a welder and as a plumber.
Q. What did you do for work when you arrived in the U.S.?
A. When I arrived in the United States, I worked as a construction helper.
Q. What do you do for work now?
A. Right now, I'm a truck driver.
Q. Have you had any other jobs while you've been in the U.S.?
A. Yes.
Q. What other jobs have you done?
A. I worked as a limo driver.
Q. Do you know Djonibek Rahmankulov?
A. Yes, I know him.
Q. How did you meet him?
A. We met in the city of Brooklyn at a restaurant.

Q. About when did you first meet him?
A. I met him approximately in the year 2017.
Q. Did you become friends with Djonibek?
A. No.
Q. How would you describe your relationship with him?
A. We are distant relatives of each other. And since he's older than myself, I use the term "older brother" as an honorific title to show respect.
Q. Did you ever socialize together?
A. Yes.
Q. How many times per week did you used to see each other?
A. It varied. It could be four -- four and -- four or five times or two times. It varied.
Q. I'd like to pull up for identification what's marked as Government Exhibit 2712.
A. All right.
Q. Do you recognize this?
A. Yes, I recognize it.
Q. Did you give the FBI screenshots from your phone?
A. That is correct.
Q. Is this one of the screenshots?
A. Yes.
Q. Is this an accurate copy of that screenshot?
A. It is an accurate copy.
MS. VOGEL: All right. The government offers

Government Exhibit 1227.

THE COURT: Any objections?

MR. MURRAY: No objections.

THE COURT: It will be admitted.

(Government's Exhibit 1227 received in evidence)

Q. Mr. Karimov, who is in this video? I'd like to be clear. Who's the person in the blue T-shirt?

A. That is myself.

Q. Who is the person in the gray T-shirt?

A. Djonibek Rahmankulov.

Q. Who is the person in the red T-shirt?

A. That would be my -- that would be the son of my wife's paternal uncle.

Q. And the person in the last shirt with the striped shirt, who is that?

A. That would be the friend of the person in the red T-shirt.

Q. Now, when was this photo taken?

A. This picture was taken approximately in 2017 or 2,000 -- or 2018.

Q. Where was this photo taken?

A. It was taken in the city of Queens in a cafe called Martha Bakery.

MS. VOGEL: We can take down Government Exhibit 2712. Thank you.

Q. Who immigrated to the U.S. first, you or Djonibek?

A. Of course, it was Djonibek.
Q. Do you know when Djonibek came to the U.S.?
THE INTERPRETER: The interpreter would like you to repeat the question, please.
Q. Do you know when Djonibek came to the U.S.?
A. It must be 2008 or 2009 because he moved a lot -- a lot earlier than I did.
Q. Did Djonibek help you in any way in adjusting to life in the United States?
A. Yes.
Q. What did he do?
A. It was I didn't speak English. I would contact him to help me with understanding or translating letters for tickets. I would ask him to help -- to help teach me how to pay the tickets. I would go to him for help.
Q. When you say "tickets," are those parking tickets?
A. I mean that, correct. Parking ticket and the ticket the police writes, issues.
Q. Did you ever borrow money directly from Djonibek?
A. No.
Q. Did you ever lend money directly to Djonibek?
A. No.
Q. Did you ever buy anything from Djonibek?
A. No.
Q. Do you still socialize with Djonibek?

A. No.
Q. Now, when was the last time you spoke with him?
A. It was the month of May of 2019.
MS. VOGEL: Can we please pull up for the witness, Ms. Pierre, what's marked for identification as Government Exhibit 2705?
Q. Do you recognize this?
A. Yes, I do recognize it.
Q. Is this one of the screenshots you provided to the FBI from your phone?
A. That is correct.
Q. Is this an accurate copy of that screenshot?
A. It's an accurate copy.
MS. VOGEL: Your Honor, the government offers Government Exhibit 2705.
THE COURT: Any objection?
MR. MURRAY: No objection, your Honor.
THE COURT: Admitted.
(Government's Exhibit 2705 received in evidence)
Q. Mr. Karimov, what is this a screenshot of?
A. This would be the contact phone number for Djonibek.
Q. Was this saved in your contacts in your phone?
A. That is correct.
Q. The phone number listed here ends in 7777. Whose phone number is that?

A. Of course, it is Djonibek's number.
Q. And at the top, do you see it says, "Djonibek Aka"?
A. Because he's older than me and to express my respect for him, I use the honorific term. I use the term "Aka," which means older brother.

MS. VOGEL: We can take this down, please. And if we can bring up Government Exhibit 2708 for the witness.

Q. Do you recognize this?
A. I recognize it.
Q. Is this one of the screenshots you provided to the FBI from your phone?
A. Yes, it is one of those.
Q. Is this an accurate copy of the screenshot?
A. It is an accurate copy.

MS. VOGEL: Your Honor, the government offers Government Exhibit 2708.

THE COURT: Any objection?

MR. MURRAY: No objection, your Honor.

THE COURT: Admitted.

(Government's Exhibit 2708 received in evidence)

Q. Mr. Karimov, what is this a screenshot of?
A. This would be the first contact -- first contact number for Djonibek, and the one you showed first was the second contact number.
Q. Is this a screenshot of the contacts saved in your phone?

A. That is correct.

MS. VOGEL: You can take down Government Exhibit 2708. Thank you.

Q. Mr. Karimov, in the beginning, what did Djonibek tell you he did for a job?

A. He's -- what he did for a living was working as an Uber driver, and he worked for in New York. He worked as a taxi driver. They have Uber and TLC in New York, so he have a TLC number.

Q. To your knowledge, did Djonibek ever operate a trucking company?

A. No.

Q. Are you familiar with the term "perevodchik"?

A. Yes, I do know that word.

Q. What does that mean?

A. That would be person who transfers money to other cities.

Q. Was Djonibek a perevodchik?

A. Yes.

Q. How do you know that?

A. He told me himself.

Q. What did he tell you about his perevodchik business?

A. In the beginning, he told me that he was transferring money to other countries.

Q. Did Djonibek say to which countries he could transfer money?

A. He did tell me, yes.
Q. What did he say?
A. He said that he sent money to Uzbekistan, Russia, Europe and Dubai.
Q. Did you ever transmit money using Djonibek's perevodchik services?
A. Yes, once.
Q. Where did you transfer money?
A. I sent it to Uzbekistan. I have to do it -- to send it to my parents.
Q. About how much money did you send?
A. $800.
Q. What did -- sorry.
A. Approximately.
Q. What did Djonibek tell you about his fee for transferring money?
A. He told me he charges 20 to $25 for $1,000 that is transferred.
Q. Did you ever see Djonibek deliver cash?
A. Yes, I have seen it.
Q. About how many times have you seen that?
A. Approximately I've seen it three or four times.
Q. Were you personally with Djonibek when he was delivering cash?
A. I was there in person.

Q. Sorry. I couldn't hear you.
A. I was with him in person.
Q. Why were you with Djonibek when he was delivering cash?
A. It was Djonibek did not like to eat at home, so he would often go to Brooklyn to eat at restaurants, at an Uzbek restaurant. So he would often invite me. He would go with a buddy.
Q. Would he deliver cash while going out to the restaurant with you?
A. Yes.
Q. How did you know what Djonibek was delivering?
A. Because he would look into a plastic bag where the money was, and he would -- the money would be in -- in bundles of stacks. So he asked me to count that money.
Q. When you -- in the times that you counted the money, about how much typically, money, was there?
A. Approximately, he would have anywhere from ten to 15 stacks or bundles.
Q. About how much was in each bundle?
A. $10,000.
Q. So doing the math, was that about 100,000 to $150,000 in the bag?
A. That is correct.
Q. When you were with Djonibek, where did he deliver the money?

A. To the city of Brooklyn.
Q. Was he delivering it to residences or businesses?
A. To private residences.
Q. Did Djonibek deliver the cash to the same place or different places?
A. Different places.
Q. Do you know the people to whom he was delivering the money?
A. No. I did not know them.
Q. At the time when you observed Djonibek delivering cash, what did Djonibek tell you about why he was delivering cash?
A. Well, as he mentioned in the beginning, that he was transferring money to other countries. So he sent that -- all that money, the money to the people.
Q. In other words, did you understand this to be money related to his perevodchik business?
A. That is correct.
Q. In 2018, did you open multiple business bank accounts?
A. Yes, I did open them.
Q. Did someone instruct you to do that?
A. Djonibek told me to.
Q. What did Djonibek say about why he was asking you to open business bank accounts?
A. In order to use it for his business, he told me that his business account got closed, and this account was to be used for his business.

Q. What did you understand his business to be?
A. Do you mean his business?
Q. Yes.
A. At that time, I understood his business to be the business of transferring money to other countries.
Q. What did Djonibek say about how he was going to use your business bank accounts?
A. At that time, he told me to give him -- he told -- he asked me to give him my account information and told me that money will come into that account.
Q. Did he say how much money would come into these business bank accounts?
A. Yes, he did tell me.
Q. What did he say?
A. He said that approximately there would be -- the money would be around 120,000, 80,000, around that.
Q. What did he say about what you should do with the money once it came into your business bank account?
A. Well, he told me to take the money or withdraw the money.
Q. What did he tell you to do with the withdrawn money?
A. I did not under -- would you mind repeating the question?
Q. Did Djonibek say what you should do with the money once you withdrew it?
A. So I would go with Djonibek himself, and Djonibek himself would manage the thing. And once we would withdraw the money,

I would give the entire amount to Djonibek.
Q. Did you also open business bank accounts in your wife's name?
A. Yes, I did.
Q. Why did you do that?
A. Because Djonibek told me to do that as well.
Q. Did he say why?
A. The reason was to use it for his business. He told us about his need for an account.
Q. So what did he say about why he needed you to open the accounts instead of opening them himself?
A. The reason was either that he didn't have account of his own and that his credit -- his credit history was ruined.
Q. What did he offer to pay you for helping him with the business bank accounts?
A. Well, he pleaded with me to open the bank account on several -- on a number of occasions, saying that we are relatives. Could you repeat the question again, please?
Q. Yes.
So if you could please listen carefully to the question.
What did he offer to pay you for helping him open the business bank accounts?
A. He told me that he would pay me $10,000 for -- from, for every $100,000.

Q. Did you agree to open the business bank accounts?
A. Well, because first of all, I did agree, and the reason being he pleaded with, me saying that we are relatives. And since we didn't speak English when I arrived to America, he pretty much used us.
Q. Did you also agree to open the accounts because you would be paid?
MR. MURRAY: Objection.
THE COURT: One second. What's the basis of the objection?
MR. MURRAY: It's leading.
THE COURT: All right. Rephrase the question, please.
Q. Were there any other reasons that you agreed to open the account?
A. No, that was the reason.
Q. You could just say -- sorry. If you could repeat the answer for me.
A. No, that was the reason, the reason I just mentioned.
Q. Just to be clear, though, did you receive any money from these business bank accounts?
A. I did.
Q. So we're going to talk about that more later.
A. All right.
MS. VOGEL: Your Honor, I'm not sure if this is too early. I am at a breaking point.

THE COURT: It's fine. We can take a break now. Why don't we resume at 1:30. Does that work?

MS. VOGEL: Yes, thank you.

THE COURT: Just remember to keep an open mind and don't discuss the case.

(Jury not present)

THE COURT: I'll see you at 1:30.

(Luncheon recess)

AFTERNOON SESSION

1:40 P.M.

(Jury present)

THE COURT: Everyone can be seated. Thanks. You may proceed.

BY MS. VOGEL:

Q. Mr. Karimov, you can take off your mask.

Mr. Karimov, what was the name of the company you used to open the business bank accounts?

A. Sadullo Transportation.

Q. About how many bank accounts did you open for Sadullo Transportation?

A. Approximately four or five.

Q. Is this all at the same bank or different banks?

A. In different banks.

Q. Why did you open bank accounts at different banks?

A. Because Djonibek said so.

Q. How did you open the bank accounts?

A. It happened, of course, by -- it was the idea of Djonibek.

Q. How did you actually go about opening the accounts?

A. When we went to bank, Djonibek was the one who spoke -- he told me a few words to say, yes or no, but most of the conversation he spoke to them.

Q. When you say to them, do you mean to the bank?

A. Yes.

Q. Did you discuss with Djonibek what to tell the banks about what kind of business Sadullo Transportation was engaged in?
A. Yes. Djonibek told me that once we go to the bank, we have to tell truck -- it's a truck company.
Q. Was Sadullo Transportation engaged in any trucking?
A. No.
Q. At the time, were you working as a truck driver?
At the time, were you working as a truck driver?
A. No. At that moment, I worked as an Uber driver.
Q. Whose idea was it to tell the banks that Sadullo Transportation was engaged in trucking?
A. Of course it was Djonibek's idea.
Q. Did you receive money in any of these business bank accounts?
A. Yes.
Q. About how many accounts received money?
A. Approximately four or five of them received money. Three of them, we got money with Djonibek -- from three of them, we got money with Djonibek.
Q. Just to clarify, were you able to withdraw the money from all of the accounts?
A. No. Only from three of them.
Q. Why were you not able to withdraw money from the other accounts?
A. Because money left -- for example, if money came today,

next day there was no money.
Q. You testified earlier that you also opened business bank accounts in your wife's name; do you remember that?
A. Yes, I remember.
Q. Did any of those accounts receive money?
A. Yes.
Q. Were you able to -- sorry.
A. Receive money.
Q. Were you able to withdraw the money from those accounts?
A. No.
Q. Why not?
A. Because money was gone. Today, it came to the account, but next day it was gone.
Q. So, in other words, by the time that you tried to withdraw the account -- the money from the account, was the money no longer in the account?
A. Correct.
Q. Did anyone else ever come with you and Djonibek to the bank when you were opening business bank accounts?
A. Yes.
Q. Who?
A. A fellow named Farrukh.
Q. Do you know his last name?
A. I don't remember.
Q. Did Farrukh have any involvement with the business bank

accounts with Djonibek?
A. Yes. They had involvement as well.
Q. So I would like to take a look at a couple of specific bank accounts now.
MS. VOGEL: Ms. Pierre, if we could please pull up what's in evidence as Government Exhibit 701 and go to Page 15. I just want to make sure the jury is able to see that.
A. I see it.
Q. So I'm showing you a bank statement from Chase Bank for Sadullo Transportation Inc. Company. Do you see that?
A. I can see that.
MS. VOGEL: Ms. Pierre, please zoom in on the top, all of the top header.
Q. Do you see that this statement was for June 30th through July 31st, 2018?
A. I can see that.
Q. Is this one of the bank accounts you opened with Djonibek?
A. Yes. Exactly.
MS. VOGEL: Can we please zoom out? Thank you. Back to Page 15. If we could please zoom in on the deposits and additions section?
Q. So, Mr. Karimov, do you see that it says 07/10 Fed Wire Credit, United Community Bank?
A. Yes, I can see.
Q. And later in that entry, it says Blue Ridge Mountain EMC,

Young Harris, Georgia; do you see that?
A. I can see.
Q. And you see the amount was $83,540?
A. I see.
Q. What was that deposit?
A. It's Djonibek's money.
Q. Do you know what Blue Ridge Mountain EMC is?
A. No.
Q. Do you do any business with that entity?
A. No, of course.
Q. How did you learn that your account had received this deposit?
A. It's Djonibek. He used to -- he used to tell me a day before when money had to come.
Q. What would he tell you?
A. He would tell me that money will come, and once money come, he will have to tell me.

MS. VOGEL: Would you please turn to Page 16, the next page? Could we please zoom in on the section that says other withdrawals?

Q. Do you see, Mr. Karimov, that there are two withdrawals on July 9?
A. I see that.
Q. Do you see that one withdrawal is 40,000 and the other one is 41,000?

A. I see that.

Q. Did you make these withdrawals?

A. Yes. Withdrew together -- went with Djonibek and withdrew it together.

Q. Why did you make these withdrawals?

A. Because it was Djonibek's money. Djonibek told me to withdrawal it and give it to him.

Q. So the money -- this money that you withdrew, did that come from the wire that was $83,546?

A. Yes, that one.

MS. VOGEL: Could you please turn to Page 19? If we could zoom in on the withdrawal slip? Thank you.

Q. Is this a withdrawal slip for $41,000 dated July 9, 2018? Oh, sorry --

A. Yes.

Q. I meant to say July 9, 2018 and $40,000.

A. Correct.

Q. And is it a withdrawal slip for Sadullo Transportation?

A. Yes, correct.

Q. Who filled this out?

A. I think I -- I filled out, but Djonibek told me how to write -- what to write because I didn't speak English at that time.

MS. VOGEL: Ms. Pierre, can you please turn to the next page, Page 20?

Q. Is this a withdrawal slip for $41,000 from July 9, 2018?

A. Correct. Yes.

(Continued on next page)

BY MS. VOGEL:
Q. Is this for your Sadullo Transportation account?
A. Correct.
Q. Who filled this out?
A. I think this one is Djonibek's handwriting.
Q. Do you see, it says if purchasing a cashier's check, provide payee name. What does it say under that?
A. I see that.
Q. What does it say under there?
A. Jasur Transport Inc.
Q. What did Djonibek tell you about Jasur Transport Inc.?
A. Jasur Transport Inc. is the company opened in Djonibek son's name.
Q. Did Djonibek tell you who controlled this company?
A. Yes, he told me later on.
Q. Did you use any of this money you withdrew to get a cashier's check made out to Jasur Transport?
A. Yes, Djonibek told so.
Q. Sorry. I just want to go back and clarify a question because I think I misheard the answer.
Did Djonibek tell you who controlled Jasur Transport Inc.?
A. He controls. He said that he controls it.
Q. When you say he, do you mean Djonibek?
A. Yes.

MS. VOGEL: Please bring up what's in evidence as Government Exhibit 701-01 at page 4.

Actually, if it would be possible to pull this up next to Government Exhibit 701, page 20. If we can go to page 4 of exhibit 701-01.

Q. Do you see there are two documents on your screen?

A. I see that.

Q. Looking at the document on the right, it says cashier's check, do you recognize this?

A. Yes, I recognize this.

Q. Do you see where it says remitter, Sadullo Transportation Inc.?

A. I see that.

Q. It says pay to the order of Jasur Transport Inc.?

A. I see that.

Q. Do you see the check is dated July 9th, 2018?

A. I see that.

Q. And the amount is $41,000. Do you see that?

A. I see that.

Q. Did you obtain this cashier's check from the bank?

Did you get this cashier's check from the bank?

A. Got it together with Djonibek.

Q. What did you do with the cashier's check?

A. I gave it to him. I gave it to Djonibek. It was his money.

Q. Whose idea was it to get a cashier's check?
A. Of course Djonibek's idea.
Q. What, if anything, did Djonibek say about why he wanted a cashier's check instead of cash or a regular check?
A. According what Djonibek said at that time, cashier check was better for the business, to move it quickly.
Q. Do you have any understanding of what the difference is between a cashier's check and a regular check?
A. Now I know.
Q. At the time, did you know?
A. By what he said at that time, a regular check would take long time to process and cashier check would be easier and faster to process.
MS. VOGEL: We can take down 701-01, but if we can please leave up Government Exhibit 701. If we could go back one page.
Q. What did you do with the $40,000 cash that you and Djonibek withdrew?
A. Gave it to Djonibek.
Q. Did you divide it with him?
A. No.
Q. Did you keep any portion of this money?
A. Approximately gave me four or five thousand.
MS. VOGEL: We can take this exhibit down, please. Ms. Pierre, can you please pull up 703-02-F, which is in

evidence. We can go to page 3. If we can zoom in on the top header.

Q. I'm showing you a TD Bank statement for a Sadullo Transportation account. Do you see that?

A. I see that.

Q. Do you see the statement, the bank statement is for August 2018?

A. No, I don't. Now, yes, I see it. It's on the right side.

Q. Was this one of the accounts you opened with Djonibek?

A. Yes, one of the accounts we opened together.

MS. VOGEL: Ms. Pierre, if we can zoom out again and zoom in on the "Other credits" section.

Q. Mr. Karimov, do you see that under other credits, August 7th, it says wire transfer incoming, Home Services Title Agent IOTA?

A. I see that.

Q. Do you see that under amount, it lists $99,390?

A. Yes, of course I see that.

Q. What was that wire transfer for?

A. This is also Djonibek's money.

Q. Do you know what Home Services Title agent is?

A. No.

Q. Did you do any business with that entity?

A. No.

Q. How did you learn that this account had received this wire

transfer?
A. Djonibek would tell me one day before, before money comes. Then I saw it from online banking.
MS. VOGEL: Ms. Pierre, if we could zoom out and turn to page 5. Can we please zoom in on the section "Other withdrawals."
Q. Do you see on August 10th, there is a withdrawal for $88,016?
A. I see that.
Q. Do you see there's another withdrawal that day for $10,008?
A. I see that.
MS. VOGEL: Ms. Pierre, if we could please zoom out and keep this document on the screen, but pull up Government Exhibit 703-03, which is in evidence.
The exhibit on the left-hand side should be 703-02-F.
If we could go back to page 5. And then for 703-03, if we could go to page 3, please.
Q. So on the right-hand side -- well, let me ask you first, do you see two documents on your screen?
A. I see that.
Q. On the right-hand side, do you recognize this?
A. I recognize it.
Q. Is this a withdrawal slip for $10,008 from TD Bank?
A. Yes.
Q. Is it dated August 8th, 2018?

A. I see.
Q. Who filled this out?
A. Djonibek filled out.
Q. Were you present when he filled it out?
A. Yes.

MS. VOGEL: Can we please, for the document on the right-hand side, 703-03, go to page 4.

Q. Is this a cashier's check from Sadullo Transportation to you?
A. Can you repeat the question, please.
Q. Is this a cashier's check -- actually, let me withdraw that.

Is this a check from Sadullo Transportation made out to you, Sadullo Karimov.
A. Yes, exactly like that.
Q. Is it dated August 8th, 2018?
A. Yes, correct.
Q. And the amount is $10,000. Do you see that?
A. I see.
Q. Who asked the bank for this check?
A. Of course it's Djonibek's words asking from bank.
Q. Were you present for that?
A. Yes, I was there.
Q. Did you get this check using the money you withdrew on August 7th?

I apologize. Let me rephrase that. Let me move on.

What did you do with this cashier's check?

A. You mean this $10,000?

Q. Yes.

A. As he said before, from $100,000, he would pay $10,000. This was that money he gave me.

Q. Did you keep the money from this check?

A. Yes.

Q. Staying on 703, could we please turn to page 8. Is this a withdrawal slip for $88,000 from TD Bank?

A. Yes, correct.

Q. Is it dated August 8th, 2018?

A. Correct.

Q. Who made this withdrawal?

A. We withdrew it with Djonibek, together.

Q. You get checks with this money?

A. Correct.

THE COURT: I'm going to say, does anyone want to stand and stretch for a minute? Does anyone feel like they need to wake up?

You may proceed. Thank you.

MS. VOGEL: On Government Exhibit 703-03, can we please turn to page 9.

Q. Is this one of the checks that you got with the money you withdrew from the TD Bank account?

A. I'm sorry. Which one you said?
Q. On page 9, on the right-hand side of your screen.
A. Yes, this is the one we did with Djonibek.
Q. Do you see the check is made out to Jasur Transport Inc.?
A. I see that.
Q. The amount is $50,000. Do you see that?
A. I see that.
MS. VOGEL: Can we please go to page 10 of Government Exhibit 703-03.
Q. Is this one of the checks that you obtained from TD Bank?
A. Exactly like that.
Q. The amount was $38,000?
A. I see that.
Q. Do you see the check is made out to Rohatoy Khudoynazarov?
A. I see that.
Q. Who is that?
A. It's been a while. I don't really remember. From what I remember, I think it's one of his family members.
Q. For these two checks that we've just looked at made out to Rohatoy Khudoynazarov and to Jasur Transport, do you know what Djonibek did with them?
A. He kept it for himself.
MS. VOGEL: We can take down these exhibits, Ms. Pierre, and if we could please pull up Government Exhibit 703-01-B, which is in evidence.

Q. This is a record from TD Bank for Sadullo Transportation. Is this information on this page, page 1, accurate information about you?

Sorry. Looking at page 1 of Government Exhibit 703-01-B, is the information on this page about you accurate?

A. Yes, correct.

MS. VOGEL: Can we please turn to page 2. Can we zoom in on the middle where it says email address.

Q. Do you see it says tom007@mail.ru?

A. I see that.

Q. Is that your email address?

A. No.

MS. VOGEL: If we can please zoom out and pull up Government Exhibit 3312, which is in evidence. If we can zoom in on the top portion. Thank you.

Q. Do you see that for email, it lists djonik1988@gmail.com?

A. I see that.

MS. VOGEL: Can we please zoom out. If we can zoom in on the account recovery information, Ms. Pierre. Thank you.

Q. Do you see where it says recovery email, tom007@mail.ru?

A. I see that.

Q. Below that, it says recovery SMS, and it lists a phone number ending in 9492. Do you see that?

A. I see that.

Q. Whose number is that?

A. This is Djonibek's regular phone number that he uses.

MS. VOGEL: Ms. Pierre, we can take this exhibit down.

We're going to talk about one more bank account. If we can please pull up Government Exhibit 702-05, which is in evidence. If we can please turn to page 5. Please zoom in on the header.

Q. I'm showing you a Citibank statement for a Sadullo Transportation account. Do you see that?

A. I see that.

Q. Do you see the statement is for November 15th to December 13th, 2018?

A. I see that.

Q. Is this one of the accounts you opened with Djonibek?

A. Yes, one of them.

MS. VOGEL: Can we please zoom out and if we could zoom in, Ms. Pierre, please, on the section that says checking activity.

Q. In particular, I'd like to direct your attention to a line item, 11/27, funds transferred, $99,100. Do you see that?

A. I see that.

Q. Do you see that it says, wire from Commonwealth of Massachusetts?

A. I see that.

Q. What was that wire transfer?

A. I don't know that.

Q. Whose money was that?
A. It was Djonibek's money.
MS. VOGEL: If we could please zoom out. Sorry. I apologize. If we could keep the same portion up, the checking activity.
Q. So further down, there is an entry 11/27 withdrawal. Do you see that?
A. I see that.
Q. Who made this withdrawal?
A. Of course, Djonibek. Together with Djonibek.
MS. VOGEL: Now we can take this down.
I'd like to show the witness the exhibit that's marked Government Exhibit 2714 for identification.
Q. Do you recognize this?
A. I recognize it.
Q. Do you recall that you testified earlier that you gave screenshots from your phone to the FBI?
A. I remember.
Q. Is this one of those screenshots?
A. Yes, it is one of them.
Q. Is it an accurate copy of the screenshot?
A. Yes, it is an accurate copy.
MS. VOGEL: Your Honor, the government offers Government Exhibit 2714.
THE COURT: Any objection?

MR. MURRAY: No objection, your Honor.

THE COURT: Admitted.

(Government's Exhibit 2714 received in evidence)

MS. VOGEL: Keep up Government Exhibit 2714 and bring back up Government Exhibit 702-05, page 5. Is it possible to zoom in on the bank statement, checking activity. We can zoom out, please.

BY MS. VOGEL:

Q. Mr. Karimov, focusing your attention on Government Exhibit 2714, which is on the left-hand side of the screen, is this a screenshot of a text message?

A. Yes.

Q. Who are these text messages from?

A. From Djonibek, of course.

Q. Are they from Djonibek or to Djonibek?

A. I believe that I must have sent it to Djonibek.

Q. So within these messages, you send a screenshot. Do you see that?

A. Yes, I see it.

MS. VOGEL: Ms. Pierre, could we please zoom in on the screenshot within the screenshot that is Government Exhibit 2714.

Q. What is this screenshot that you sent to Djonibek?

A. Well, it has to do with Djonibek's money. I showed it to him because he told me to.

Q. Is this a screenshot of your Citibank account?
A. Yes, precisely correct.
Q. Why did you send this screenshot to Djonibek?
A. Because he, himself, told me to. He said I want to see whether the money arrived or not, so I sent him a screenshot.
Q. Does this screenshot also show the $20,000 withdrawal?
A. Yes.
Q. Why did you send him a screenshot that included the withdrawal?
A. Because Djonibek wanted me to do that. He told me to send him everything.
MS. VOGEL: Ms. Pierre, we can take down Government Exhibit 2714, but leave up 702-05. If we could go to page 6 now. We can zoom in on the checking activity.
Q. Do you see on November 29th, there's a withdrawal for $27,000?
A. I can see it.
Q. Do you see there is another withdrawal that same date for $50,000?
A. I can see it.
Q. Who made these withdrawals?
A. We went together with Djonibek and withdrew the money -- and withdrew this money.
Q. When you say we went together with Djonibek, was there anyone else there, other than you and Djonibek?

A. No.

MS. VOGEL: Can we please pull up Government Exhibit 702-04, which is in evidence. Please zoom in, Ms. Pierre, on the check.

Q. Do you see, Mr. Karimov, this is a check made out to Jasur Transport for $50,000?

A. I can see it.

Q. And it's dated November 28th, 2018?

A. Correct.

Q. When you withdrew the $50,000 with Djonibek from the Citibank account, did you use that money to get this check?

THE INTERPRETER: The interpreter would like you to repeat the question, please.

Q. When you withdrew the $50,000 from Citibank with Djonibek, did you get this check?

A. Well, we got it together, but I didn't use it. I gave it all to Djonibek.

MS. VOGEL: Can we please go to page 2.

Q. Mr. Karimov, do you see that this is a Citibank check made out to Djonibek Rahmankulov for $27,000?

A. I can see it.

Q. It's dated November 28th, 2018.

A. I can see it.

Q. When you withdrew the $27,000 with Djonibek from your Citibank account, did you use that money to get this check?

A. Yes, we used it for this check.
Q. Who decided to split up the money into these two checks?
A. Djonibek himself, of course.
Q. Who kept the checks?
A. Djonibek himself took them.
Q. Did you get to keep any of the money that had come into the Citibank account?
A. Approximately, I got five or $4,000. He gave me a small amount.

MS. VOGEL: We can take down this exhibit.

I would now like to pull up what's in evidence as Government Exhibit 702-02-A, which is a video from Citibank.

Q. We are focused now, pulled up in large is the view of camera 3. Do you see the date?
A. I can see the date.
Q. On the bottom of the screen is November 27th, 2018?
A. Yes, I see it.
Q. Who is the person on the right-hand side of the screen?
A. Would that be on the right side from where I'm looking at it?
Q. The right side, your right, facing the screen.
A. Of course that would be me.
Q. And who is the person on the left-hand side facing the screen in the image closest to the hanging light?
A. That, of course, would be Djonibek.

Q. What are you and Djonibek doing here?
A. We came to the bank to withdraw Djonibek's money.
Q. Where was this bank branch located?
A. I believe that it must be in Manhattan, if I'm not mistaken.
Q. Why did you go to Manhattan to go to the bank?
A. It was the idea of Djonibek, himself.
Q. Did Djonibek say why he wanted to go to Manhattan to go to the bank?
A. He did.
Q. What did he say?
A. He said that we would be able to withdraw the entire amount of money in Manhattan.

MS. VOGEL: So if we could please play just a small portion of this video up to approximately 14:20:23 timestamp.

Just one moment, your Honor.

THE COURT: Okay. Just for scheduling purposes, how much longer do you estimate you have with this witness?

MS. VOGEL: Possibly 45 minutes. Hopefully more like half an hour.

THE COURT: Why don't you proceed. Thank you.

MS. VOGEL: Thank you. The video is playing now.

(Video played)

We can pause here, which is 14:19:40. Skip ahead to 14:24:53 timestamp. That's fine, we can play it from there,

14:24:47, and if you could pause at 14:25:58.

(Video played)

BY MS. VOGEL:

Q. What did the bank teller just give you in the video?

A. She gave me the checks.

Q. Are you sure it's checks? Please take a close look.

A. I was given the checks, as well as cash, as we can see.

MS. VOGEL: If you could please continue the video until 14:26:21.

(video played).

Q. So while on the video we see you getting cash from the bank teller, where was Djonibek at that time?

A. Djonibek was waiting outside, meaning he was waiting inside the bank.

MS. VOGEL: Can we please, on this timestamp, switch to camera 10. If we could play from here and pause at 14:26:21.

(video played).

Q. So who is walking out of the bank first?

A. I am.

Q. Who is walking behind you?

A. Djonibek.

Q. Did you see in the video that you put something in your pocket?

A. I can see it.

Q. What did you put in your pocket?
A. The check and the money. The checks and the money.
Q. What did you do with the checks and the money after this?
A. I later gave them to Djonibek. I gave them to Djonibek outside in his car.
Q. Why did you wait to give them to Djonibek outside of the bank?
A. Because Djonibek was the one who organized the whole thing and he told me, since this is your account, before we go outside, you're the one who should handle the money, you're the one who should put it in your pocket.

MS. VOGEL: Your Honor, I'm not sure if you were planning on taking a midafternoon break.

THE COURT: I was at some point. That's why I was asking before.

MS. VOGEL: I'm about to enter sort of another longer section of questions. If you want me to continue, I can continue.

THE COURT: Can we continue for about 15 minutes or 20 minutes, does that work for you?

MS. VOGEL: Yes. Thank you.

THE COURT: Let's do that.

MS. VOGEL: We can take down this exhibit.

BY MS. VOGEL:
Q. Did you ever have trouble withdrawing money from the

business bank accounts with Djonibek?
A. Of course we did.
Q. What was the first time you had trouble with withdrawing money?
A. The first time it happened at Wells Fargo bank.
Q. Very briefly, what happened at Wells Fargo bank?
A. When money arrived into this account, I was working at New Jersey at the time and Djonibek contacted me and told me, the money has come to an account, you should come quickly.
Q. What happened next?
A. After I arrived home, he said let us go to a bank in Manhattan. So we went to one of the banks, one of the Wells Fargo banks in Manhattan.
Q. What happened at the bank?
A. That bank told us they couldn't give us the money and that we needed to go to a different branch. Then Djonibek said let's leave this place because we would go to a different bank, to a bigger bank because we cannot -- because they would not give us the money here.
Q. Did you go to a second bank branch?
A. Yes, we did go and Djonibek told them that we were doing a trucking business and that supposedly we hauled a load of -- roll of electric cables for some company.
Q. Was Djonibek lying to the bank when he said those things?
A. Of course.

Q. What happened next at the bank?
A. Well, they told us to wait, then they took us to a room. Then a bank employee came in and told us he would not give us any money because this is some other kind of money.
Q. What do you mean, some other kind of money?
A. That the money -- meaning that the money belongs to some other person, that this is not Djonibek's money.
Q. What happened after the person at the bank told you and Djonibek this?
A. Well, then Djonibek said that a mistake, a misunderstanding had happened here. He said he would get to the bottom of this and return. Then he told me that we should go.
Q. You mentioned that the first Wells Fargo branch was in Manhattan. Where was the second branch that you visited?
A. It was often Manhattan. The first one was in the upper part, the second one was in the lower part, I believe.
Q. Were you and Djonibek able to withdraw money from the Wells Fargo account?
A. No.
Q. About how much money was in the account?
A. It was roughly around 119,000. It was almost $120,000. It was 119 and some change.
Q. Did that money come from one transfer or multiple transfers into the account?
A. By one transfer.

Q. After you received the deposits in the business bank accounts, did you have an argument with Djonibek about the business bank accounts?
A. There was a quarrel, yes.
Q. In the context of that argument, did Djonibek tell you who he was working with to get these deposits into the business bank accounts?
A. After our quarrel, he told me everything, yes.

(Continued on next page)

BY MS. VOGEL:

Q. What did he tell you?

THE INTERPRETER: The interpreter would like the gentleman to repeat his answer. It was structured a little bit oddly, and the interpreter wants to make sure.

THE COURT: Will you repeat the answer, please?

THE INTERPRETER: If I may, the gentleman just repeat the very last part of his entire statement.

THE COURT: If you could repeat your whole last answer, please.

A. He said that is my personal business. There's a hacker in Russia that I'm working with, and no one has a right to hinder that business or get involved in it.

Q. Did Djonibek explain how this scheme with the hacker worked?

A. Yes, he did. He said that the following, I take the bank accounts of people like you and provide that information to the hacker and then he takes money from the account of rich people and then he put that money onto those -- to those accounts, then he calls me and tells me the money is there and then we get the money. So he told me that he would take the bank accounts of many people, provide them to the hacker, and get the money that way. That is what he told me.

Q. Did he say whether the money was taken legitimately or illegitimately?

A. Of course, it was illegal because they were taken someone's wealth, someone else's property, stealing it.
Q. Did Djonibek say anything about how important this hacker was to him?
A. He said this hacker is more important to me, he's closer to me than my mother and the father, I'm going to make a lot of moneys for this hacker, I'm going to become a rich man through him. He said that this is my business, and I'm never going to abandon it.
Q. What did Djonibek tell you about who the hacker was?
A. He told me that he lives in Russia, the republic, in the country we call Russia in the city of Moscow. And he said that several years prior to that, about four to five years prior, that hacker came to America, and he managed to steal money from a large number of -- from all the banks -- from a large number of banks.
Q. Did Djonibek tell you anything else about the hacker?
THE INTERPRETER: The interpreter would like you to repeat the question, please.
Q. Did Djonibek tell you anything else about the hacker?
A. No. This is it for now. He told me all the things that he was doing.
Q. What, if anything, did Djonibek say about whether he divided the money with the hacker?
A. Well, he said that generally they split the money in

between themselves and -- quite often they will split it in between themselves, and sometimes he would give him a larger portion. For example, sometimes they would get $100,000, and he would give him 60,000 and keep 40,000 for himself.

Q. Did Djonibek say anything about how he got the money back to the hacker?

A. He did.

Q. What did he say about that?

A. He said that he would take the hacker's money to Brooklyn and give it to some individual, and that is how he would get the money to him.

Q. Did Djonibek say what form he was delivering the money to the person in Brooklyn?

THE INTERPRETER: The interpreter would like you to repeat the question. I apologize.

Q. Did Djonibek specify in what form he was delivering the money to the person in Brooklyn?

A. Well, he was -- he was taking cash to him. He told me that he was taking cash to that person.

Q. You testified earlier that Djonibek had a company called Jasur Transport. Do you recall that?

A. Yes, I remember.

Q. So around this time, once Djonibek has told you about the hacker, did Djonibek say anything to you about other companies he controlled?

A. Well, yes. He told me that he was doing a lot of different -- a lot of different kinds of business, not just this one.
Q. What, if anything, did he say about companies that he had?
A. Yes. He told me that he was using the account or the money of the deceased individuals through that hacker. He said that he would take people's debt -- people's credit -- people's debts using the dead people accounts, and he would charge a percentage for that, and he also said that he was doing some sort of a cell phone thing where he would ship cell phones to Russia.
Q. Do you recall that you testified earlier that you had opened a business bank account in your wife's name?
A. I remember. I remember.
Q. Did you ever learn whether Djonibek had similarly opened bank accounts in any of his family member's names?
A. He told me that he first opened the bank accounts in his family member's names and then proceeded to use other people.
Q. Did he explain why he used other people?
A. He told me that he would open the accounts in other people's names through lies, and that he would make -- earn profit for that.
Q. After Djonibek told you about the hacker, did you accept any more wire transfers on his behalf?
THE INTERPRETER: This is the interpreter. Did you

say expect or did you say did you accept?
Q. Did you accept?
A. No.

THE COURT: So at this point, tell me when it's a good time to go.

MS. VOGEL: It is a good time to stop.

THE COURT: I'm sorry. I didn't hear the last thing that was said.

A. When you just asked me did I receive money transfers, what did you mean?
Q. Let me be more specific with my question.

After Djonibek told you about the hacker, did you accept any more wire transfers into business bank accounts on Djonibek's behalf?
A. No.

MS. VOGEL: We could break here.

THE COURT: Why don't we take our afternoon break? Just remember, keep an open mind. Don't discuss the case.

(Jury not present)

THE COURT: You can step down. Thank you. Just come back in 10 minutes.

Just two quick things I wanted to note for the record, and then we'll take a break.

Number one: One of the jurors told my deputy -- you can step out. Thank you -- that yesterday after court was adjourned, he and the defendant were together in the public restroom, but no one said anything to anyone else. So I just want to disclose that.

I think we'll make sure that the jurors don't use this restroom, but only use the ones near the jury room going forward, but I just wanted to disclose that.

In addition, one of the jurors told Ms. Cavale that another juror appeared to take a picture of that juror. I don't know if that was accidental, but I wanted to let you know it. I'm happy to follow through or just have Ms. Cavale follow through and make sure that juror feels comfortable. But I just wanted to disclose whatever I heard back.

So if there's anything you want me to do in particular, I'm happy to hear you out. It may have been an accident. I just want to make sure there's no conflict among the jurors. That's all.

MR. MURRAY: Thank you for raising that, Judge, for informing us. I don't see any reason to take any action at

all. Do the people -- the government --

MR. REHN: We agree.

THE COURT: I think that's right. Okay. All right. So I'll see you in 10 minutes. Thank you.

(Recess)

THE COURT: Everyone can be seated. Are you all ready for the jury?

MS. VOGEL: Yes.

THE COURT: Folks, I was just saying with Ms. Cavale, with respect to the juror I mentioned who thinks that another juror may have taken a picture of him, that she should say, number one, that none of the jurors are allowed to use the restroom on this floor, which I noted for the other reason, but number two, that you're not allowed to take any pictures in the courthouse at all, which is true, consistent with court policy anyway, including in the jury room or in hallways or anywhere. And we'll just leave it at that for now, is everyone comfortable with that?

MR. RAYMOND: Yes, your Honor. Thank you.

THE COURT: You can be seated if you'd like, whatever is more comfortable.

Also while we're waiting for the jury, I took a quick look at the issue with respect to what cross-examination is allowed regarding the circumstances that led to the immunity order. And I will say that there's language in a Second

Circuit case, for example, the *Lizza* case, that says a prosecutor who uses the fact that a witness has invoked his Fifth Amendment privilege against self-incrimination to discredit that witness or prejudice the defendant against trial error.

But in those cases, I think in that case, or at least in other cases, the concern was really about the government bolstering its case, and so I don't know that that -- there's that same concern if it's the defendant who wants to elicit that fact.

So you don't need to do it right now if you're not prepared, but I want to hear the government on sort of its rationale on why it would be inappropriate for defendant, if he wants to, to elicit that fact in cross-examination of the witness. Does that make sense?

MR. REHN: Your Honor, we looked into it over lunch as well, and we would withdraw that objection. We have discussed this with defense counsel.

THE COURT: You have. We're on the same page that we think it's proper?

MR. REHN: If defense counsel would like to invoke the Fifth Amendment, we do not object to that.

THE COURT: Okay.

MR. MURRAY: To introduce the order is -- I have no problem with that.

THE COURT: I think then we're all on the same page. That was my view as well. But I just wanted to make sure I heard you all beforehand. All right.

(Jury present)

THE COURT: Everyone may be seated. Thanks.

You may proceed.

MS. VOGEL: Will you please pull up, Ms. Pierre, for the witness what's marked for identification Government Exhibit 2701A?

BY MS. VOGEL:

Q. Do you recognize this, Mr. Karimov?

A. Yes, I recognize.

Q. You testified earlier that you provided screenshots from your phone to the FBI; do you recall that?

A. Yes, one of them.

Q. Was this one of those screenshots?

A. Yes, one of them.

Q. Is it an accurate copy of the screenshot?

A. Yes, yes, accurate.

MS. VOGEL: Your Honor, the government offers Government Exhibit 2701A.

THE COURT: Any objection?

MR. MURRAY: No objection.

THE COURT: Admitted.

(Government's Exhibit 2701A received in evidence)

MS. VOGEL: Ms. Pierre, if we could pull up before we turn to this, the government stipulation in evidence, Government Exhibit 3506?

So I'd like to read one of the paragraphs.

If called as a witness, a Russian interpreter would testify that Government Exhibit 2701AT contains true and accurate English translations of the messages in Government Exhibit 2701A, which are written in Russian.

So the government offers Government Exhibit 2701AT.

THE COURT: Any objection?

MR. MURRAY: No objection.

THE COURT: Admitted.

(Government's Exhibit 2701AT received in evidence)

MS. VOGEL: If we can pull up Government Exhibit 2701A and 2701AT side by side?

Q. So, Mr. Karimov, focusing on the left-hand side of your screen, which is 2701A, what language are these messages written in?

A. So the top is in Russian and the alphabet is Cyrillic, and then the ones at the bottom are -- used English alphabet but it's Russian language.

Q. Did someone send this screenshot to you?

A. Djonibek sent me.

Q. Did Djonibek talk to you about this screenshot more than once?

A. Yes, more than one time.

Q. So the first time when Djonibek sent the screenshot to you, what did Djonibek tell you about the screenshot?

A. He said it's about my private -- my own business, and this is message -- these are the words of my partner -- my business partner in Moscow.

Q. What did Djonibek say about who was exchanging these messages?

A. As I told you before, that he sends money out to other countries. He said this is the person -- his partner in Moscow.

Q. So who did you understand Komal businessman to be?

A. My understanding in the times he sent money, this is the businessman he work with.

Q. Let me try and ask it this way: Who are these messages between, to and from?

A. These are the messages between Djonibek and his partner in Moscow.

Q. And is that just based on what Djonibek told you?

A. Yes, and it has its own reason.

Q. Let me now focus you to later, once Djonibek told you about the hacker. What did Djonibek tell you about the screenshot?

A. After we had that disagreement, after we had the quarrel, he told me that these messages were from hacker in Moscow.

Q. Who did -- at that time, who did you understand Komal businessman to be?

A. Like it says here, it was Komal businessman, like it says here.

Q. Focusing your attention on the time, once Djonibek told you about the hacker, who did you understand Komal businessman to be?

THE INTERPRETER: I'm sorry. Can you repeat that question?

Q. Focusing on the period after Djonibek told you about the hacker, who did you understand Komal businessman to be?

A. He told me himself that I lied to you, these are the words coming from my hacker.

Q. What, if anything, did Djonibek say about why he referred to the hacker as Komal businessman?

A. Because it was his personal secret, so no one knows that this is a hacker. He put his name under Komal businessman.

Q. I just want to read briefly into the record the English translation on the left-hand side:

Have you heard me?

On Thursday, many deposits are supposed to arrive over there.

Don't get on any of the accounts. Don't touch them at all.

On Thursday and Friday, there will be money.

Fucking yoo-hoo.

Can you hear me?

And then on the right side: Yes, bro. I've got it all. I got it all, whatever you say we are doing, bro.

MS. VOGEL: We can take down both of these exhibits.
Q. Mr. Karimov, did you ever tell -- sorry. Did Djonibek ever tell you what he did with his portion of the money from the hacking?
A. Yes. He told me that time.
Q. What did he tell about that?
A. In Uzbekistan in Samarkand, he said in Uzbekistan in Samarkand City, he bought a couple of cars, a house, and apartment.
Q. What, if anything, did he tell you about how much those things cost?
A. The house -- his house -- is $1,200 -- I'm sorry, $120,000 in the middle -- in the center of the city.
Q. Did you ever witness Djonibek spending money extravagantly?
A. Yes, I have seen.
Q. What did you see?
A. For example, if we would go to Brooklyn and eat four, five people, he would pay for everyone. He have some -- he have some performer which he would pay big money to them, and he would spread the money -- he would throw it in the air.
Q. When he threw the money in the air, what was going on when that happened?
A. He would behave like he's rich, and he would throw the money.
Q. Sorry --

A. And those performers -- and those performers, he would tip them 300, $400.

Q. Just to clarify, when you're describing when Djonibek would throw money in the air, is that at a particular kind of event?

A. Yes. It would be an event. It would be either wedding or the birthday party. He would have three, four parties a week. He had a lot of -- he had a lot of -- he would have a lot of friends among the party and choose -- and he would attend those events and throw money there too.

And also he organize a party for his son as well, what -- some kind of party over there. He also -- he called all the relatives, and he throw money over there too.

Q. So to your knowledge when you observed these kinds of things, what was Djonibek doing for work at the time?

A. So the time when he -- the time when he introduced himself, he said that he's transferring money to Moscow.

MS. VOGEL: Ms. Pierre, can we please play what's in evidence as Government Exhibit 3901?

(Video played)

(Continued on next page)

BY MS. VOGEL:

Q. Do you recognize the voice of the person speaking in that video?

A. Yes, I recognize.

Q. Whose voice is it?

A. It's, of course, Djonibek's words.

Q. What language was Djonibek speaking there?

A. Russian.

Q. Do you know who Kevin is?

A. After the quarrel, after I found out everything, like you saw on the screen, the commode, that one is Kevin.

Q. How do you know that?

A. He said so.

Q. Who's he?

A. Djonibek himself.

Q. Did you ever overhear Djonibek speaking with Kevin?

A. Yes, one time he spoke near me.

Q. Was that conversation between Djonibek and Kevin on the phone?

A. Yes, over the phone.

Q. What language were they speaking?

A. Russian, the Russian language.

Q. What could you hear?

A. They didn't speak much. They spoke about when money will come, when money will go. It was all about money.

MS. VOGEL: Ms. Pierre, can we please pull up what's in evidence as 3901-T, which is the translation of this video. If we could go to the substantive portion here.

I'm going to read into the record a portion of this. I'm going to skip the part in brackets.

Here it is, Kevin. Like I told you, here is 100. Here, you see it's in stacks. One, two, three, I'm putting them on the package. Four, five, six, seven, eight, nine. This is the one in the envelope, ten; one hundred. I, as I promised you, I would send you a video. I sent it. Take a look. Enjoy.

We can take this down. Thank you.

Q. Do you recall earlier, Mr. Karimov, that you testified you observed Djonibek deliver cash?

A. I remember.

Q. After Djonibek told you about the hacker, what did he tell you about why he was delivering cash?

A. He said that some of this money were not peoples money and this money was sent to hacker. So he said about the part, about the part that hacker would get, that he said that he's sending hacker's part to him.

Q. What, if anything, did Djonibek say about where in the world he was sending the money to the hacker?

A. Moscow, Moscow city.

Q. After Djonibek told you about the hacker, did you continue

to see him?
A. Yes, not too much, but kept seeing him.
Q. Why did you keep seeing Djonibek?
A. Because of the -- because in the beginning -- because in the beginning, he lied to me and $7,000 -- because of the $7,000 from the Chase.
Q. What is that $7,000 from Chase, what are you talking about?
A. It happened in the beginning. It happened before the business. I don't know how this money, his money came to my account. So he said that time that he needs help. He told me that he does not have any accounts, and he said about the job he's done for the bakery and he placed the money.
Q. How much money was it?
A. $7,000.
Q. How did he place that money in your account?
A. He asked me to give him my account information. He said about him not having account and that his credit is messed up. When I told him no, I don't want to give it to you, he said, we are relatives, can't you help and please give me that information.
Q. So did he deposit $7,000 into your account?
A. Correct.
Q. Was that a check?
A. I don't know if it was check. I gave him account information and that money came to that account.

Q. What did he tell you to do with that money?
A. He said it's my money. He said after the money comes, after the money goes to the account, to give it to him.
Q. Did you do that?
A. Yes.
Q. What happened to your bank account after you gave Djonibek the $7,000 from your account?
A. I got in debt in that account.
Q. Can you explain that.
A. I had a debt on that account and I asked Djonibek to pay for that.
Q. What did you believe caused that debt in the account?
A. Well, that reason for closing down that account would be Djonibek's money. It closed down because of that. It wasn't my money, so I didn't owe money. I would pay if I spent that money, but it wasn't my money.
Q. So, to clarify, did you withdraw $7,000 from your account?
A. Yes, went to bank with Djonibek. It was in the morning. Yes, went with him and withdrew $7,000 in cash and gave him all this money.
Q. Did the bank close your account at some point after that?
A. Correct.
Q. Did the bank claim that you owed $7,000?
A. Yes, they would call me three, four times a day because this was under my wife's name. First, I opened an account and

then my wife and under both our names.
Q. Who did you believe was responsible for this $7,000 debt to the bank?
A. Of course it's Djonibek's. How can I pay for something I didn't eat?
Q. So during this time period in about 2018 and 2019, were you part of a lending circle?
A. Yes, I was a member.
Q. Very briefly, what is a lending circle?
A. So lending circle is the thing that a lot of people attend, like ten or more people can attend. Usually, numbers are drawn and then people receive by the numbers or the first person or money can go to someone who is in need at this moment. So, according to the agreement.
Q. So let me ask some clarifying questions.
A. Okay.
Q. Do the members of the lending circle contribute money to the circle?
A. Yes, of course.
Q. How often?
A. It can be according to the agreement. It could be once a month, it could be once every two weeks, it could be different ways, depending, according to agreements, usually.
Q. Let's say once a month, for our purposes. How much does each person contribute each month?

A. $1,000.
Q. And each month, what happens to the money that everyone contributes to the circle?
A. Usually, one of the members is the bigger one, and that person usually collects the money and gives to whoever's turn it is, gives to that person.
Q. And what can that person -- so for the person whose turn it is, what can they do with the money when it's their turn?
A. Whatever need that person has to whatever he needs at that moment, he can buy a house or he can buy a car, whatever is needed at that moment.
Q. And the next month, is it someone else's turn?
A. Correct.
Q. So for this particular lending circle that you were part of, who else was part of it?
A. Me and Djonibek and other women.
Q. Did you take money from this lending circle when it was not your turn?
A. Yes, when it was Djonibek's turn, I took the money.
Q. How much money did you take?
A. So the lending circle we were doing, it was $11,000 in total and Djonibek would pay for two people. So I took $9,000 because it was Djonibek's turn, so he wouldn't pay for himself.
Q. Why did you take this money when it was not your turn?
A. Because Djonibek was owing to that bank. He owed, he owed,

that's why I kept money.
Q. So just to clarify, did you believe that Djonibek owed you in connection with the bank that we spoke about a moment ago?
A. Correct.
Q. Did you tell Djonibek whether you took this money from the lending circle?
A. Yes, I told him.
Q. Did you tell Djonibek why you took the money?
A. Yes, I told him. I told him that because he has -- he owes -- he has a debt of $7,000 from bank, that's why I kept this money.
Q. What did Djonibek say to you in response?
A. Djonibek told me to come by his house.
Q. And what did he say to you?
A. So when I came, we went to his car and he said, why did you keep this money, it's not my money. So he said why are you keeping this money, it's not your money, it's my money, and why you not giving it back to me. Then I said, it's because you owe bank and I'm taking this money to pay the bank. I told him I have to do that, I don't have any other choice because it's not possible to take money from you.
Q. How did the conversation end?
A. So he cursed me out. He said get from my car and he cursed me towards my personality. When we got out of the car, he held me by my shoulders and he hit me twice, then I hit him back.

So then he let me go and he said, I'm going make you ashamed in U.S. I will tell everyone in the community what kind of person you are.

Q. And what did you say in response?

A. I said you are thief. I will go and report you to police. He went back to his place and he said, I'm going to make you leave USA.

Q. When did this argument take place?

A. May 2019.

Q. Did you continue to spend time with Djonibek after May 2019?

A. No. He called several times and he would demand the money. He cursed me, he cursed my parents. He told me that he would destroy me and he would stop me personally.

Q. Did there come a time when the FBI approached you about Djonibek?

A. Yes, they did contact me.

Q. Did you later meet with me, other prosecutors, and the FBI agents?

A. Yes.

Q. How many times did we meet?

A. First, the Ohio guy came to my house. Then I met with the FBI in Philadelphia. Then I met with you and your colleagues.

MS. VOGEL: Ms. Pierre, can we show the witness what's marked as Government Exhibit 1404.

Q. Do you recognize this?
A. I do recognize it.
Q. Did you enter into an agreement with the government before your testimony today?
A. Yes, that is correct.
Q. What is this document?
A. Well, this document states this document obliges me to tell the truth, not to tell any lies, and it specifics that if I was to provide false information, criminal charges would be brought up against me.
Q. Is that your agreement with the government?
A. This is the one, yes.
MS. VOGEL: The government offers Government Exhibit 1404.
THE COURT: Any objection?
MR. MURRAY: No objection, your Honor.
THE COURT: Admitted.
(Government's Exhibit 1404 received in evidence)
MS. VOGEL: If we could go to the last page.
BY MS. VOGEL:
Q. Did you sign this agreement?
A. Yes, that is correct.
MS. VOGEL: Go back to the first page, please.
Q. What does this agreement require you to do?
A. Well, as I mentioned in the beginning, provides if I tell

the truth, nothing is going to happen to me.
Q. Does the agreement require you to testify?
A. Yes.
Q. If you lie, what can happen?
A. Well, it says that a criminal case could be started against me.
Q. Is this agreement affected by whether Djonibek gets convicted at trial?
A. No.

MS. VOGEL: Just one moment, please.

No further questions.

THE COURT: Cross examination.

MR. MURRAY: Your Honor, would it be better to start in the morning or should I start now?

THE COURT: Jurors, if there is anyone who feels like they are ready to go home now, raise your hand. If not, I would just ask you to start now so that we move forward. Looks like no one is raising their hands. So why don't we move forward and use the half hour that we have.

MR. MURRAY: Yes, your Honor.

CROSS-EXAMINATION

BY MR. MURRAY:
Q. Good afternoon, Mr. Karimov.
A. Hello.

MR. MURRAY: Can I please have Government Exhibit 2712

up.
Q. Mr. Karimov, you were shown this picture on your direct testimony. Do you recall that?
A. I remember, yes.
Q. You identified, if you're looking at the picture, the two people to the left, you identified the two people as Djonibek and you; correct?
A. Yes, that is correct.
Q. And I don't think you gave the names of the two individuals to the right. Can I ask you, isn't it a fact that the gentleman in the reddish shirt, has name is Fios (ph.)?
A. That is correct.
Q. And the gentleman that has his arm around Fios, what's his name?
A. Zarif (ph.).
Q. I just want to ask you, when you first came to the United States, did you know anyone here before you came?
A. Yes, I did. Yes.
Q. And was that Odil Sharipov?
A. What Odil Sharipov?
Q. Is that who you knew here in the United States, Odil Sharipov?
A. But there is no Odil Sharipov here.
Q. I'm sorry. I'm not talking about the picture anymore. I'm sorry.

I'm just asking you, when you came to the United States, you knew some people here, correct, before you came?
A. Correct, yes.
Q. Who else, besides Odil, did you know living here in the United States when you arrived?
MS. VOGEL: Objection.
THE COURT: What's the basis of the objection?
MS. VOGEL: Your Honor, it's assuming information not in evidence.
THE COURT: Overruled. I mean, I think the question is a little bit vague, but let's see what he says. If he needs clarification, I can give it.
MR. MURRAY: Thank you, your Honor.
A. I have three or four relatives here, yes.
Q. But not a lot, just a handful of people that you knew?
A. Yes, correct.
Q. Did you know my client, Djonibek Rahmankulov, from Uzbekistan or did you meet him here?
A. In Uzbekistan, I knew that I have relatives, but when I came here, that is when I met him.
Q. So you knew of him, but you never met him until you arrived; correct?
A. Well, I knew that he came here to America.
Q. Did you seek him out when you arrived here in the United States?

A. I did not seek him out on purpose. When I was at the restaurant in Brooklyn with some friends and relatives, this person came over with the relatives.

Q. Can you just explain for the jury, because I think you said there is some kind of family relation. How are your families related?

A. Djonibek's grandfather is my mother's maternal uncle.

Q. And the reason why I'm asking is when you referred to your family here, do you consider Djonibek your family?

A. Well, he's a distant relative. So you know when let's say there is a birthday, relatives would invite me, they would invite him, also. He is a distant relative, not a close one.

Q. So when you say you're in a restaurant with family in Brooklyn, that family wouldn't include Djonibek, would it?

THE INTERPRETER: The interpreter is going to ask the gentleman to repeat his answer. It was a bit jumbled up and I can't make sense of it.

A. Only Djonibek is related to me. His wife is not related. His wife does not have any family relation to us.

Q. Is it a fact that your wife is the sister of Djonibek's wife?

A. No. How could it be?

Q. I'm sorry?

A. How could it be?

Q. It's just a question. Thank you for answering.

A. I just meant where are you headed with that?
Q. Well, I have to ask the questions.
A. All right.
Q. Okay. Let's move on.
When you arrived here, did you come with your wife and kids or just by yourself?
A. I came by myself.
Q. Did you have a place to stay or did you meet up with your family to stay with family?
A. Do you mean America? Do you mean America?
Q. I'm sorry. When you came to the United States, did you live with family or where did you live?
A. No, what could I say. I got married in Uzbekistan and I came here.
THE INTERPRETER: If I may?
THE COURT: Yes.
THE INTERPRETER: The interpreter wants to make a comment. When you use the word family, in the Uzbek language the word family might refer to a rather small group of people around you and might not include distant relatives.
MR. MURRAY: I understand.
THE INTERPRETER: Usually, it means the wife and the children.
THE COURT: Thank you for that clarification.
If you want to follow up, you're free to do so.

MR. MURRAY: I'll move on, Judge. That clarifies it.
BY MR. MURRAY:
Q. So when you arrived here, did you meet up with Odil Sharipov?
A. Yes, I did.
Q. And was it Odil Sharipov that introduced you to Djonibek Rahmankulov?
A. Well, yes. When I was at that restaurant in Brooklyn, that's where Odil Sharipov told me that man is your relative.
Q. I understand. It was at that night at the restaurant in Brooklyn where he identified my client as your relative. Is that what you're saying?
A. Yes.
Q. Great. Did he then introduce you to him physically so you could meet?
A. Well, we would go to the restaurant in Brooklyn to eat, meaning me, myself, Odil Sharipov and his friends, he would have some friends. So he took me there, as well.
Q. When you say he, are you referring to Djonibek?
A. Well, Djonibek would organize the thing. He would say let's all gather in Brooklyn to eat, to have a feast.
Q. Now, you're newly arrived here. Was it Djonibek and Odil that helped you adjust to life here in the United States?
A. That is correct, yes.
Q. Now, is it also a fact that Odil and Djonibek pulled their

money together to buy you a car?
A. That's a lie.
Q. A white Hyundai Elantra, you didn't drive a white Hyundai Elantra?
A. No, Odil and Djonibek did not purchase that car with their money. They just went there with me when I purchase it in order to translate for me because I did not speak the language.
Q. How did you arrive at the funds to purchase this car on your own?
A. Well, I asked that other Sharipov person, meaning I told him, could you lend me some money. The story was, when it comes to debts, the story was a little you different. I can tell it to you if you like me to.
Q. I know there is a translation issue. They gave you money -- lent you money, I should say, so you could buy a car so you had a car; correct?
A. First of all, no. First of all, they did not lend me any money to buy the Hyundai Elantra. Although, Sharipov did purchase a vehicle for me from an auction. He did purchase me a Hyundai Sonata for $4,000 from an auction. I personally asked him to help me with that. So after I purchased it, it turned out that some of the parts for that vehicle were no good. Then we went to a Hyundai service center together with Djonibek and Odil Sharipov.
THE INTERPRETER: If I may, the interpreter would like

the gentleman to repeat the answer. It was a bit jumbled up again.

A. So, in short, they gave my Hyundai Sonata as a down payment to give me a new car.

Q. I'm a little confused by that. Can you explain what you mean, they gave you the Hyundai Sonata to put down as a down payment on a new car? I'm confused. Can you explain that?

A. The vehicles were purchased at an auction, some of its parts were faulty. It turned out to be bad. Then, these men said let us go to a dealership and use this vehicle as a down payment to get you a new car or another car.

Q. I understand. So did you then do that, go to a dealership and use that as a trade-in to get a better car?

A. Yes, they did it. Of course it happened -- yes, we did it. Of course it happened with their help, of help of Djonibek and Sharipov.

Q. So they both helped you to upgrade the car to get a nicer car?

A. Correct.

Q. And that consisted of them giving you more money to upgrade the car; correct?

A. How could they give me more money? What do you mean? All Sharipov will do is give me more money. There was no more money involved.

Q. Just so we can move forward, is it a fact that both

Djonibek and Odil contributed money to help you with your car?
A. No, Djonibek did not spend any money. Why are you adding Djonibek to this?
MR. MURRAY: Can we just put back up Government Exhibit 2712.
Q. Mr. Karimov, you seem to be very hostile towards Djonibek. Weren't you happy to meet new people in the United States at that time?
A. Why would I be happy?
Q. When you take a look at the picture, does it seem like a happy occasion that you're together with Djonibek and Fios?
A. It is a joyful event, of course.
Q. And you testified on direct that Djonibek is a very generous guy, giving out money and paying extravagant dinners; right?
A. Well, that is a different issue altogether. As I said, he was throwing -- he was throwing around stolen money.
Q. Okay. But what I'm asking you is, wasn't Djonibek very generous with you to help you adjust to the United States?
A. It was like that in the beginning, yes.
Q. That's all I'm asking.
Isn't it a fact that Odil and Djonibek are longtime friends?
A. That, I don't know.
Q. Wasn't it Djonibek and Odil primarily who were helping you

at that early point when you came to the United States?
A. Correct.
Q. And did they help you get set up to drive Uber?
A. That guy, Odil, he did teach me how to do that job. As I said earlier, whenever I would get ticket for letters, I would go to them for help because I did not speak the language. So I would appeal to them for help.
Q. Also, financially, when you needed a couple dollars to help you out, you could go to both of them and they would help you; correct?
A. When you say them, who do you mean?
Q. I mean Odil and Djonibek.
A. I did not take any money from Djonibek. The only person I took money from was that Sharipov person and I paid him back.
Q. And where did you live when you first moved there?
A. Well, the first year -- do you mean when I came to America?
Q. Sorry?
A. Do you mean when I came to America?
Q. Yes, came to the United States.
A. I came to the house of the child of my wife's uncle. In short, my wife's cousin.
Q. And you discussed the gash tag during your direct examination. Do you remember participating in the gashtak?
A. I remember, yes.
Q. And do you recall Odil, Djonibek, another gentleman by the

name of Farrukh all participating in the gashtak?
A. No, that, I don't remember.
Q. Do you remember participating with Odil and Djonibek?
A. No, I did not partake in such lending service. I did not partake in those lending service.
Q. Didn't you say on your direct that you did participate with Djonibek and you took the money from him?
A. I did say that, but Odil was not a participant. The participants were myself, Djonibek, and the rest were women.
Q. Okay. But you participated in multiple gashtaks; correct?
A. No, I only participated in one gashtak lending circle with Djonibek.
Q. Sir, isn't it a fact that the very first gashtak that you participate in, Odil and Djonibek asked the group if they would allow you to take number one; is that true?
A. No, why do you keep adding Odil to the question of the lending circles. Odil was not participating. I keep telling you, only myself and Djonibek participated.

(Continued on next page)

BY MR. MURRAY:
Q. Isn't it a fact, though, that both Odil and Djonibek appeal to the group, telling them you newly arrived in the country and they asked if they would agree to let you collect first?
A. No. This is all a lie and slander, Odil was not participating -- I was participating in the gashtak along with Djonibek. You keep recycling the same question.
Q. Let me ask you this: Are you familiar that times people will do that in a gashtak and ask the group to allow somebody who needs help to pick first?
A. Such occasions do happen.
Q. And did such occasion happen to you?

THE INTERPRETER: The interpreter would like to clarify something to make sure he understands the question right.

THE COURT: Mr. Murray, it's after 5:00, so I'm going to want to stop shortly, but you tell me when.

MR. MURRAY: That's fine, Judge. I'm ready to pass out myself.

THE COURT: Let the interpreter -- if you could state what the witness just stated, and then we'll adjourn for the day.

THE INTERPRETER: The interpreter -- part of my understanding is it was a bit jumbled up grammatically. So it's interpreter's opinion it might be best to repeat the

question and I could interpret it again.

THE COURT: Do you want to do that now or in the morning?

MR. MURRAY: We'll do it in the morning, Judge.

THE COURT: Just remember, don't discuss the case, keep an open mind, and I'll see you tomorrow morning. I'll see you at 10:00. Please be here at 9:45.

(Jury not present)

THE COURT: You can step down. Thank you.

Are there any issues anyone needs to discuss?

MR. MURRAY: Judge, I'm just sorry. I wasn't looking at my watch. I thought you were just going to let me know.

THE COURT: It's fine. I did. It's now 5:00 after. But no worries.

Is there anything else --

MR. MURRAY: No.

THE COURT: -- you all need to discuss? All right. I'll see you in the morning. Thank you.

Oh, one issue with respect to the witness who's testifying subject to immunity order, do you want to do you want to let me know after a break? Do you want to let me know tomorrow? Let me know if I need to be down in court.

MS. VOGEL: I don't think we'll be doing it first thing in the morning.

THE COURT: Given the cross?

MS. VOGEL: We have some other short witnesses we'd like to call before we get to that witness, so perhaps the lunch break. We'll see.

THE COURT: Just keep me posted.

MR. MURRAY: Judge, with regards to my cross, he seems so hostile, I may just cut it short. I'm not going to get anywhere with him.

THE COURT: I'm going to leave that to you.

MR. MURRAY: Okay.

THE COURT: Have a nice evening.

(Adjourned to August 25, 2022, at 9:45 a.m.)

* * *

INDEX OF EXAMINATION

Examination of: Page

AMANDA RUTH HOLDAWAY

Direct By Mr. Raymond . . . . . . . . . . . . . 247

Cross By Mr. Murray . . . . . . . . . . . . . . 257

KRISTINA BITSADZE

Direct By Ms. Vogel . . . . . . . . . . . . . . 260

Cross By Mr. Murray . . . . . . . . . . . . . . 276

Redirect By Ms. Vogel . . . . . . . . . . . . . 281

SUZANNE MILLER

Direct By Mr. Raymond . . . . . . . . . . . . . 283

SADULLO KARIMOV

Direct By Ms. Vogel . . . . . . . . . . . . . . 295

Cross By Mr. Murray . . . . . . . . . . . . . . 363

GOVERNMENT EXHIBITS

Exhibit No. Received

901 . . . . . . . . . . . . . . . . . . . . 252

906 . . . . . . . . . . . . . . . . . . . . 255

604-06-R . . . . . . . . . . . . . . . . . . 265

1227 . . . . . . . . . . . . . . . . . . . 299

2705 . . . . . . . . . . . . . . . . . . . 301

2708 . . . . . . . . . . . . . . . . . . . 302

2714 . . . . . . . . . . . . . . . . . . . . 329

2701A . . . . . . . . . . . . . . . . . . . 348

2701AT . . . . . . . . . . . . . . . . . . 349

1404 . . . . . . . . . . . . . . . . . . . . 362